UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FIREMAN'S FUND INSURANCE ) | |
| COMPANY a/s/o DAVID RYAN, ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 1:05-CV-10786(NMG) |
| v. ) | |
| ) | |
| WHIRLPOOL CORPORATION, ) | |
| Defendant. ) | |

## WHIRLPOOL CORPORATION'S MOTION
## TO STRIKE PLAINTIFF'S EXPERT WITNESSES

### INTRODUCTION

Pursuant to Fed. R. Civ. P. 37(c)(1) and L.R. 7.1, Defendant Whirlpool Corporation ("Whirlpool"), by and through its undersigned attorneys, submits this Memorandum in Support of its Motion to Strike or Exclude Plaintiff's experts Steven Pietropaolo, M.S. and Thomas Haynes, CFI and their respective reports.

Plaintiff has not complied with Rule 26's expert disclosure requirements regarding Messrs. Pietropaolo and Haynes. As such, the Court should exclude their testimony, as well as their reports, in order to address Plaintiff's failure to adhere to Rule 26 and the Court's Scheduling Order, entered July 14, 2005. Fed. R. Civ. P. 37(c)(1).

### BACKGROUND

The operative Scheduling Order, entered July 14, 2005, established the following discovery deadline:

> All trial experts by plaintiff are to be designated and disclosure of
> information contemplated by FRCP, Rule 26(a)(2) by <u>1/13/06</u>

(Scheduling Order, filed July 14, 2005, ¶ 3) (attached as Ex. A). On February 2, 2006, almost three weeks beyond the due date for Plaintiff's expert disclosures, Plaintiff's counsel mailed to

counsel for Whirlpool its expert designations and accompanying reports. Both documents were entitled "Plaintiff Fireman's Fund Rule 26(a)(2)(B) Disclosure of Expert Witness" wherein one document identified Steven Pietropaolo, M.S. as an expert and the other document identified Thomas Haynes, CFI as an expert. (Pl. Rule 26(a)(2)(B) Expert Disclosures, Ex. B & C)

The expert disclosures of Messrs. Pietropaolo and Haynes, as well as their accompanying reports, are the subject of this motion. Neither complies with Fed. R. Civ. P. 26's expert disclosure requirements. Under Fed. R. Civ. P. 37(c)(1), these experts and their reports should be struck and/or Plaintiff should not be permitted to use their testimony or reports as evidence at trial or otherwise.

## LEGAL ARGUMENT

Plaintiff's failed to comply with the Scheduling Order and Rule 26. Plaintiff has yet to offer any justification, let alone "substantial justification", to escape the mandatory language of language of Fed. R. Civ. P. 37(c)(1). As such, Mr. Pietropaolo's and Mr. Haynes' testimony and their reports should be struck and/or Plaintiff should not be permitted to use either one at trial or otherwise. Preclusion is the appropriate remedy.

### A. Expert Disclosure Requirements of Rule 26(a)(2) of the Federal Rules of Civil Procedure.

Rule 26(a)(2) requires each party to disclose to other parties, without awaiting a discovery request the following information:

> 1) the identity of any person who may be sued at trial to present evidence under Rules 702, 703 or 705 of the Federal Rules of Evidence; and

> 2) with respect to a witness who is retained or specially employed to provide expert testimony in the case . . . [the disclosure shall be] accompanied by a written report prepared and signed by the witness.

Fed. R. Civ. P. 26(a)(2)(A), (B). Among other requirements, an expert's written report

> shall contain a complete statement of all opinions to be expressed
> and the basis and reasons therefore; the data or other information
> considered by the witness in forming the opinions; [and] any
> exhibits to be used as a summary of or support for the opinions.

Fed. R. Civ. P. 26(a)(2)(B). Under Rule 26(a)(2)(C), "[t]hese disclosures shall be made at the

time and in the sequence directed by the court." "These directives are mandatory and self-

executing." Lohnnes v. Level 3 Communications, Inc., 272 F.3d 49, 59 (1st Cir. 2001)

(excluding a belatedly offered expert affidavit on a motion for summary judgment). "A party

does not waive its entitlement to Rule 26(a)(2)(B) disclosures merely by filing interrogatories or

deposing an expert." Sullivan v. Glock, Inc., 175 F.R.D. 497, 502 n.8 (D.Md. 1997) (internal

citations omitted) (attached as Ex. D).

As previously noted, the Scheduling Order required Plaintiff to make its expert

disclosures by January 13, 2006. Plaintiff did not make these disclosures for either Mr.

Pietropaolo or Mr. Haynes as required. Plaintiff has not offered any justification as to why it

failed to make these disclosures.

### B.  Federal Rule of Civil Procedure 37(c)(1) Mandates Exclusion for a Party's Failure to Make the Required Expert Disclosures.

The 1993 Amendments to the Federal Rules added Rule 37(c)(1) which provides:

> (1) A party that without substantial justification fails to disclose
> information required by Rule 26(a) or 26(e)(1) or to amend a prior
> response to discovery as required by Rule 26(e)(2), is not, unless
> such failure is harmless, permitted to use evidence at trial, at a
> hearing, or on a motion any witness or information not so
> disclosed. In addition to or in lieu of this sanction, the court, on
> motion and after affording an opportunity to be heard, may impose
> other appropriate sanctions. In addition to requiring payment of
> reasonable expenses, including attorney's fees, caused by the
> failure, these sanctions may include any of the actions authorized
> under Rule 37(b)(2)(A), (B), and (C) and may include informing
> the jury of the failure to make the disclosure.

Fed. R. Civ. P. 37(c)(1). This rule is mandatory: a party that fails to make the required disclosures "shall not, unless such failure is harmless, be permitted to use [undisclosed] evidence." Id.; see Klonoski v. Mahlab, 156 F.3d 255, 269 (1st Cir. 1998). As the First Circuit noted in Klonoski, "the rule somewhat tempers this mandate by permitting courts to excuse failures to disclose to some degree (i.e., to impose other sanctions 'in lieu of this sanction')." Id. But Rule 37(c)(1) "clearly contemplates stricter adherence to discovery requirements, and harsher sanctions for breaches of this rule, and the required sanction in the ordinary case is a mandatory preclusion." Id. (emphasis added). Courts across the country acknowledge that "expert disclosure requirements are not merely aspirational, and courts must deal decisively with a party's failure to adhere to them." Lohnnes, 272 F.3d at 60. More particularly, courts have consistently recognized the need to abide by deadlines and exclude evidence that was untimely disclosed. See Baker v. Indian Prairie Community Unit, School District No. 204, 1999 WL 988799, *1-3 (N.D. Ill. 1999) (attached as Ex. E).

### C. There are only Two Exceptions to Mandatory Exclusion.

In Lohnnes, the First Circuit noted only two exceptions to the general rule excluding evidence that a party seeks to rely upon but has failed to disclose:

> 1) when the failure to disclose is "substantially justified" or
> 2) when the nondisclosure is "harmless."

272 F.3d at 60.

Plaintiff's failure to disclose these two experts is not substantially justified. The two untimely disclosed experts were never identified in Plaintiff's Responses to Defendant Whirlpool Corporation's First Set of Interrogatories. In fact, Plaintiff acknowledged that such disclosures would be made in accordance with the Court's scheduling order.

**Interrogatory 18:**

State the name, business address, and business telephone number
of all persons whom you expect to call as an expert witness at trial,
stating the subject matter on which the expert is expected to testify,
the substance of his/her facts and opinions, and the grounds for
each such opinion.

**ANSWER:**

The Plaintiff will designate its experts in accordance with the
Court's scheduling order.

(Pl. Responses to Def. Whirlpool Interrog. No. 18, attached as Ex. F).  Despite its pledge to the
contrary, Plaintiff failed to identify these experts in compliance with this Court's Scheduling
Order that required expert disclosures and reports by January 13, 2006.

Plaintiff's counsel had all necessary information well before the close of expert
disclosure deadline to have disclosed expert witnesses in a timely fashion.  Plaintiff chose to
disclose these experts almost three weeks after the Court's deadline.  Plaintiff's failure to
disclose these two experts should not work to the detriment of Whirlpool.  Since Plaintiff has
offered no reason for the delay in identifying these experts, let alone "substantial justification,"
these experts and their accompanying reports should be excluded from all hearings, motions and
trial.  See Fed. R. Civ. P. 37(c)(1).

Plaintiff's untimely disclosures are not harmless.  In reliance upon Plaintiff's response to
interrogatory # 18, Whirlpool justifiably believed that Plaintiff would designate experts, if any,
by the expert disclosure deadline.  Based on Plaintiff's pledge to designate experts in accordance
with the scheduling order and Plaintiff's failure to designate any such experts by January 13,
2006, Whirlpool was surprised when it received Plaintiff's expert designations almost three
weeks after the deadline.

Plaintiff violated the Court's scheduling order. The factors involving docket control planning are sufficiently important alone to justify the exclusion of an untimely disclosed expert witness <u>even in absence of prejudice to the opposing party</u>. See <u>Akeva v. Mizuno Corp.</u>, 212 F.R.D. 306, 311 (M.D.N.C. 2002) (attached as Ex. G) (applying Rules 26 and 37 to expert disclosures).

Here, just as in <u>Akeva</u>, "[a]t this state, the question is not whether the defendants have been prejudiced, but whether the plaintiff has shown good cause for its failure to timely disclose." <u>Id</u>. at 309. Since Plaintiff has not even attempted to show ***any cause*** for its failure to timely disclose these experts, exclusion of Messrs. Pietropaolo and Haynes, as well as their respective reports, is appropriate.

Other curative measures, short of exclusion, would be an inadequate remedy because of the policy concerns and incentives for parties to comply with discovery rules. <u>Klonoski</u>, 156 F.3d at 274. Less harsh sanctions "would create greater incentives" for attorneys to violate Rule 26. <u>Klonoski</u>, 156 F.3d at 273. "Such conduct should not be rewarded." <u>Licciardi v. TIC Ins. Group</u>, 140 F.3d 357, 367 (1st Cir. 1998). If less harsh sanctions – such as a continuance - were granted as a matter of course for violations of Rule 26, "the rule could always be disregarded with impunity." <u>Thibeault v. Square D. Co.</u>, 960 F.2d 239, 246 (1st Cir. 1992).

If this Court were to condone the procedure followed by Plaintiff in this case, then any party could flout Rule 26's expert disclosure requirements and disclose experts at a time convenient for the designating party rather than at the time ordered by the Court. Such behavior would circumvent the purpose underlying the designation of experts. Neither exception to the mandatory directive of Rule 37(c)(1) applies here. Exclusion of Messrs. Pietropaolo and Haynes, as well as their respective reports, is appropriate and warranted.

**<u>CONCLUSION</u>**

Based upon the forgoing reasoning, citation to authority and attached exhibits, Whirlpool

respectfully requests this Court for an Order that strikes or excludes Plaintiff's experts Steven

Pietropaolo and Thomas Haynes and their respective reports, or, in the alternative, an order that

prevents Plaintiff from using these experts and their respective reports at trial, at a hearing, or on

a motion in accordance with Fed. R. Civ. P. 37(c)(1).

Respectfully submitted
**WHIRLPOOL CORPORATION**
By its Attorneys,
CAMPBELL CAMPBELL EDWARDS & CONROY,
PROFESSIONAL CORPORATION,


/s/ Steven M. Key _____ _____
Richard L. Edwards (BBO# 151520)
Steven M. Key, (BBO# 638145)
One Constitution Plaza
Boston, MA 02129
(617) 241-3000
redwards@campbell-trial-lawyers.com
skey@campbell-trial-lawyers.com

AND

Robert W. Foster, Jr., Esq. (Admitted Pro Hac Vice)
Nelson Mullins Riley & Scarborough LLP
1320 Main Street, 17th Fl.
Columbia, South Carolina 29201
(803) 799-2000
robbie.foster@nelsonmullins.com

DATED: February 17, 2006

**CERTIFICATE OF SERVICE**

I, Steven M. Key, hereby certify that I have mailed a copy of the foregoing document to
plaintiff's counsel, Eric Loftus, Law Offices of Stuart G. Blackburn, Two Concorde, Way, P.O.
Box 608, Windsor Locks, CT 06096 on February 17, 2006.

/s/ Steven M. Key_____
Steven M. Key

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


Fireman's Fund Insurance Company,
            Plaintiff(s)

                                                    CIVIL ACTION
            V.                                      NO. 05-10786-NMG
Whirpool Corporation,
            Defendant(s)

### SCHEDULING ORDER

### GORTON, D.J.

This order is intended primarily to aid and assist counsel in scheduling and planning the preparation and presentation of cases, thereby insuring the effective, speedy and fair disposition of cases either by settlement or trial.

The above-entitled action having been filed on 4/13/2005, it is hereby ORDERED pursuant to Rule 16(b) of the Federal Rules of Civil Procedure and Local Rule 16.1(F), that:

(1)     automatic discovery by_____amendments and/or supplements to the pleadings may be filed by  11/7/05 subject to the provisions of the Federal Rules of Civil Procedure;

(2)     written discovery requests are to be filed by 12/31/05 and answers are to be filed by 2/28/06/

(3)     all fact depositions by_____, expert depositions are to be completed by 5/13/06

(4)     all trial experts by plaintiff are to be designated and disclosure of information contemplated by FRCP, Rule 26(a)(2) by 1/13/06  trial experts and designated and disclosure of information, defendant 3/13/06

(5)     all dispositive motions, including  motions for summary judgment, are to be filed by 6/13/06  and responses  6/28/06.

(6)     motions for summary judgment are to be filed   _ [after completion of the necessary discovery] and responses___

(7)     discovery is to be completed by 5/13/06 unless shortened or enlarged by Order of this Court.

.

(8)     referred to mediation___Joint status report re: ADR 2/15/06

(9)     a final pretrial conference will be held on   9/13/06 at 3:00 p.m. to
        be notified by court,  and must be attended by trial counsel.  Counsel
        shall be prepared to commence trial as of 10/2/06 at 9:00 a.m.


        All provisions and deadlines contained in this order having been established with the
participation of the parties to this case, any requests for modification must be presented to the judge
or magistrate judge, if referred for case management proceedings.  Any requests for extension will
be granted only for good cause shown supported by affidavits, other evidentiary materials, or
reference to pertenent portions of the record.  The request shall be made by motion and shall contain
the reasons for the request, a summary of the discovery which remains to be taken, and a date certain
when the requesting party will complete the additional discovery, join other parties, amend the
pleadings or file motions.  The Court may then enter a final scheduling order, if necessary.

        Counsel are encouraged to seek an early resolution of this matter.   Additional case
management conferences may be scheduled by the court or upon the request of counsel, if the Court
can be of assistance in resolving preliminary issues or in settlement.


                                        By the Court,


                                        /s/ Craig J. Nicewicz
                                        _____
                                        Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

---------------------------------------------------

FIREMAN'S FUND INSURANCE     :
COMPANY                       :
As Subrogee of                :
David Ryan                    :          CIVIL ACTION NO.
777 Marin Drive               :          1:05-CV-10786(NMG)
Novado, California 94998      :
                              :
          Plaintiff           :
                              :
      v.                      :
                              :
WHIRLPOOL CORPORATION        :
200 North M-63                :
Benton Harbor, MI  49022      :
                              :          FEBRUARY 2, 2006
          Defendant           :

---------------------------------------------------


### PLAINTIFF FIREMAN'S FUND'S RULE 26(a)(2)(B) DISCLOSURE OF EXPERT WITNESS

### NAME AND ADDRESS OF WITNESS

      Steven Pietropaolo, M.S.
      Levine Group, Inc.
      650 Halstead Avenue, Suite 201
      Mamaroneck, NY  10543

### SUBJECT MATTER ON WHICH THE EXPERT IS EXPECTED TO TESTIFY

Mr. Pietropaolo is expected to testify concerning his investigation and inspection of the evidence removed from the residence of David Ryan, located at 7 Sandpiper Way, Nantucket, Massachusetts including the refrigerator and Berko toe-kick heater, as well as his opinion regarding the cause of the November 25, 2003.

**THE SUBSTANCE OF THE FACTS AND OPINIONS TO WHICH THE EXPERT IS EXPECTED TO TESTIFY**

Mr. Pietropaolo is expected to testify that the cause of the November 25, 2003 fire was a malfunction in the KitchenAid model KTRS22KHW refrigerator/freezer located in the kitchen of the residence, that the most probable ignition source was a high resistance connection at a wiring assembly connection within the rear of the unit, and that the Berko heater was eliminated as a cause of the fire. Mr. Pietropaolo's report is attached hereto.

**SUMMARY OF THE GROUNDS FOR EXPERT'S OPINION**

Mr. Pietropaolo will testify based on his education and experience as a forensic engineering expert, and his inspections and examinations of the evidence removed from the residence of David Ryan, located at 7 Sandpiper Way, Nantucket, Massachusetts.

THE PLAINTIFF,

By: _____

Erik Loftus, Esq.
Law Offices of Stuart G. Blackburn
Two Concorde Way
P. O. Box 608
Windsor Locks, CT  06096
860-292-1116
Fed. Bar No.:  CT25168



**LGI LevineGroup Inc.**
FORENSIC ENGINEERS & CONSULTANTS

President & CEO
Steven Pietropaolo, M.S.

Engineers/Consultants
Jerome G. Levine, M.E.
John P. Flynn, P.E.
Herman Silverberg, P.E.
James J. Bernitt, P.E.

Field Technicians/
Field Investigators
Raymond D. Infante
Philip G. Frederick

November 2, 2004

Ms. Sharon Gold
Craig Insurance Services
225 Water Street
Jacksonville, Florida 32220

RE:     FFIC INSURED:          David Ryan
        L/L:                   7 Sandpiper Way
                               Nantucket, MA 02554
        FFIC CLAIM NO.:        00503119324
        OUR FILE NO.:          8377/8376/8031
        TYPE OF LOSS:          Fire
        DATE OF LOSS:          November 25, 2003

Dear Ms. Gold

We wish to thank you for the assignment with reference to the above captioned matter.

**INTRODUCTION**

We conducted a site inspection on the above referenced matter on December 11, 2003, administered detailed evidence examinations on May 13, 2004 and July 27, 2004, have tested and inspected exemplar evidence, have completed our investigation and submit this report for your review.

The purpose of our investigation was to opine as to the cause of fire at the aforementioned residence. Our opinion is based upon a detailed inspection of the premises and an examination of the removed evidence. The cause determination investigation was completed in a manner consistent with the scientific method, and meets the requirements for proper cause determinations as proffered by the National Fire Protection Associating Standard, NFPA 921 – Guide for Fire and Explosion Investigations.

The following material was reviewed in conjunction with this investigation:

1. Crawford Investigation Services initial fire report dated June 10, 2004
2. Nantucket Fire Department report dated December 12, 2004
3. Whirlpool/Kitchen Aid and Berko Electric Manufacturer's data sheets, wiring guides, etc. (copies attached).

RE: David Ryan                                                                          Page: 2
OUR FILE NO.: 8377                                                          November 2, 2004

    4.  X-rays of evidence (Note: copy of films previously sent to your attention, and copy of digital x-
       rays sent on CD with printed copies attached hereto).

**DISCUSSION**

A fire ensued at the aforementioned residence on November 25, 2003. The residence is a summer home
located on Nantucket Island. The insured was not home at the time of the fire. The fire condition was
discovered by the insured. The Nantucket Fire Department responded to the fire scene, however no fire
activity was noted. Heavy sooting and kitchen fire damage was found. It is believed that the fire was
suppressed by a failing water connection or lack of oxygen within the home.

Our site inspection was conducted on December 11, 2003 in the presence of several parties. The
Nantucket Fire Department hosted our inspection by allowing us an examination of removed evidence,
and ingress into the home. Other parties present during the site visit included engineers and fire
investigators representing the interests of the manufacturer of a toe heater and a refrigerator identified in
the area of origin.

The Nantucket Fire Department originally identified two possible ignition sources in the general area of
origin, a Berko electric toe space heater located under the kitchen cabinets, and the recently purchased
KitchenAid refrigerator/freezer. The toe heater was removed to their firehouse. The toe heater was
inspected and tested by the undersigned and other parties at the time of the site inspection. The
refrigerator was later removed by the contractor retained by the insured and presented to Crawford
Investigation Services. The Nantucket Fire Department also gave the heater to Crawford Investigation
Services. We later retained possession of the refrigerator and the heater for forensic testing. A chain of
custody sheet was administered and is kept in our file.

The refrigerator/freezer is identified as a KitchenAid (made by Whirlpool) model KTRS22KHW, serial
number EK0819041 purchased July 24, 2000. The heater was later identified as a Berko model TS-1-A-
T.

The Nantucket Fire Department investigation report and the Crawford Investigation Services report place
the area of origin of the fire at the KitchenAid kitchen refrigerator/freezer. The Nantucket Fire
Department report states:

    *Area of origin was believed to be in the area of the refrigerator. The probable point of origin is*
    *believed to be from the refrigerator, in the area of the motor & compressor.*

As will be later discussed in detail in this report, we concur with the Nantucket Fire Department
assessment. We will also identify the cause of the fire to be due to a malfunction within the refrigerator's
rear mechanical compartment.

A detailed protocol was agreed upon by all parties regarding the forensic testing to be done at LGI's
facility. The testing was finished over a two-day period. It included both non-destructive and destructive
testing. Copies of the sign-in sheets, the X-ray films and digital images have been provided under
separate cover.

As mentioned, the investigation was conducted in a scientific manner. Site examination coupled with
forensic laboratory testing was done in a systematic manner. Fire patterns were examined at the structure
and on the removed evidence. X-rays were taken of various portions of the removed evidence. Possible
failure modes were analyzed, possible ignition sources eliminated, and exemplar evidence was tested. In
addition, arc mapping was utilized to pinpoint the area of origin to within the refrigerator, and testing has

confirmed both the first and second fuels ignited. Known failure modes were analyzed and a competent ignition source identified.

Based upon our initial examination of the fire scene, our preliminary examination of the Berko heater at the Nantucket Fire Department, and our detailed forensic examination of the Berko heater, we have eliminated it as the ignition source. Burn patterns at the home and within the KitchenAid refrigerator/freezer confirm the area of origin to be at the refrigerator. Resistance and mega-ohm testing of the Berko heater's heating elements confirmed no failures. The fan motor was tested and it was operational. No other electrical activity was found within the heater. The heater was installed in the manner prescribed by the manufacturer. The minor smoke, heat and fire damage to the heater is indicative of fire attach.

Regarding the examination and testing of the refrigerator/freezer, specifically the rear mechanical compartment area of origin, the following was noted:

1. The compressor although badly burned tested satisfactorily from an electrical standpoint during both the resistance (continuity) test and the mega-ohm test. The compressor was not grounded or shorted.
2. The condenser fan motor showed extensive damage indicating it was within the area of origin of the fire. No electrical activity was found on the motor windings.
3. Evidence of beading and arcing was found on a multitude of conductors located within the rear mechanical compartment, specifically at the compressor starting circuit and on the remains of the wiring assembly.
4. The appliance line cord showed evidence of fire attach, and electrical activity in the form of arcing and beading.
5. Fire patterns emanating from the rear mechanical compartment shows a distinct fire pattern coming up from the area of the wiring assembly/compressor wiring connections.

## CONCLUSIONS

Based upon the foregoing, and within a reasonable degree of forensic engineering certainty, it is our opinion, that the following conclusions can be made:

1. The fire was caused by a malfunction of the newly purchased KithcheAid model KTRS22KHW refrigerator/freezer.
2. Arc mapping, fire pattern analysis, forensic testing, and scientific analysis have determined that the point of origin of the fire was within the unit's rear mechanical compartment.
3. The most probable competent ignition source was a high resistance (glowing) connection at a wiring assembly connection within the rear of the unit. Connections include the compressor starting circuit/overload and condenser fan motor connections (see appendix A).
4. Temperatures up to 2000 degrees F. have been reported at high resistance connections with nominal house voltage of 120 Volts. A high resistance connection causes localized heating at the area of the failure. This type of failure could take months or years to cause a fire. As the wire insulation fails, it begins to melt, causing a potential for arcing through the charred insulation that becomes a conductor (carbon arc tracking).
5. The unit was still supplied with electricity until the line cord arced due to fire attack, severing the electrical service to the unit. Prior to that occurring, a fire was occurring inside the mechanical compartment. Arcing on conductors within compartment well documented, and shown in attached photographs.
6. The first and second fuels ignited are most probable accumulated dust and plastic components of the refrigerator freezer respectively. Tests have shown that combustible dust accumulation in the

RE: David Ryan                                                          Page: 4
OUR FILE NO.: 8377                                              November 2, 2004

rear of the unit will have an autoignition temperature below temperatures expected at a high resistance/glowing connection. The plastic components of the refrigerator/freezer rear compartment such as the condenser fan air baffle, drain pan, etc., will readily support combustion once ignited.

7. Since there are no reports of modifications to the refrigerator/freezer, evidence of recent service on the unit, and because of the young age of the unit, we consider this failure a manufacturing defect.

8. The Berko heater has been eliminated as a fire cause as stated above.

We reserve the right to amend this report if further information becomes available.

If you have any questions regarding the above, please contact the undersigned.

Very truly yours,

LGI LEVINEGROUP, INC.

Steven Pietropaolo, M.S.
President & CEO
SP: bw
Encl.

P.S. When referring to this report either by query or paid invoice, please include our file/invoice number.

cc:
Alan DeLee
Craig Insurance Services
225 Water Street
Jacksonville, Florida 32220

Encl:
Photographs
Sign-in-Sheets
Evidence Log
Nantucket Fire Department Report
KitchenAid and Berko specs.
Original approved and revised protocols

**Photographic Log –Inspection of heater @ N.F.D. and loss location inspection series taken 12/11/03**

1. A view of the Berko heater removed from the scene. This is a view of the bottom.
2. Same as 1.
3. A view of the bottom and right side.
4. A view of the bottom with the front grill removed.
5. A view of the top and front of the heater.
6. A close-up of the top of the heater.
7. A view of the top and right side.
8. A view of the branch circuit requirements.
9. A view of the manufacturer's nameplate data.
10. A view of a date stamp.
11. Of view of spinning the blower impellers showing the blower motor is not seized.
12. A view of the top cover removed.
13. An overview of the unit with the top cover removed.
14. A view of the incoming wiring into the unit.
15. A view of the enclosed wiring compartment – note no signs of electrical activity, and wire nuts still intact.
16. Same as 15.
17. A view of the wiring diagram located in the unit – note still almost intact.
18. A view of the integral disconnect plug not damaged. Note insulation on wires not damaged.
19. A view of the unit with the deflector removed.
20. A close-up of the heating element terminals.
21. A view of the heating element disconnected vis-à-vis disconnect plug.
22. Same as 21.
23. A close-up of the heating element connections.
24. Same as 23.
25. Same as 23.
26. Same as 23.
27. Same as 23.
28. Same as 23.
29. A view of the thermal safety cut-out.
30. Same as 29.
31. Same as 29.
32. Same as 29.
33. A view of the strain relief at the incoming wiring.
34. A view of testing the heating element's resistance.
35. Same as 35.
36. Same as 35.
37. Same as 35.
38. Same as 35.
39. A view of the front of the home.
40. Same as 39.
41. A view of the left side of the home.
42. Same as 41.
43. A view of the right side of the home.
44. A view of the rear of the home.
45. Same as 44.
46. A view of the front of the home.
47. Same as 46.
48. A view of the location of the refrigerator and the rear mechanical compartment cover.

49. Same as 48.
50. A view of the cabinets above the refrigerator location.
51. A view of the cabinets to the right of the rifeigerator location.
52. Overview of the counter top area.
53. A view of the location of the toe heater.
54. A view of the plug for the refrigerator.
55. A close-up of the toe kick heater area.
56. Same as 55.
57. A view of the floor burn patterns.
58. Same as 57.
59. A close-up of the refrigerator/freezer rear mechanical compartment cover.
60. A view of the left of the rear mechanical compartment, looking from the rear of the unit. This is the location of the condenser fan.
61. An overview of the rear compartment.
62. Same as 61.
63. A close-up of the compressor area.
64. A view of a warning tag on the rear of the unit.
65. A view of the rear mechanical compartment cover placed behind the unit.
66. Same as 65.
67. A close-up of the line cord.
68. A view of the condenser fan area.
69. Same as 68.
70. A view of the left side of the refrigerator/freezer.
71. Same as 70.
72. Same as 70.
73. A view of the right front corner of the refrigerator/freezer.
74. An overview of the right side of the refrigerator/freezer.
75. Same as 74.
76. A view of the top right of the refrigerator/freezer.
77. A view of the inside of the freezer compartment.
78. A view of the middle section of the refrigerator/freezer.
79. A view of the refrigerator portion.
80. Same as 79.
81. A view of the house thermostat set at 68 degrees.
82. A view of the heater thermostat.
83. A view of ceiling burn patterns.
84. Same as 83.
85. Same as 83.
86. Same as 83.
87. A view of burn patterns low on wall near appliances.
88. Same as 87.
89. Same as 87.
90. Same as 87.
91. A view of cabinet damage.
92. Same as 91.
93. A close-up of the condenser fan.
94. Same as 93.
95. A close-up of the compressor.
96. An overview of the rear mechanical compartment of the refrigerator/freezer.
97. A view of flame patterns on the rear of the unit.
98. A view of the interior of the refrigerator/freezer.

99.    Same as 98.
100.   Same as 98.
101.   Same as 98.
102.   A general overview of the exterior of the refrigerator/freezer.
103.   Same as 103.
104.   Same as 103.
105.   Same as 103.
106.   Same as 103.
107.   Same as 103.
108.   Same as 103.
109.   A view of the hot water heater.
110.   An overview of the laundry room.
111.   Same as 110.
112.   A view of the refrigerator/freezer line cord.
113.   A view of the refrigerator/freezer placed on the side for further examination.
114.   Same as 113.
115.   A view of conductors at the rear of the refrigerator/freezer later to have been found to have
       signs of electrical activity.
116.   Same as 115.
117.   Same as 115.
118.   A view of the home's main electrical panel.
119.   Same as 118.
120.   Same as 118.
121.   A view of the electrical panel breaker chart.
122.   Same as 121.
123.   An overview of the breakers as found.
124.   Same as 123.

**Photographic Log – Nantucket Fire Department's location inspection series**

1.     An overview under the kitchen sink.
2.     A view of the kitchen window and upper cabinets – note heavy soot condition.
3.     A view of the refrigerator/freezer rear mechanical compartment.
4.     An overview of the base cabinets.
5.     Additional view of upper cabinets.
6.     A view of the compressor area.
7.     An overview of the upper cabinets.
8.     A view of the Nantucket's fire department scene reconstruction.
9.     A view of the rear mechanical compartment of the refrigerator/freezer.
10.    An overview of the kitchen.
11.    A view of the burnt base cabinet door.
12.    A view of the base cabinet frame.
13.    Same as 10.
14.    A close-up of the heater area.
15.    A view of the upper ceiling area.
16.    Same as 14.
17.    Same as 15.
18.    A view of the floor burning in front of the refrigerator/freezer.
19.    A view of the ceiling burning.
20.    A view of the floor burning in front of the heater and to the side of the refrigerator/freezer.
21.    An overview of the refrigerator/freezer.

22.   A close-up near the heater.
23.   A view of the refrigerator/freezer with the door opened.
24.   A view of the refrigerator/freezer contents.
25.   An exterior view of the kitchen window.
26.   An overview of the kitchen.
27.   A view of the refrigerator/freezer door.
28.   A view of burnt contents.
29.   A view of the refrigerator/freezer and cabinet to right.
30.   A close-up of stored food stuffs in the refrigerator/freezer.
31.   Same as 30.
32.   A view of the fire department removing the heater.
33.   A close-up of the freezer area.
34.   A view of the wall area to the left of the refrigerator/freezer.
35.   A view of the heater.
36.   A view of the floor area in front of the heater.
37.   Same as 24.
38.   A close-up of the heating elements.
39.   A view of the heater thermostat.
40.   An overview of the wall near the refrigerator/freezer.
41.   A view under the cabinet after the heater was removed.
42.   Same as 42.
43.   Same as 42.
44.   Same as 42.
45.   Same as 42.
46.   A view of a closet.
47.   A view of the area after the refrigerator was removed. Note extensive fire damage in area of
      origin.
48.   An overview of the kitchen.
49.   A view of the heater after it was removed.
50.   Same as 49.
51.   Same as 49.
52.   A view of the floor area in front of the cabinet and heater area.
53.   An overview of the base cabinets just to the right of the refrigerator.
54.   Same as 53.
55.   A view of the right side of the refrigerator.
56.   A view of the electrical panel circuit identification.
57.   We are unsure what this view shows.
58.   A view of the upper kitchen cabinets.
59.   A view of the electrical panel.
60.   Same as 57.
61.   Same as 58.
62.   Same as 59.
63.   A view of the heavy fire damage behind the refrigerator/freezer.
64.   An overview of the base cabinets.
65.   Same as 64.
66.   A close-up of the cabinets to the right of the refrigerator/freezer.
67.   Same as 64.
68.   Same as 66.
69.   A view of the rear of the refrigerator/freezer.
70.   A view of the front of the refrigerator/freezer.
71.   Same as 66.

72.    Same as 69.
73.    Same as 66.
74.    Same as 66.
75.    Same as 69.

**Photographic Log – Nantucket Fire Department's exemplar photos taken @ Marine Lumber.**

1.    A view of the rear mechanical compartment.
2.    A close-up of the condenser fan motor and solenoids.
3.    A close-up of the compressor area.
4.    Same as 3.
5.    Same as 2.
6.    A view of the model number sticker.

**Photographic Log –Forensic testing of exemplar – 05/07/04**

1.    An overview of the refrigerator/freezer.
2.    Same as 1.
3.    A view of the rear of the refrigerator/freezer.
4.    A view of the rear and left side of the refrigerator/freezer.
5.    A view of the refrigerator compartment.
6.    A view of the manufacturer identification tag.
7.    Same as 6.
8.    A view of an information sticker.
9.    Same as 8.
10.    A view of the rear mechanical area.
11.    Same as 10.
12.    Same as 10.
13.    A view of the rear compartment with the cover off.
14.    Same as 13.
15.    Same as 13.
16.    Same as 13.
17.    Same as 13.
18.    A close-up of the condenser fan.
19.    A close-up of the solenoid.
20.    Same as 19.
21.    Same as 19.
22.    A close-up of the compressor.
23.    Same as 22.
24.    Same as 22.
25.    Same as 22.
26.    Same as 22.
27.    A view of the condenser fan connection.
28.    Same as 27.
29.    A close up within the mechanical compartment.
30.    Same as 27.
31.    A view of the pan in the rear compartment.
32.    Same as 31.
33.    Same as 31.
34.    Same as 31.
35.    A view of the nomenclature on the pan.

RE: David Ryan
OUR FILE NO.: 8377

Page: 10
November 2, 2004

36.    A view of the slot at the base of the unit looking at condenser coil.
37.    Same as 36,
38.    Same as 36.
39.    Same as 36.
40.    Same as 36.
41.    A view of the compressor overload and relay.
42.    Same as 41.
43.    Same as 41.
44.    Same as 41.
45.    Same as 41.
46.    Same as 41.
47.    Same as 41.
48.    A view of testing the overload.
49.    Same as 48.
50.    Views of a gouge/nick on the line cord insulation due to the improper attachment of the strain relief.
51.    Same as 50.
52.    Same as 50.
53.    Same as 50.
54.    Same as 50.
55.    Same as 50.
56.    Same as 50.
57.    Same as 50.
58.    Same as 50.
59.    Same as 50.
60.    Same as 50.
61.    Same as 50.
62.    Same as 50.
63.    Same as 50.
64.    Same as 50.
65.    A view of the sharp edge of the rear cover that abraded the line cord insulation.  Strain relief not on correctly, causing contact between the line cord and the edge.
66.    Same as 65.
67.    Same as 65.
68.    Same as 65.
69.    A close-up of the sharp cover edge.
70.    Same as 69.
71.    Same as 69.
72.    Same as 69.
73.    A view showing the strain relief location on the line cord – see indent.
74.    Same as 73.
75.    A view of the evaporator section.
76.    Same as 75.
77.    A close-up of the evaporator coil.
78.    Same as 77.
79.    Same as 77.
80.    Same as 77.
81.    A view of the evaporator fan.
82.    A view of the control box.
83.    Same as 82.
84.    Same as 82.

RE: David Ryan
OUR FILE NO.: 8377

Page: 11
November 2, 2004

85.     Same as 82.
86.     Same as 82.
87.     Same as 82.

**Photographic Log –Forensic testing and inspection number 1 @ LGI – 05/13/04**

1.      A view of refrigerator/freezer as presented to us.
2.      Same as 1.
3.      Overview of the refrigerator/freezer outside our lab for dismantling and cleaning.
4.      Same as 3.
5.      An overview of the Berko Heater.
6.      A view of the Berko heater evidence tag.
7.      A view of additional wrapped evidence – electrical receptacles, etc.
8.      A view of weighing the Berko heater – 16 pounds.
9.      Same as 7.
10.     A view of the heater on the test bench.
11.     Overview of the heater.
12.     Same as 11.
13.     A view of the rear of the heater.
14.     Same as 13.
15.     A view of the branch circuit requirement sticker.
16.     Same as 11.
17.     Same as 11.
18.     A view of measuring the heater.
19.     Same as 18.
20.     Same as 18.
21.     Same as 18.
22.     A view of the heater with the top removed.
23.     A view of the nameplate.
24.     Same as 23.
25.     A view of the cover.
26.     A view of the wire connections.
27.     A view of the heating element and fan connections.
28.     Same as 27.
29.     Same as 27.
30.     Same as 27.
31.     Same as 27.
32.     Same as 27.
33.     Same as 27.
34.     A view of testing meter.
35.     A view of heating elements.
36.     A view of performing resistance testing of heating elements.
37.     Same as 36.
38.     Same as 36.
39.     Same as 36.
40.     Same as 36.
41.     Same as 36.
42.     Same as 36.
43.     Same as 36.
44.     Same as 36.
45.     Same as 36.

RE: David Ryan
OUR FILE NO.: 8377

Page: 12
November 2, 2004

46.    Same as 36.
47.    Same as 36.
48.    Same as 36.
49.    Same as 36.
50.    A view of testing fan motor.
51.    Same as 50.
52.    Same as 50.
53.    A view of leads removed from elements to isolate.
54.    A view of testing line cord to ground.
55.    Same as 54.
56.    Same as 54.
57.    Same as 54.
58.    Same as 54.
59.    Same as 54.
60.    A view of the receptacle, thermostat, and circuit breakers removed from the scene.
61.    Same as 60.
62.    Same as 60.
63.    Same as 60.
64.    Same as 60.
65.    A view of Crawford's notes.
66.    Same as 65.
67.    Same as 60.
68.    Same as 60.
69.    A view of an internal examination of the receptacles.
70.    Same as 69.
71.    Same as 69.
72.    Same as 69.
73.    Same as 69.
74.    Same as 69.
75.    Same as 69.
76.    Same as 69.
77.    Same as 69.
78.    Same as 69.
79.    Same as 69.
80.    Same as 69.
81.    Same as 69.
82.    Same as 69.
83.    Same as 69.
84.    A view of the engraving on the heating element plate.
85.    A view of the refrigerator/freezer with shrink-wrapping removed.
86.    Same as 85.
87.    Same as 85.
88.    Same as 85.
89.    A view of the flame patterns on the rear of the refrigerator/freezer.
90.    Same as 90.
91.    A view of the right side of the refrigerator/freezer.
92.    Same as 91.
93.    Same as 91.
94.    A view of the lower inside of the refrigerator/freezer to be cleaned and examined.
95.    Same as 94.
96.    A view of the inside of the freezer compartment.

97.    Same as 96.
98.    Same as 94.
99.    Same as 94.
100.   Same as 96.
101.   Same as 94.
102.   A close-up of the evaporator coil.
103.   A view of the larger solidified mass of plastic and stuff removed from the inside of the refrigerator that was later x-rayed.
104.   Same as 103.
105.   Same as 103.
106.   Same as 103.
107.   Same as 103.
108.   A view of a solidified mass that was not x rayed – no items remaining inside.
109.   Same as 108.
110.   A view of the evaporator coil.
111.   A view inside the unit after cleaning.
112.   A view of a connection found near the evaporator section.
113.   Close-ups of the evaporator area.
114.   Same as 114.
115.   A view of the separator section.
116.   A view of the bottom of the unit.
117.   A view of the left side bottom.
118.   A view of the left side top.
119.   A view of the top.
120.   A view of non-essential pieces found inside unit.
121.   A view of misc. essential small pieces found inside the unit after screening.
122.   A view of the top of the unit.
123.   A view of the right side of the unit.
124.   A view of the rear mechanical area.
125.   Same as 124.
126.   A view of the top rear.
127.   A view of the rear mechanical area with cover and condenser fan removed.
128.   Same as 127.
129.   A view of carefully removing conductors from the back of the unit.
130.   Same as 129.
131.   A close-up of the compressor.
132.   Same as 131.
133.   Same as 131.
134.   A view of preparing to remove compressor for further testing.
135.   Same as 134.
136.   Same as 134.
137.   A view of the compressor removed.
138.   Same as 137.
139.   A view of the compartment after compressor removed.
140.   Same as 139.
141.   A close-up of the compressor.
142.   Same as 141.
143.   Same as 141.
144.   Same as 141.
145.   A view of the conductors removed from the rear mechanical area.
146.   Same as 145.

RE: David Ryan
OUR FILE NO.: 8377

Page: 14
November 2, 2004

147.   A view of the condenser fan.
148.   Same as 147.

**Photographic Log –Forensic testing digital X-rays**

1.   A view of the line cord frayed wire end.
2.   A view of the line cord beading.
3.   A view of the line cord frayed wire.
4.   A view of the plug end.
5.   A view of the severed end close-up.
6.   A view of beading on severed end.
7.   Same as 6.
8.   A view of the compressor motor.
9.   Same as 8.
10.   Same as 8.
11.   A view of the terminal – side view.
12.   Additional view of compressor terminal.
13.   Same as 12.
14.   A view of the condenser fan motor center.
15.   A view of the condenser fan motor end.
16.   A view of the condenser fan motor side.
17.   A view of the condenser fan motor side.
18.   A view of the condenser fan motor side 90 degrees.
19.   Additional view of windings.
20.   Same as 19.
21.   Same as 19.
22.   Same as 19.
23.   Same as 19.
24.   Same as 19.
25.   Same as 19.
26.   Same as 19.
27.   A view of remnants found inside smaller solidified plastic piece from inside refrigerator/freezer.
28.   Same as 27.
29.   Same as 27.
30.   Same as 27.
31.   Same as 27.
32.   Same as 27.
33.   Same as 27.

**Photographic Log –Forensic testing and inspection number 2 @ LGI – 07/27/04**

1.   An overview of the front of the refrigerator/freezer.
2.   A view of the previously bagged, boxed, and tagged evidence.
3.   Same as 2.
4.   A view of the larger solidified section x-rayed by Branch labs – note tape showing quadrants.
5.   Same as 4.
6.   Same as 4.
7.   Same as 4.
8.   Same as 4.
9.   Same as 4.
10.   Overview of the evaporator section.

11.   Same as 10.
12.   Same as 10.
13.   Same as 10.
14.   Same as 10.
15.   An overview of the rear of the unit.
16.   Same as 15.
17.   Same as 15.
18.   Same as 15.
19.   A view of the rear and right corner.
20.   A view of the front doors.
21.   A view of the right side.
22.   Same as 21.
23.   A view of the lower right side.
24.   A view of the front doors.
25.   A view of the lower front.
26.   A view of the upper front.
27.   An overview of the front.
28.   Same as 27.
29.   A view of the front left.
30.   An overview of the left.
31.   An overview of the rear.
32.   Same as 31.
33.   Same as 31.
34.   Same as 31.
35.   A close-up of the rear mechanical compartment with cover on.
36.   A view of the rear mechanical compartment with cover removed.
37.   Same as 36.
38.   Same as 36.
39.   Same as 36.
40.   Same as 36.
41.   Same as 36.
42.   Same as 36.
43.   Same as 36.
44.   Same as 36.
45.   A close-up of the condenser.
46.   Same as 45.
47.   A view of the area after the compressor removed. Note the protected area near compressor, and
      significant burning to the left of the compressor area.
48.   Same as 47.
49.   Close-up view of the compressor area.
50.   Same as 49.
51.   Same as 49.
52.   A view of the condenser fan motor.
53.   Side view of the condenser fan motor.
54.   Same as 53.
55.   Overview of the condenser fan motor.
56.   Same as 55.
57.   Same as 55.
58.   Same as 55.
59.   A view of the condenser fan motor nameplate.
60.   Same as 59.

61.    Same as 59.
62.    A view of the housing of the motor split apart for examination of the windings.
63.    A view of the inside of the motor housing cover.
64.    Same as 63.
65.    A close-up of the stator windings.
66.    Same as 65.
67.    Same as 65.
68.    Same as 65.
69.    Same as 65.
70.    A view of attempting to turn shaft and remove core.
71.    A view of windings with core removed.
72.    Same as 71.
73.    Same as 71.
74.    Same as 71.
75.    Same as 71.
76.    Same as 71.
77.    Same as 71.
78.    A view of core.
79.    Same as 78.
80.    Same as 78.
81.    A view of numbers on core.
82.    A view of microscope examination of motor windings.
83.    Same as 83 – examination of start winding end for beading – none found.
84.    A view of the start-winding end examined under the microscope.
85.    Overview of motor windings.
86.    An overview of the motor.
87.    A view of the compressor.
88.    A view of the compressor terminal and wiring.
89.    Same as 88.
90.    Same as 88.
91.    Same as 88.
92.    Same as 88.
93.    Same as 88.
94.    Same as 88.
95.    A view of beading on conductor found in rear mechanical compartment.
96.    Same as 95.
97.    Additional conductors examined.
98.    Same as 97.
99.    A view of compressor terminal parts.
100.   Same as 99.
101.   Same as 99.
102.   Same as 99.
103.   Same as 99.
104.   A close-up of the compressor terminal.
105.   A view of performing resistance testing on compressor motor.
106.   Same as 105.
107.   Same as 105.
108.   A view of performing mega-ohm testing on compressor.
109.   Same as 108.
110.   A view of mega-ohm testing Berko heating elements.
111.   A view of heating element connections to be cut for individual mega-ohm testing.

112.  Same as 111.
113.  Same as 11.
114.  An overview of the conductors from the rear mechanical compartment that were removed and examined under the microscope.
115.  An overview of the refrigerator/freezer line cord.
116.  Same as 115.
117.  Same as 115.
118.  A view of the strain relief.
119.  Close-up of the severed end.
120.  Close-up of the line cord damage.
121.  Same as 120.
122.  Same as 120.
123.  A view of the line cord tag.
124.  A view of the plug end.

**Photographic Log –Forensic testing and inspection Microscope view.**

1.   A view of conductor A end A.
2.   Same as 1.
3.   Same as 1.
4.   Same as 1.
5.   A view of conductor A end B.
6.   A view of conductor B end A.
7.   Same as 6.
8.   A view of conductor B end B.
9.   A view of conductor C end A.
10.  A view of conductor C end B.
11.  A view of conductor D end A.
12.  A view of conductor D end B.
13.  A view of conductor E end A.
14.  Same as 13.
15.  Same as 13.
16.  A view of conductor E end B.
17.  A view of conductor E midpoint.
18.  A view of conductor F end A.
19.  A view of conductor F end B.
20.  A view of conductor H end A.
21.  A view of conductor H end B.
22.  A view of conductor I end A.
23.  A view of conductor I end B.
24.  A view of conductor J end A.
25.  A view of conductor J end B.
26.  A view of conductor J midpoint.
27.  Same as 26.
28.  A view of conductor K end A.
29.  A view of conductor K end B.
30.  A view of conductor M.
31.  A view of the start winding wire.
32.  Same as 31.
33.  Same as 31.
34.  Same as 31.

35.    A view of the line cord.
36.    Same as 35.
37.    Same as 35.
38.    Same as 35.
39.    Same as 35.
40.    Same as 35.
41.    Same as 35.
42.    Same as 31.

**Photographic Log –Forensic testing and inspection of dust.**

1.    A view of the test set-up – cal rod heater from stove with variable voltage supply to vary heater voltage, which is proportional to heat from heater. Also note infrared thermal tester used to get ambient temperature within test chamber.
2.    Overview of test chamber.
3.    A view of dust collected from a typical household refrigerator/freezer using new vacuum bag.
4.    A view of the dust.
5.    Same as 4.
6.    A view of a fan used to simulate condenser fan movement.
7.    A view of the placement of the infrared thermal tester.   This reading ambient temperature. Temperature at surface of heater greater.
8.    A view of heating up dust.
9.    Same as 8 – see clump of dust on heater.
10.    Same as 8-note smoke.
11.    Same as 8.
12.    A view of the recorded temperature in degrees F.
13.    Same as 8.
14.    Same as 8.
15.    Same as 8 – see glowing red dust on fire.
16.    Same as 15.
17.    A view of the ambient temperature.
18.    Same as 15.
19.    Same as 16.

## CERTIFICATION

This is to certify that the foregoing EXPERT DISLCOSURE was mailed, postage prepaid, first class mail, this 2nd day of February, 2006 to the following:

Steven M. Key, Esq.
Campbell Campbell Edwards & Conroy
One Constitution Plaza, Third Floor
Boston, MA  02129

Robert W. Foster, Jr., Esq. (pro hac vice counsel)
Nelson Mullins Riley & Scarborough LLP
1320 Main Street, 17th Floor
Columbia, SC  29201

_____
Erik Loftus, Esq.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

------------------------------------------------

| | | |
|---|---|---|
| FIREMAN'S FUND INSURANCE COMPANY | : | |
| As Subrogee of | : | |
| David Ryan | : | CIVIL ACTION NO. |
| 777 Marin Drive | : | 1:05-CV-10786(NMG) |
| Novado, California 94998 | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| WHIRLPOOL CORPORATION | : | |
| 200 North M-63 | : | |
| Benton Harbor, MI 49022 | : | |
| | : | |
| Defendant | : | FEBRUARY 2, 2006 |

------------------------------------------------

## PLAINTIFF FIREMAN'S FUND RULE 26(a)(2)(B) DISCLOSURE OF EXPERT WITNESS

### NAME AND ADDRESS OF WITNESS

> Thomas Haynes, CFI
> Crawford Investigations
> Greene, RI 02827

### SUBJECT MATTER ON WHICH THE EXPERT IS EXPECTED TO TESTIFY

Mr. Haynes is expected to testify concerning his investigation as to the cause and origin of the November 25, 2003 fire at the residence of David Ryan, located at 7 Sandpiper Way, Nantucket, Massachusetts.

**THE SUBSTANCE OF THE FACTS AND OPINIONS TO WHICH THE EXPERT IS EXPECTED TO TESTIFY**

Mr. Haynes is expected to testify that the fire damage he observed was consistent with the fire originating within the refrigerator in the kitchen at the home.  His conclusion is that the fire originated within the refrigerator in the kitchen at the home.  Mr. Haynes' report is attached hereto.

**SUMMARY OF THE GROUNDS FOR EXPERT'S OPINION**

Mr. Haynes will testify based on his education and experience as a certified fire inspector, and his inspections of the residence located at 7 Sandpiper Way, Nantucket, Massachusetts.

THE PLAINTIFF,

By:_____
　　　Erik Loftus, Esq.
　　　Law Offices of Stuart G. Blackburn
　　　Two Concorde Way
　　　P. O. Box 608
　　　Windsor Locks, CT  06096
　　　860-292-1116
　　　Fed. Bar No.:  CT25168

2



**Crawford**®
Investigation Services, Inc.
Fire / Explosion Unit
(800) 315-0383

PRIVILEGED AND CONFIDENTIAL

**REPORT DATE:**             June 10, 2004

**REPORT RECIPIENT:**

Fireman's Fund Insurance Company

C/O Craig/IS LTD

225 Water Street - Suite 1700

Jacksonville, FL 32202-0569

**ATTENTION:**              Alan DeLee

---

**INSURED:**                David Ryan

**DATE OF LOSS:**           Tuesday, November 25, 2003      **Time:**    6:03 p.m.
                                                                        18:03 hrs.

**LOSS LOCATION:**          7 Sandpiper Way

**CITY / STATE OF LOSS:**   Nantucket, MA

**CLAIM NUMBER:**           00503119324

**CIS FILE NUMBER:**        7250-001293

**PREPARED BY:**            Thomas Haynes

                            Certified Fire & Explosion Investigator

---

File Status:

          X    Initial Report

               Interim report

               Final report - File closed

THIS REPORT IS FURNISHED AS PRIVILEGED AND CONFIDENTIAL TO ADDRESSEE.
RELEASE TO ANY OTHER COMPANY, CONCERN, OR INDIVIDUAL IS SOLELY
THE RESPONSIBILITY OF ADDRESSEE.

Insured:    David Ryan
File No.:    7250-001293                                                    1

## ASSIGNMENT:

Received from:    John Bonsigfiglioli, Fireman's Fund

Instructions:    Fireman's Fund is the insurer of the Ryan summer/vacation home in Nantucket, MA. We were asked to conduct a fire cause and origin investigation into the above captioned fire loss. We were further asked to direct all future correspondence regarding this fire loss to Alan DeLee, Senior Associate, Craig/IS Ltd.

Received on:    12/02/03

Commenced on:    12/02/03

Verbal report on:    12/03/03

Verbal report to:    John Bonsigfiglioli

We commenced our fire investigation on December 2, 2003, with the following present during some portion of our analysis: Captain Stephen Murphy, Nantucket Fire Department; Benjamin (Ben) Turnbull, Isle Caretaking, representing David Ryan; Daniel Cronin, Phoenix Investigations representing Marine Home Center; Ron Parsons and Michael Phy, Wright Group representing Berko Electric; Richard Splaine, Splaine Investigations representing Kitchen Aid (Whirlpool); Steve Pritrotaolo, Levine Group, Inc. representing Fireman's Fund; and Thomas Haynes from our staff.

## PRELIMINARY FINDINGS:

The following information was obtained through interviews, review of documents, and our fire scene analysis.

The fire occurred in a single-family summer/vacation home that was constructed in 1982. The building has approximately eleven hundred (1,100) square feet on the first floor and eight hundred (800) square feet on the second floor. The summer/vacation home was in good condition and well maintained on a semi year-round basis - electricity, LP gas, water and heat.

Ben Turnbull indicated to this investigator that David Ryan had notified him that he would be coming to Nantucket late in the afternoon on November 25, 2003, and requested the heat be tuned up in anticipation of his arrival. At approximately two (2) in the afternoon, November 25, 2003, Ben Turnbull went to the Ryans' summer/vacation home and turned the electric heat up and the water ON (well pump). Noticing nothing unusual Ben Turnbull then left. The temperature had been set around 40-45°F and was turned up to ±65°F. *Note: the thermostat in the kitchen was set at ±68-69°F at the time of the fire.*

**Insured:**     **David Ryan**
**File No.:**     **7250-001293**                                                                                          2

Shortly before six (6 p.m.) on Tuesday, November 25, 2003, David Ryan arrived at 7 Sandpiper Way, his summer/vacation home. "On opening the door he noticed a funny smell and heard water running. He entered the residence trying to turn the lights on, and then noticed embers of fire." [1]  David Ryan notified the fire department of the fire at 6:03 p.m. (18:03 hrs.).

Upon arrival the fire department found the fire was basically out; it was in a smoldering stage due to a lack of oxygen. The summer/vacation home was so tight that the initial fire consumed most of the oxygen within the building which resulted in the lack of open flames. The fire was quickly extinguished with minimal water. The summer/vacation home sustained moderate to severe fire and smoke damage to the kitchen and moderate smoke damage to the remainder of the building. The Nantucket Fire Department conducted an investigation and determined:

"Area of Origin was believed to be in the area of the refrigerator. The probable point of origin is believed to be from the Refrigerator, in the area of the motor & compressor. Cause of the fire believed to be possibly from the failure of the refrigerator motor and components."

Our investigation is in agreement with and further supports the Nantucket Fire Department's findings as to the origin of the fire.

**EXTERIOR EXAMINATION:**

Nantucket is an island off the south coast of Cape Cod, MA. The summer/vacation home is located in a secluded section of Nantucket Island at the end of a long driveway. The driveway is off a dirt or gravel road. The summer/vacation home is a salt box design constructed of wood that appears to be in good condition and well maintained. The summer/vacation home consists of a one-and-one-half (1½) story building with single story sections off two (2) sides. There is a large wrap-around deck on two (2) sides. The underside of the building consisted of an enclosed crawlspace, no basement. Based on the different weathering to the wood shingles on the exterior, all of the windows had been replaced recently; this was later confirmed by Ben Turnbull.

All of the windows were thermal-pane windows. This played a role in the fire growth and development by limiting the oxygen within the building.

The primary and secondary electrical service and the telephone service to the building were underground. The electrical service was still operational at the time of our investigation.

The lack of exterior fire damage is consistent with the fire having been confined to the kitchen within the building.

Walking around the exterior found no indication of a fire having occurred within the building.

---

[1] Nantucket Fire Department Fire Report.

Insured:    David Ryan
File No.:    7250-001293

3

**INTERIOR EXAMINATION:**

### The Second Floor:

The second floor was accessed by stairs on the south side of kitchen.

The damage to the second floor consisted of moderate smoke damage. The smoke damage is consistent with having extended up from the kitchen.

All of the damage to the second floor is consistent with smoke having extend up the open stairs from the kitchen.

### The First Floor:

The first floor primarily consisted of a common area, bedroom, dining room, a living room and kitchen.

The Common Area:

The common area consisted of a short hallway/corridor that connected to the bedroom, several service areas and the kitchen. The common area contained the primary entrance from the parking area, the entrance used by David Ryan on the day of the fire. The common area was accessed from the deck.

Upon entering the common area:

One would be facing the bedroom at the opposite end of the short common area.

The kitchen with the stairs to the second floor was immediately on the right upon entering the exterior door.

The common area sustained moderate to heavy smoke damage.

All the damage to the common area was the result of the extension of smoke from the kitchen area. There was no fire or heat damage to the common area.

The Bedroom:

The bedroom was at the end of the common area the farthest from the kitchen.

The bedroom sustained moderate smoke damage.

All the damage to the bedroom was the result of the extension of smoke from the kitchen by way of the common area.

Insured:    David Ryan
File No.:    7250-001293

4

The Living Room:

The living room was accessed from the dining room.

The living room sustained moderate smoke damage.

All the damage to the living room was the result of the extension of smoke from the kitchen through the dining room.

The Dining Room:

The dining room was accessed from the west side of the kitchen.

There was a walk-through opening and a pass-through opening from the kitchen.

The area above the kitchen cabinets was open to the kitchen.  This opening corresponded to the pitch of the ceiling/roof.

The dining room sustained moderate to severe smoke damage with some heat damage.

The smoke and heat damage were consistent with having extended through the openings from the kitchen.

All the damage to the dining room was the result of the extension of heat and smoke from the kitchen.

The Kitchen:

The dining room, living room and second floor were accessed through the kitchen.

The kitchen occupied approximately two hundred twelve (212) square feet of floor area - (one hundred thirty-nine inches by one hundred and eighteen inches - 139 by 118 inches).  The long side was the exterior or north wall.  The ceiling was on a slant from the exterior wall to the stairs to the second floor.  Note: eighty-six (86) inches at the exterior wall and one hundred twenty-five (125) inches at the stairs.

The walls and ceiling were sheetrock on wood framing members.  The floor was hardwood - approximately two (2) inch by three-quarters of an inch thick tongue-and-grooved flooring.

The Stairs to the Second Floor:

The stairs to the second floor were basically in the kitchen along the south side - open on one (1) side to the kitchen.  The stair area sustained moderate smoke and heat damage from exposure to the kitchen.

Insured:    David Ryan                                                              5
File No.:    7250-001293

All the smoke and heat damage to the stairs to the second floor was the result of exposure to the kitchen.

The kitchen counter and cabinets extended along the east, north and west sides of the kitchen. The east and north sides of the kitchen were exterior walls. The south side of the kitchen contained the stairs to the second floor. The west side of the kitchen consisted of a dividing partition with the dining room. The refrigerator was located against the west dividing partition between the opening to the dining room and the pass-through opening above the counter.

The kitchen sustained moderate to severe smoke and heat damage with some fire damage.

Extending around the kitchen was a line of demarcation between the less damaged lower portion and the more severe heat and smoke damage above. The line of demarcation began along the west dividing partition at the floor and gradually extended up to approximately the five (5) feet at the east exterior wall. This is consistent with the origin of the fire at the refrigerator.

The kitchen cabinets above and to the right of the refrigerator sustained fire damage.

The fire damage extended from within the refrigerator mechanical compartment at floor level, at the back of refrigerator. The fire extended from the refrigerator to the cabinets above and to the right, north side, of the refrigerator.

The fire damage to the kitchen cabinets is consistent with the fire originating within the refrigerator at floor level and extending to the cabinets.

The lowest area of burning in the kitchen was to the hardwood floor under and in front of the refrigerator.

The fire damage to the hardwood floor in the kitchen is consistent with the fire originating within the refrigerator.

Located under and within the kitchen cabinet approximately twelve (12) inches to the right and at a forty-five (45) degree angle to the refrigerator was a Berko electric toe-kick heater.

Based on burn patterns and examination of the electric toe-kick heater, the fire did not originate from the electric toe-kick heater.

The fire/flame damage to the kitchen was confined to the west side of the kitchen in the area of the refrigerator.

The refrigerator was against the Sheetrock dividing partition separating the kitchen from the dining room. There were kitchen cabinets above and on the right side of the refrigerator.

Insured:   David Ryan                                                                6
File No.:   7250-001283

Unusual burn patterns under, behind and immediately adjacent to the refrigerator are consistent with the refrigerator having caused the fire.

Unusual burn patterns consist of the burning to:

The framing members within the dividing partition behind the refrigerator.

The hardwood floor under the refrigerator.

The kitchen cabinet immediately adjacent to the refrigerator on the right side. This kitchen cabinet was burned all the way to the floor and from the dividing partition to the front of the kitchen cabinet.

The refrigerator was the most severely burned object in the kitchen.

All of the fire damage to the refrigerator is consistent with the origin of the fire within the refrigerator.

Preliminary Field Examination of the Refrigerator:

The refrigerator was purchased from Marine Home Center, Nantucket, MA on July 24, 2000, model number KTRS22KHW, serial number EK0819041. [2]

The refrigerator is not equipped with an ice maker or water dispensing outlet.

The refrigerator has been in use from the date of purchase with no problems noted.

The freezer section is above the refrigerator section.

There is significant fire damage:

Inside the freezer and refrigeration compartments. The internal fire damage is consistent with the fire extending into the freezer and refrigeration compartments.

The lower back, right side and the sheet metal under the refrigerator is fire damaged. This is consistent with the fire originating within the lower portion of the refrigerator mechanical compartment.

Removal of the lower rear access panel to the mechanical compartment revealed significant fire and heat damage.

There were few, if any, combustible components remaining in the area of the condensing fan and adjacent combustibles. This is consistent with a fire within the mechanical compartment.

---

[2] Nantucket Fire Department, Fire Investigation Report

Insured:    David Ryan                                                                    7
File No.:    7250-001293

> All of the fire and heat damage to the mechanical compartment within the
> refrigerator is consistent with the origin of the fire within the mechanical
> compartment.

All of the damage to the refrigerator is consistent with the origin of the fire within the
mechanical compartment of the refrigerator.

**CONCLUSIONS:**

1.   All of the damage to the summer/vacation home is consistent with the fire
     originating within the building.

2.   All of the damage to the second floor is consistent with smoke having extended
     up the open stairs from the kitchen.

3.   All the damage to the common area was the result of the extension of smoke
     from the kitchen area. There was no fire or heat damage to the common area.

4.   All the damage to the bedroom was the result of the extension of smoke from the
     kitchen by way of the common area.

5.   All the damage to the living room was the result of the extension of smoke from
     the kitchen through the dining room.

6.   All the damage to the dining room was the result of the extension of heat and
     smoke from the kitchen.

7.   All the smoke and heat damage to the stairs to the second floor was the result of
     exposure to the kitchen.

8.   The fire damage to the kitchen cabinets is consistent with the fire originating
     within the refrigerator at floor level and extending to the cabinets.

9.   The fire damage to the hardwood floor in the kitchen is consistent with the fire
     originating within the refrigerator.

10.  Based on burn patterns and examination of the electric toe-kick heater, the fire
     did not originate from the electric toe-kick heater.

11.  All of the fire damage to the refrigerator is consistent with the origin of the fire
     within the refrigerator.

12.  All of the fire and heat damage to the mechanical compartment within the
     refrigerator is consistent with the origin of the fire within the mechanical
     compartment.

13.  All of the damage to the refrigerator is consistent with the origin of the fire within
     the mechanical compartment of the refrigerator.

Insured:    David Ryan                                                    8
File No.:   7250-001293

**ORIGIN AND CAUSE:**

The origin of the fire was within the mechanical compartment of the refrigerator within the kitchen of the summer/vacation home.

The cause of the fire was the result of an undetermined failure within the Kitchen Aid (Whirlpool) refrigerator.

**STATUS:**

Should you feel that additional investigation or technical work would be beneficial, please contact us with your further instructions, advice or questions should you have any. Our file is closed.

The physical evidence is in the possession of Lavine Group, Inc., 650 Hallstead Ave. Suite 103 B, Mamaroneck, NY 10543, 914-670-0208.

If you have any questions concerning this investigation, feel free to contact me at (401)-397-7820.

**Respectfully,**


Thomas Haynes
Certified Fire & Explosion Investigator
Greene, RI 02827
401-397-7820

Cf:    John Pflanz
       Northern Region
       610-328-2035

(Address all correspondence concerning this file to the following address. Please include the CIS file number.)
    Crawford Investigation Services, Inc.
    National Operations Center
    285 W. Esplanade Ave., Suite 200
    Kenner, LA 70065

Insured:   David Ryan
File No.:   7250-001293

9

ENCLOSURES:

1    Photographs - Mounted = 32
2    Fire Department Incident Report
3    Fire Department Investigation Report
4    Evidence Transmittal Form

Insured:    David Ryan
File No.:    7250-001283

10

## PHOTOGRAPHS:

1)  The west side of the house.
    a)  The letter "A" indicates the dining room.
    b)  The letter "B" indicates the living room.

2)  The north side of the house.
    a)  The letter "A" indicates the dining room.
    b)  The letter "B" indicates the kitchen.
    c)  The letter "C" indicates the main entrance door from the parking area.  This is the door though which David Ryan entered the day of the fire.

3)  Standing in the kitchen looking north along the east exterior wall with the part of the north exterior wall in the left background.
    a)  The smoke and heat have banked down to approximately the five (5) foot level.
    b)  The letter "A" indicates a burn pattern on the kitchen cabinet above the microwave oven.  This burn pattern is consistent with the origin of the fire to the left, the area of the refrigerator.

4)  A composite photograph.  Looking across the kitchen to the northwest corner.  All of the burn patterns are consistent with the origin of the fire in the area of the refrigerator, the letter "A".
    a)  The letter "B" indicates the area under the diagonal kitchen counter where the electric toe-kick heater had been located.

5)  A composite photograph.  Looking from the east to west in the kitchen with the dining room in the background.  The opening to the left of the refrigerator is to the dining room
    a)  The letter "A" indicates the side of the refrigerator that faced the kitchen cabinet on its right.
        i)   The line of demarcation of the fire damage on the side of the refrigerator is consistent with the top of the counter that had been on top of the cabinets.
        ii)  The fire damage below the line of demarcation is consistent with the origin of the fire within the refrigerator.  This is a protected area and should have little to no fire damage.

    b)  The letter "C" indicates significant fire/heat damage to the sheetmetal side of the refrigerator in a protected area.  The protected area was where the refrigerator was against the side of the kitchen cabinet/s.

    c)  The letter "D" indicates fire/heat damage to the ceiling.  This damage is consistent with the origin of the fire at the refrigerator and kitchen cabinets.  This damage is consistent with the refrigerator having failed and caused this fire.

6)  A lighting fixture in the kitchen with part of the glass melted on one (1) side.  The melted glass is "pointing" in the direction of the origin of the fire, the refrigerator.

7)  A composite photograph.  Standing in the dining room looking east at the dividing partition with the kitchen in the background.
    a)  The letter "A" indicates dining room side of the dividing partition in the area behind the refrigerator.
    b)  The letter "B" indicates the pass-through opening over the kitchen counter.
    c)  The letter "C" indicates front of the refrigerator in the kitchen.
    d)  The letter "D" indicates stairs to the second floor.

8)  The floor and kitchen cabinets in the area adjacent to the refrigerator.
    a)  The letter "A" indicates the front of the door to the diagonal kitchen cabinet above the electric toe-kick heater.  The burn patterns are consistent with the origin of the fire towards the lower right, this is consistent with the origin of the fire at the refrigerator.

Insured:    David Ryan
File No.:    7250-001293                                                    **11**

   b) The letter "B" indicates the location of the electric toe-kick heater under the diagonal kitchen cabinet.
   c) The letter "C" indicates a protected, not burned, area under the twelve (12) inch kitchen cabinet that was adjacent to the refrigerator. This damage is consistent with the origin of the fire at the refrigerator.
   d) The letter "D" indicates a fire damaged dividing partition framing member, two (2) two-by-fours (2 x 4).
      i) The framing member is fire damaged in a protected area, behind the Sheetrock and the kitchen cabinet.
      ii) This fire damage is consistent with the fire originating in the lower mechanical compartment of the refrigerator.

9) The floor area partly under the refrigerator and in front of the kitchen cabinets.
   a) The letter "A" indicates the front of the door to the diagonal kitchen cabinet above the electric toe-kick heater. The burn patterns are consistent with the origin of the fire towards the lower right, this is consistent with the origin of the fire at the refrigerator.
   b) The letter "B" indicates the location of the electric toe-kick heater under the diagonal kitchen cabinet.
   c) The letter "C" indicates a protected, not burned, area under the twelve (12) inch kitchen cabinet that was adjacent to the refrigerator. This damage is consistent with the origin of the fire at the refrigerator.
   d) The letter "D" indicates a fire damaged dividing partition framing member, two (2) two-by-fours (2 x 4).
      i) The framing member is fire damaged in a protected area, behind the Sheetrock and the kitchen cabinet.
      ii) This fire damage is consistent with the fire originating in the lower mechanical compartment of the refrigerator.
   e) The letter "E" indicates burned hardwood floor under the back right side of the refrigerator. This fire damage is consistent with a fire within the equipment compartment of the refrigerator.
   f) The letter "F" indicates the two-by-four (2 x 4) plate at the base of the dividing partition behind the Sheetrock. This fire damage is consistent with a fire within the equipment compartment of the refrigerator.
   g) The back right lower corner of the refrigerator. This fire damage is consistent with a fire within the equipment compartment of the refrigerator.

10) A similar photograph as Photograph Number 9 indicating the area behind and under the refrigerator. All the fire damage is consistent with the origin of the fire within the equipment compartment of the refrigerator.

11) A reconstruction of the kitchen cabinet on the north side of the refrigerator. The fire and heat damage is consistent with the origin of the fire within the equipment compartment of the refrigerator.
   a) The letter "A" indicates fire damage under the refrigerator in the area of the condensing fan motor within the equipment compartment.

12) A similar photograph as Photograph Number 11.
   a) The letter "A" indicates the location of the electric toe-kick heater under the diagonal cabinet.

13) Located in the center of the photograph is the side of the kitchen cabinet that was adjacent to the refrigerator. The side that we are looking at is the inside of the kitchen cabinet and indicates little to no fire damage. This is consistent with the fire originating outside of the kitchen cabinets and in the refrigerator.

14) Located in the center of the photograph is the side of the kitchen cabinet that was adjacent to the refrigerator. The side that we are looking at is the exterior side of the kitchen cabinet with indications of fire damage consistent with the fire originating within the refrigerator.

Insured:    David Ryan
File No.:   7250-001293                                                          12

    a) The letter "A" indicates the back of the kitchen cabinet, the area of the kitchen cabinet that was
       against the dividing partition. This fire damage is consistent with fire extending from the back of
       the refrigerator, equipment compartment.
    b) The letter "B" indicates the front of the kitchen cabinet, the portion that formed the toe-kick area.
       This fire damage is consistent with fire extending out of the front grill at the floor level in the
       equipment compartment.

15) Reconstruction of the fire scene with the kitchen cabinet and refrigerator in the approximate location
    they were in at the time of the fire.

16) An overall view of the inside of the refrigerator with its contents in place. All of the fire damage is
    consistent with the fire extending into the refrigeration/freezer compartments of the refrigerator or
    from equipment compartment of the refrigerator.

17) The inside and contents of the upper portion of the refrigerator, the freezer. All of the fire damage is
    consistent with the fire extending into the freezer compartment of the refrigerator or from equipment
    compartment of the refrigerator.

18) The inside and contents of the lower portion of the refrigerator. All of the fire damage is consistent
    with the fire extending into the refrigeration compartment of the refrigerator or from equipment
    compartment of the refrigerator.

19) The right and back side of the refrigerator. All of the fire damage is consistent with the fire extending
    from the equipment compartment, letter "A", of the refrigerator.
    a) The letter "A" indicates the equipment compartment with the cover removed.
    b) The letter "B" indicates the right side of the refrigerator, the side immediately adjacent to the
       kitchen cabinet.
    c) The letter "C" indicates the back of the refrigerator, the portion immediately adjacent to the
       dividing partition.
    d) The letter "D" indicates the location of the kitchen counter top.

20) The equipment compartment with the condenser fan inside, the letter "A".

21) An overall view of the equipment compartment.
    a) The letter "A" indicates condenser fan motor.
    b) The letter "B" indicates the condensing coils.
    c) The letter "C" indicates the compressor.
    d) The condensing fan motor had been mounted in the approximate location of the arrow for the
       letter "B" in a plastic shroud. The fan sucks air in through the front grill at the floor level, left side.
       The "cool" air is pulled across the condensing coils and then across the compressor. After going
       through the fan the warm air is forced out the right side of the grill in front at floor level.

22) The inside side of the equipment compartment cover. The most fire damage is on the right side as
    seen here. This is consistent with a fire on the right side of the equipment compartment as seen from
    the front of the refrigerator.

23) The exterior side of the equipment compartment cover. The fire damage is consistent with a fire on
    the right side of the equipment compartment as seen from the front of the refrigerator.

24) The underside of the refrigerator. The upper portion of this photograph has fire and heat damage
    consistent with the damage to the hardwood floor under the refrigerator. This fire damage is
    consistent with the origin of the fire within the refrigerator equipment compartment.

25) The electric toe-kick heater as examined at the Nantucket Fire Headquarters with Captain Stephen
    Murphy. The top and front of the electric toe-kick heater.

Insured:    David Ryan
File No.:    7250-001293

13

26) The top of the fan/heating element portion of the electric toe-kick heater.
   a)  The letter "A" indicates the front of the electric toe-kick heater. The heat damage is consistent with the fire extending into the heater. The heat damage is not consistent with a failure of the electric toe-kick heater.

27) The lower side or the side that is normally down of the fan/heating element portion of the electric toe-kick heater.
   a)  The heat damage is consistent with heat extending into the electric toe-kick heater.
   b)  *Note: the heating elements tested out to be in operational condition. The fan motor was in working condition, it still operated at the May 13, 2004 testing at Levine Group, Inc.*

28) A closeup photograph of the electrical connections for the heating elements. The thermal protector, the letter "A", had been destroyed from exposure to fire/heat.

29) The electrical meter on the east side of the summer/vacation home .

30) The main electrical distribution panel.

31) A closer view of the main electrical distribution panel with the letter "A" indicating the tripped circuit breaker for the refrigerator in the kitchen.
   a)  The only normal circuit breaker that was tripped in the main electrical distribution panel. *Note: the GFCI circuit breaker, the second one below the refrigerator circuit breaker, was tripped. GFCI circuit breakers are very sensitive resulting in its tripping from the fire conditions.*

32) The circuit breaker identification on the inside of the door on the main electrical distribution panel. Number 19 is for the refrigerator which was found in the tripped position.

## CERTIFICATION

This is to certify that the foregoing EXPERT DISLCOSURE was mailed, postage prepaid, first class mail, this 2nd day of February, 2006 to the following:

Steven M. Key, Esq.
Campbell Campbell Edwards & Conroy
One Constitution Plaza, Third Floor
Boston, MA  02129

Robert W. Foster, Jr., Esq. (pro hac vice counsel)
Nelson Mullins Riley & Scarborough LLP
1320 Main Street, 17th Floor
Columbia, SC  29201

Erik Loftus, Esq.



175 F.R.D. 497                                                                                    Page 1

175 F.R.D. 497, 39 Fed.R.Serv.3d 1351

**(Cite as: 175 F.R.D. 497)**

**Motions, Pleadings and Filings**

United States District Court,
D. Maryland.
Lisa SULLIVAN
v.
GLOCK, INC.
**No. CIV. A. WMN-95-2652.**

Sept. 29, 1997.

Former police officer brought action against manufacturer of semiautomatic pistol, alleging that she sustained serious injuries as a result of defective design of carrying case for pistol. Manufacturer moved to exclude testimony of officer's expert witnesses. The District Court, Grimm, United States Magistrate Judge, held that to extent that source of facts which formed basis for treating physicians' opinions derived from information learned during actual treatment of officer, no comprehensive written report from physicians was required.

Motion to exclude testimony denied.

West Headnotes

**[1] Federal Civil Procedure** **1274**
170Ak1274 Most Cited Cases
To extent that source of facts which form basis for treating physician's opinions derive from information learned during actual treatment of patient, as opposed to being subsequently supplied by attorney involved in litigating case involving condition or injury, no comprehensive written report signed by witness is required. Fed.Rules Civ.Proc.Rule 26(a)(2), 28 U.S.C.A.

**[2] Federal Civil Procedure** **1274**
170Ak1274 Most Cited Cases

Party does not waive its entitlement to disclosure of report prepared by expert witness merely by filing interrogatories or deposing expert. Fed.Rules Civ.Proc.Rule 26(a)(2)(B), 28 U.S.C.A.

**[3] Federal Civil Procedure** **1278**
170Ak1278 Most Cited Cases
If failure to comply with required disclosure involves material aspect of expert's testimony, and if opposing party can show prejudice in connection with lack of disclosure, then opinion of expert should be excluded, in whole or in part, at trial. Fed.Rules Civ.Proc.Rules 26(a)(2)(B), 37(c)(1), 28 U.S.C.A.

**[4] Federal Civil Procedure** **1278**
170Ak1278 Most Cited Cases
Trial court has enormous discretion in deciding whether party's violation of expert report rules is justified or harmless, and result will be determined by facts peculiar to each. Fed.Rules Civ.Proc.Rule 26(a)(2), 28 U.S.C.A.

**[5] Federal Civil Procedure** **1274**
170Ak1274 Most Cited Cases

**[5] Federal Civil Procedure** **1278**
170Ak1278 Most Cited Cases

**[5] Federal Civil Procedure** **1532.1**
170Ak1532.1 Most Cited Cases
It is incumbent upon counsel to make full and timely disclosures of information regarding their retained experts, supplement them promptly when required,
responsively answer interrogatories directed towards experts, and supplement these answers if warranted; failure to do so may well result in exclusion of testimony of expert at trial, in whole or in part. Fed.Rules Civ.Proc.Rules 26(a)(2), 37(c)(1), 28 U.S.C.A.

**[6] Federal Civil Procedure** **1278**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

175 F.R.D. 497                                                                                           Page 2

175 F.R.D. 497, 39 Fed.R.Serv.3d 1351

**(Cite as: 175 F.R.D. 497)**

170Ak1278 Most Cited Cases
Counsel's failure to pursue interrogatories and/or depositions to discover expected opinion testimony of "hybrid" fact/expert witnesses is not a basis for excluding that testimony at trial. Fed.Rules Civ.Proc.Rule 26(a)(2), 28 U.S.C.A.

**[7] Federal Civil Procedure** ⬡⟲1278
170Ak1278 Most Cited Cases
In determining whether or not automatic exclusion provisions of rule governing discovery sanctions should be applied to exclude expert testimony, court should consider four factors in assessing whether there was substantial justification for failure to disclose or harmlessness to opposing party: importance of excluded testimony, explanation of party for its failure to comply with required disclosure, potential prejudice that would arise from allowing testimony, and availability of a continuance to cure such prejudice. Fed.Rules Civ.Proc.Rules 26(a)(2), 37(c)(1), 28 U.S.C.A.
**\*498** Marlon Steve Charles, Washington, DC, for plaintiff.

John P. Sweeney, Gregory L. Lockwood, Susan Durbin Kinter and Miles & Stockbridge, Baltimore, MD, and John F. Renzulli, Christopher P. Orlando and Renzulli, Gainey & Rutherford, New York City, for defendant.

### *MEMORANDUM AND ORDER*

GRIMM, United States Magistrate Judge.

This case has been assigned to me for the resolution of discovery disputes pursuant to 28 U.S.C. § 636(c) (1993) and Local Rule 301 (D.Md.1997). The plaintiff, a former police officer, has sued Glock, Inc., the manufacturer of the Glock 9mm semiautomatic pistol. The plaintiff alleges that she sustained serious injuries as a result of the defective design of a carrying case for the Glock pistol which, it is claimed, caused the pistol to discharge while the plaintiff was attempting to put it in its carrying case following a training session.

Presently pending is the defendant's motion to

exclude testimony of plaintiff's expert witnesses, the plaintiff's opposition and the defendant's reply. Paper Nos. 41, 42 and 43. [FN1] The essence of the defendant's motion is that the plaintiff failed to provide complete expert disclosures as required by Fed.R.Civ.P. 26(a)(2) with respect to all experts except Mr. Roane (hereinafter the "health care experts") and, therefore, pursuant to Fed.R.Civ.P. 37(c)(1), those experts should not be permitted to testify at trial, which counsel advises is presently scheduled for early 1998. For the reasons set forth below, the defendant's motion is denied, but the defendant will be permitted to pursue discovery of these experts, and to designate rebuttal experts.

> FN1. The defendant also has sought to exclude the trial testimony of another of the plaintiff's experts, Mr. Roane, as part of the relief requested in its motion for summary judgment. Paper No. 38. This issue will be addressed in a separate Order.

### BACKGROUND

In its motion to exclude the plaintiff's expert testimony, the defendant concedes that the plaintiff disclosed the identity of her health care experts, but asserts that these disclosures were inadequate. The disclosure identified the following health care experts: Yomi Fakunle, M.D.; Lesley Wong, M.D.; Jerome F. Kowaleski, Ph.D., a psychologist; Lois Bethea-Thompson, a physical therapist; and Diane Doyle, an occupational therapist. During a telephone conference with counsel on September 17, 1997, counsel for the plaintiff stated that each of these health care experts provided services for, and treatment of, the plaintiff. According to plaintiff's counsel, none of the health care experts were retained for the purpose of providing testimony at trial.

The Rule 26(a)(2) disclosure statement filed by the plaintiff, [FN2] contains a very brief description of the role of each of the foregoing health care providers in connection with **\*499** their treatment and/or evaluation of the plaintiff. Unquestionably, these descriptions fall far short of the detailed information required by Rule 26(a)(2)(B). As will be discussed more fully, however, each of the health

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

175 F.R.D. 497, 39 Fed.R.Serv.3d 1351

**(Cite as: 175 F.R.D. 497)**

care experts disclosed by the plaintiff falls into the category of expert witnesses commonly described as "hybrid witnesses," for whom no Fed.R.Civ.P. 26(a)(2)(B) disclosures are required. Accordingly, I will deny the defendant's motion to exclude the testimony of these witnesses at trial. However, because there continues to be substantial uncertainty regarding the nature of the disclosures required by Rule 26(a)(2) with respect to hybrid witnesses--as displayed by the practice of counsel in this case--I also decline to penalize the defendant in resolving the pending motion. I therefore will also order that the defendant be permitted to discover the opinions of the health care experts who are expected to offer testimony at trial, and if requested, to designate rebuttal experts.

> FN2. The disclosure statement is attached as Exhibit A to the defendant's motion. Paper No. 41.

### DISCUSSION

Since the adoption of the Federal Rules of Evidence in 1975, the use of expert witnesses in civil and criminal trials has exploded. One commentator has observed:

> In modern trials, the expert is as common as the lawyer. Case after case, civil or criminal, state or federal, turns on the testimony of one or more of many kinds of experts. Expert inflation is on the rise. The causes are many. The growth of complex litigation, the explosion of technology and science, the increasing creativity of advocates--all play a role. But the main reason is the liberality with which modern evidence doctrine embraces courtroom experts.

Faust F. Rossi, *Modern Evidence and the Expert Witness,* in *The Litigation Manual: A Primer for Trial Lawyers* 254 (2d ed.1989).

The Federal Rules of Civil Procedure regarding discovery of expert witness opinions have had to change to keep pace with the increasing use of expert testimony. Prior to the 1993 amendments to the Rules, there was no right to take the deposition of an expert retained to testify at trial, without leave of the court. [FN3] Expert opinions were to be discovered through interrogatories--a practice

which proved to be almost useless in terms of obtaining meaningful disclosure of opinions and supporting factual bases. Indeed, the commentary to the 1993 changes to Fed.R.Civ.P. 26(a) specifically noted this problem, stating "[t]he information disclosed under the former rule in answering interrogatories about the 'substance' of expert testimony was frequently so sketchy and vague that it rarely dispensed with the need to depose the expert and often was even of little help in preparing for a deposition of the witness." Commentary to Fed.R.Civ.P. 26(a) (1993), 146 F.R.D. 401, 634 (1993).

> FN3. Prior to the 1993 amendments, Rule 26(b)(4) limited discovery of testifying experts to interrogatories, but provided that, upon motion, "the court may order further discovery by other means...." Fed.R.Civ.P. 26(b)(4)(A)(i) (superseded). In practice, this was one of the most ignored rules of civil procedure. Recognizing the hardship that strict adherence to the rule would impose upon efficient pretrial preparation, this Court accordingly adopted a Local Rule stating that it was "[t]he general practice in this District to permit experts designated by one party to be deposed by an opposing party." Local Rule 104.10 (D.Md.1989) (superseded).

In recognition of the need for lawyers to have an effective means of discovering expert testimony, the 1993 changes to the Rules of Civil Procedure adopted a carefully considered series of procedures designed to facilitate meaningful, and less expensive, discovery of expert opinions. The "expert disclosures" required by Fed.R.Civ.P. 26(a)(2) are the cornerstone of these changes. The Rule provides, relevantly:

(2) Disclosure of Expert Testimony.

(A) In addition to the disclosures required by paragraph (1), a party will disclose to other parties the identity of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence.

(B) Except as otherwise stipulated or directed by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

175 F.R.D. 497                                                                                     Page 4

175 F.R.D. 497, 39 Fed.R.Serv.3d 1351

**(Cite as: 175 F.R.D. 497)**

the court, this disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as *500 an employee of the party regularly involve giving expert testimony, be accompanied by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.
Fed.R.Civ.P. 26(a)(2).

It is noteworthy that Rule 26(a)(2) creates two distinct types of disclosures: (1) disclosure of the identity of *any* witness who may provide opinion testimony at trial in accordance with Fed. R. Evid. 702, 703, and 705; and (2) the far more comprehensive written and signed report which Rule 26(a)(2)(B) requires for "a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony" (hereinafter, "retained experts").
This distinction, often overlooked in practice, is of critical importance. Rule 26(a)(2)(A) is colloquially said to apply to "hybrid" fact/expert witnesses, the most frequent example being a treating physician in a personal injury case. [FN4] As to these witnesses, the comprehensive disclosures of the written report set forth in Fed.R.Civ.P. 26(a)(2)(B) are not required. The commentary to Rule 26 provides in pertinent part:

> FN4. See Local Rule 104.10.b (D.Md.1997) (indicating that "hybrid fact/expert witnesses" include treating physicians).

The requirement of a written report in paragraph

[26(a) ](2)(B), however, applies only to those experts who are retained or specially employed to provide such testimony in the case or whose duties as an employee of a party regularly involve the giving of such testimony. A treating physician, for example, can be deposed or called to testify at trial without any requirement for a written report.
Commentary to Fed.R.Civ.P. 26(a) (1993), 146 F.R.D. 401, 635 (1993). *See also* Local Rule 104.10.b (D.Md.1997) (stating that Rule 26(a)(2)(B) disclosures "need not be provided as to hybrid fact/expert witnesses such as treating physicians," and that "an adverse party may obtain the opinions of such witnesses. through interrogatories, document production requests and depositions"). [FN5]

> FN5. Although the treating physician is the most frequent example of a hybrid witness, it is clear from a review of Fed.R.Evid. 702 that any witness with expertise in an area of scientific, technical or specialized knowledge which would be helpful to the fact finder would fit into this category as well. It is very common in modern litigation to find fact witnesses who also possess the requisite expertise required by Fed.R.Evid. 702 to permit them to give expert opinion testimony. While Rule 26(a)(2)(A) does not require disclosure of anything more than their identity, lawyers still need to discover their opinions in order to effectively prepare for trial.

[1] Although it is clear that a treating physician is the quintessential example of a hybrid witness for whom no Rule 26(a)(2)(B) disclosures are required, it is a mistake to focus solely on the status of the expert, instead of the nature of the testimony which will be offered at trial. A witness can be a hybrid witness as to certain opinions, but a retained expert as to others, and with regard to treating physicians, there is a debate over where the line should be drawn. *Compare Shapardon v. West Beach Estates,* 172 F.R.D. 415, 416-17 (D.Haw. 1997) ("[T]reating physicians commonly consider the cause of any medical condition presented in a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

175 F.R.D. 497, 39 Fed.R.Serv.3d 1351

**(Cite as: 175 F.R.D. 497)**

patient, the diagnosis, the prognosis and the extent of disability, if any, caused by the condition or injury. Opinions as to these matters are encompassed in the ordinary care of a patient and do not subject the treating physician to the report requirement of Rule 26(a)(2)(B)."); *Lauria v. National R.R. Passenger Corp.,* No. Civ. A. 95-1561, 1997 WL 138906, at *2 (E.D.Pa. March 24, 1997) ("[A] court must inquire whether the treating physician acquired his opinion as to the cause of the plaintiff's injuries directly through his treatment of the plaintiff.... If **\*501** so, then even though the treating physician may be deposed, he is not required to file the written report required by Rule 26(a)(2)(B). In this situation, testimony as to whether the injuries for which the physician treated the patient are causally related to the accident are within the scope of the patient's care and treatment."); *Hall v. Sykes,* 164 F.R.D. 46, 48 (E.D.Va.1995) ("If a treating physician forms an opinion of the causation of an injury to a patient and the prognosis of the patient's condition during the treatment then such opinion may be expressed by the treating physician without the necessity of a report under Fed.R.Civ.P. 26(a)(2)(B).... However, if a physician, even though he may be a treating physician, is specially retained or employed to render a medical opinion based upon factors that were not learned in the course of the treatment of the patient, then such a doctor would be required to present an expert written report."); *Piper v. Harnischfeger Corp.,* 170 F.R.D. 173 (D.Nev.1997) (same); and *Garza v. Abbott Lab.,* No. 95 C 3560, 1996 WL 494266 (N.D.Ill. Aug. 27, 1996) (same) *with Thomas v. Consolidated Rail Corp.,* 169 F.R.D. 1, 2 (D.Mass.1996) ("Many courts, however, have recognized the unfairness of permitting a party to employ a physician who treated an injured party to provide testimony beyond simply the care of the plaintiff to classic expert opinion regarding causation and prognosis."); and *Brown v. Best Foods,* 169 F.R.D. 385, 388 (N.D.Ala.1996) ("To the extent the treating physician testifies only as to care and treatment of his/her patient, the physician is not considered a specially retained expert [for whom Rule 26(a)(2)(B) disclosures are required].").
In my opinion, the approach taken by the court in *Shapardon, supra,* is most helpful, and most

consistent with the stated purpose of Rule 26(a)(2)(A). To the extent the source of the facts which form the basis for a treating physician's opinions derive from information learned during the actual treatment of the patient--as opposed to being subsequently supplied by an attorney involved in litigating a case involving the condition or injury--then no Rule 26(a)(2)(B) statement should be required.

The failure to appreciate the distinction between a hybrid witness and retained expert can be a trap for the unwary. In this case, for example, the plaintiff disclosed the identity of a number of experts who were also her treating health care providers, and hence, hybrid witnesses, but did not provide--and was not required to provide--the detailed disclosures mandated by Fed.R.Civ.P. 26(a)(2)(B). Not appreciating the distinction between hybrid witnesses and retained experts, defendant's counsel repeatedly demanded complete Rule 26(a)(2)(B) disclosures, when she was not entitled to receive them. [FN6] Apparently operating under the misconception that the failure to provide these more detailed responses would result in automatic exclusion under Rule 37(c)(1), discussed below, defendant's counsel did not depose the hybrid witnesses. Instead, after the expiration of the discovery cutoff, she filed the instant motion in limine in an effort to exclude the testimony of these witnesses at trial.

> FN6. From a review of the papers submitted in connection with this dispute it does not appear that counsel for the plaintiff was aware of the distinction between hybrid witnesses and retained experts either. His failure to provide more detailed information about his experts in response to counsel for the defendant's many demands appears to be more a function of inattention to her requests, rather than an understanding of the rules of procedure.

As noted above, however, the plaintiff was not required to disclose any more than the identity of the hybrid witnesses under Rule 26(a)(2)(A), which

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

175 F.R.D. 497, 39 Fed.R.Serv.3d 1351

**(Cite as: 175 F.R.D. 497)**

she did. Thus, the automatic exclusion provision of Rule 37(c)(1) is inapplicable. Under an overly rigid reading of the rules of procedure, which I decline to do, the trap for the defendant would be that it would now be required to go to trial without any knowledge of the plaintiff's hybrid witnesses' opinions, because the discovery deadline has passed, and, without leave of the Court, the defendant would be unable to depose them. [FN7] In addition to the confusion **\*502** regarding what disclosures are required for hybrid witnesses and retained experts, there is also confusion associated with other methods of discovering expert opinion testimony, as will next be seen.

> FN7. From the papers filed in connection with this dispute, I do not know whether counsel for the defendant propounded an interrogatory question to the plaintiff asking for the opinions and factual bases of all witnesses who would provide opinion testimony pursuant to Fed.R.Evid. 702, 703 and 705. This would be an independent method of requiring the plaintiff to disclose this information for hybrid witnesses, and the failure to answer such an interrogatory may be separate grounds to support a motion to exclude the opinion testimony of a hybrid witness. Accordingly, prudent counsel would be wise to include in their interrogatories two separate "expert" interrogatories. The first should solicit the opinions of hybrid witnesses. For example, "for each witness identified by you in connection with the disclosures required by Fed.R.Civ.P. 26(a)(2)(A), provide a complete statement of the opinions to be expressed and basis and reasons therefor." The second should request disclosure of the opinions of retained experts covered by Rule 26(a)(2)(B). For example, "for each witness which you have retained or specially employed to provide expert testimony in this case, or employed by you whose duties regularly involve giving expert testimony and who you expect to testify at trial, provide a complete

statement of the opinions to be expressed and the basis and reasons therefor."

[2] Discovery of expert opinion testimony may also be obtained by interrogatories under Rule 26(b)(4)(B), and by deposition under Rules 26(b)(4)(A) and 26(b)(4)(B). [FN8] Rule 26(e)(1), moreover, imposes a duty on a party to supplement disclosures required by Rule 26(a). Similarly, Rule 26(e)(2) states that a party is "under a duty seasonably to amend a prior response to an interrogatory, request for production, or request for admission if the party learns that the response is in some material respect incomplete or incorrect." Supplementation, however, is not required if the corrective information already has been made known to the other parties during the discovery process or in writing. Fed.R.Civ.P. 26(e). This scheme is often confusing as reasonable minds can disagree about whether supplementing information has been provided "during the discovery process," which includes document production, written discovery responses and deposition testimony. Significant "corrective" information relating to an expert's opinion could, for example, be buried within a mass of documents produced to, but overlooked by, the receiving attorney.

> FN8. A party does not waive its entitlement to Rule 26(a)(2)(B) disclosures merely by filing interrogatories or deposing an expert. *Brand v. Mazda Motor Inc.,* No. 94-4139-SAC, 1996 WL 707018, at *2 (D.Kan. Nov. 18, 1996); *St. Paul Fire & Marine Insurance Co. v. Heath Fielding Insurance Broking, Ltd.,* No. 91 CIV. 0748, 1996 WL 19028, at *12 (S.D.N.Y. Jan. 17, 1996). Indeed, the deposition of an expert for whom a report is required by Rule 26(a)(2)(B) may not be taken until after those disclosures have been made. Fed.R.Civ.P. 26(b)(4)(A).

Another reason for potential confusion regarding the sufficiency of disclosure of expert opinion testimony is that Rule 26(e)(1) requires that, with respect to the retained expert, there is a duty to supplement the expert's opinion if there is a material

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

175 F.R.D. 497                                                                           **Page 7**

175 F.R.D. 497, 39 Fed.R.Serv.3d 1351

**(Cite as: 175 F.R.D. 497)**

change in the opinion. This obligation extends to both the report required by Rule 26(a)(2)(B), as well as the expert's deposition testimony. This supplementation must occur not later than the date of the pretrial disclosures required by Rule 26(a)(3). [FN9] Part of the potential confusion here stems from the fact that the supplementation of deposition testimony is not required for hybrid witnesses, for whom no Rule 26(a)(2)(B) disclosures are required. Once again, the failure to appreciate the distinction between hybrid witnesses and retained experts can either lead to sanctionable violations of the rules of civil procedure, or a failure to obtain sufficient discovery of the opinions of hybrid witnesses through other discovery devices.

> FN9. Rule 26(a)(3) requires that pretrial disclosures be made not later than 30 days before trial, unless otherwise required by the court. Local Rule 106.4, which governs pretrial orders, provides that disclosure of the information required by the pretrial order satisfies the requirements of Rule 26(a)(3). Thus, in this jurisdiction, if supplementation of an expert's deposition testimony is required by Rule 26(e)(1), it must be done not later than the time designated in the scheduling order for filing the joint pretrial order.

Another issue which frequently arises in connection with discovery of expert opinions is the sufficiency of the disclosures required by Rule 26(a)(2)(B). *See, e.g., 1st Source Bank v. First Resource Federal Credit Union,* 167 F.R.D. 61, 66-67 (N.D.Ind.1996) (noting that "courts and counsel are still learning the specificity required of expert reports under Rule 26(a)(2)(B)," and that "no **\*503** mechanism exists for a disclosing party to test the sufficiency of its disclosure," prior to the opposing party filing of a motion in limine or objecting at trial); *see also Reed v. Binder,* 165 F.R.D. 424, 429 (D.N.J.1996) (noting that "[t]he test of a report is whether it was sufficiently complete, detailed and in compliance with the Rules so that surprise is eliminated, unnecessary depositions are avoided, and costs are reduced"). The Rule itself is quite detailed, and, when coupled with Rule 37(a)(3), [FN10] would

seem to require exact compliance in all particulars with the disclosures required by Rule 26(a)(2)(B), even though this is often very difficult to do. Moreover, a literal reading of Rules 37(a)(3) and 37(c)(1) would result in the application of the automatic exclusion of an expert's trial testimony if there was not complete compliance with the requirements of Rule 26(a)(2)(B), unless the court finds that there was substantial justification for the failure to make complete disclosure or that the failure to disclose is harmless. *Mid-America Tablewares, Inc. v. Mogi Trading Co.,* 100 F.3d 1353, 1363 (7th Cir.1996).

> FN10. "[A]n *evasive or incomplete disclosure,* answer, or response is to be treated as a *failure* to disclose, answer or respond." Fed.R.Civ.P. 37(a)(3) (emphasis added).

[3] Thus, given the severity of the automatic exclusion sanction of Rule 37(c)(1), prudence dictates that counsel be as complete and thorough as possible in making and supplementing Rule 26(a)(2)(B) disclosures. *Accord 1st Source Bank,* 167 F.R.D. at 67 (suggesting that until Rule 26(a)(2)(b) is modified to include a safe harbor provision or a meet and confer provision as a prerequisite to exclusion for an inadequate disclosure, "counsel would seem well advised to err on the side of overinclusiveness"). As a rule of thumb, if the failure to comply with the required disclosure involves a material aspect of the expert's testimony, [FN11] and if the opposing party can show prejudice in connection with the lack of disclosure, then the opinion of the expert should be excluded, in whole or in part, at trial.

> FN11. When one understands the purpose of the Rule 26(a)(2)(B) disclosures, it is easier to appreciate why complete disclosures are required. The purpose of these disclosures is to provide "information regarding expert testimony sufficiently in advance of trial that opposing parties have a reasonable opportunity to prepare for effective *cross examination* and perhaps arrange for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

175 F.R.D. 497                                                                                      Page 8

175 F.R.D. 497, 39 Fed.R.Serv.3d 1351

**(Cite as: 175 F.R.D. 497)**

expert testimony from other witnesses." Commentary to Rule 26(a), 146 F.R.D. 401, 633 (1993) (emphasis added). Cross examination of an expert generally involves three components. During the court's preliminary assessment of whether the expert will be permitted to offer opinion testimony, pursuant to Fed.R.Evid. 104(a), the focus is whether the expert meets the requirements of evidence rule 702 to give such testimony. If so qualified, then, pursuant to Fed.R.Evid. 611(b), the focus shifts to the opinions expressed and the support therefor, as well as matters affecting the credibility of the expert. When one keeps these three functions of cross examination of experts in mind it is easier to appreciate why all of the information required by the Rule 26(a)(2)(B) disclosure is important. All too often lawyers focus almost exclusively on disclosing the expert's opinions, the supporting facts, data, and bases, and neglect their additional obligation to disclose the witness's qualifications, publications, compensation, and listing of prior testimony. This information, however, bears directly on whether the expert is qualified under Fed.R.Evid. 702, and commonly provides a factual basis to attack the credibility of the expert. Thus, a Rule 26(a)(2)(B) disclosure which does not completely address each of these elements may be lacking in a material respect.

Pursuant to Fed.R.Civ.P. 37(a)(2), a party who is not provided a Rule 26(a)(2)(B) disclosure, or receives one which he or she thinks is incomplete, may file a "motion to compel disclosure and for appropriate sanctions." [FN12] When deciding whether or not to file such a motion, however, a party must make an important tactical decision, as the facts in this case illustrate. Central to this decision is the automatic exclusion provision of Fed.R.Civ.P. 37(c)(1), which provides "[a] party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e) shall

not, *unless such failure is harmless,* be permitted to use as evidence at a trial, at a hearing or on a motion any witness or information not so disclosed." Rule 37(c)(1) is "a self executing sanction for failure to make a disclosure required by Rule 26(a), without further need for a motion under ...     **\*504**     [37](a)(2)(A)."     Commentary to Fed.R.Civ.P. 37, 146 F.R.D. 401, 691 (1993). The commentary further provides that "[p]ursuant to new subdivision [37](a)(2)(A), a party dissatisfied with the disclosure made by an opposing party *may* under this rule move for an order to compel disclosure," but that "[u]nder revised paragraph [37](3), evasive or incomplete disclosures and responses to interrogatories and production requests are treated as *failures* to disclose or respond." *Id.* at 690.

> FN12. Of course, counsel must first make a good faith attempt to confer with opposing counsel to obtain the disclosures before filing a motion to compel. Fed.R.Civ.P. 37(a)(2)(A); Local Rule 104.7 (D.Md.1997).

A party who receives incomplete or evasive Rule 26(a)(2) disclosures consequently faces a dilemma of sorts. Because the failure to completely and nonevasively respond operates as a refusal to answer, the "self-executing" exclusion of the expert's opinion is mandated, without further motion by the party, unless the court determines that the defective disclosure was substantially justified or harmless. Attorneys who wish to exclude the expert's testimony at trial, then, may be disinclined to file the motion to compel, because, if granted, the party which supplied the defective disclosures may be given another opportunity to get them right, and the expert will then be permitted to testify at trial. Furthermore, as a practical matter, filing a motion to compel can have the effect of educating an opponent as to what corrective measures must be taken in order to secure admission at trial of some of the potentially most damaging evidence which can be offered. On the other side of the coin, if the attorney does not file a motion to compel, he or she does so at the risk of the judge permitting the expert to testify, finding that the failure to properly provide

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

175 F.R.D. 497, 39 Fed.R.Serv.3d 1351

**(Cite as: 175 F.R.D. 497)**

the Rule 26(a)(2) disclosures was substantially justified or harmless. *See, e.g., Marek v. Moore,* 171 F.R.D. 298, 299-300 (D.Kan.1997) (finding that party was not prejudiced by expert's failure to sign Rule 26(a)(2)(B) report). The stakes are high, for if the expert's opinion is allowed, the result is one of the worst imaginable--an expert testifying as to opinions about which opposing counsel has no notice or knowledge. The conundrum, therefore, is whether to file a motion to compel and obtain the information prior to trial, or, alternately, not file the motion to compel and hope that the court will exclude the testimony under Rule 37(c)(1) at trial. The answer to this dilemma often depends, to borrow from Inspector "Dirty Harry" Callahan, on whether or not counsel feels lucky. [FN13]

> FN13. *See* Inspector "Dirty Harry" Callahan, *Dirty Harry* (Warner Bros. Co./ Malpaso Co.1971) "There's just one question you've got to ask yourself--'Do I feel lucky?' ".

When counsel foregoes filing a motion to compel, anticipating that the trial judge will exclude the expert testimony on the basis of inadequate 26(a)(2) disclosures, and files a motion in limine to block the testimony at trial, the court must decide whether to impose what has traditionally been considered a severe sanction, appropriate only for willful and substantial abuse of the discovery process. *See McNerney v. Archer Daniels Midland Co.,* 164 F.R.D. 584, 586 (W.D.N.Y.1995) (noting that "[p]recluding testimony from an expert under [Rule 37(c)(1) ] is a drastic remedy and should only be applied in cases where the party's conduct represents flagrant bad faith and callous disregard of the federal rules"); *see also Reed v. Binder,* 165 F.R.D. 424, 431 (D.N.J.1996) (finding that barring expert's testimony as sanction for inadequate Rule 26(a)(2)(B) disclosure was unduly harsh where expert testimony will dominate the proceedings); *Itar-Tass Russian News Agency v. Russian Kurier, Inc.,* No. 95 CIV. 2144, 1996 WL 337289, at *2 (S.D.N.Y. June 18, 1996) (same). This decision is commonly made at trial or on the eve of trial, when there is little opportunity for appropriate briefing and deliberation. Often the court is faced with

conflicting representations and a mixture of information with respect to the status of discovery of the opinions and bases of the expert which is the subject of the motion in limine. An incomplete Rule 26(a)(2)(B) disclosure may have been made providing some, but not all, of the required information. Counsel opposing exclusion may argue that the incomplete or untimely disclosure was harmless as other discovery provided the requisite 26(a)(2)(B) information. Conversely, the party challenging the testimony may not have deposed the proposed expert, arguing that it relied upon the court enforcing the automatic exclusion provisions of Rule 37(c)(1).

**\*505** If the court determines that substantial justification exists for the incomplete expert disclosures, or that the opposing party will not be prejudiced by allowing the expert to testify as to hitherto undisclosed opinions, then it is difficult to not also rule that the party opposing the expert will be permitted to depose the expert, so as not to be unfairly surprised. This is usually the case because, as already noted, a party is not required to file a motion to compel complete disclosures under Rule 37(a)(2), [FN14] and is well within its rights to rely on the automatic exclusion provision contained in Rule 37(c)(1). If the court allows the deposition, however, it tacitly condones last minute discovery and undermines compliance with the rules of procedure. Moreover, when the court determines that a challenged expert may testify, it may then have to allow the challenging party to counter-designate a rebuttal expert, also immediately before trial, who must also be deposed. This undercuts the very purpose of the pretrial scheduling order--including the important goal of setting a specific and limited period for discovery--and rewards dilatory practices by the party which failed to make proper Rule 26(a)(2) disclosures.

> FN14. That rule states, relevantly, "[i]f a party fails to make a disclosure required by Rule 26(a), any other party *may* move to compel disclosure and for appropriate sanctions" (emphasis added).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

175 F.R.D. 497, 39 Fed.R.Serv.3d 1351

**(Cite as: 175 F.R.D. 497)**

Contrastingly, if the court decides to grant the motion in limine and exclude the challenged expert's testimony as to undisclosed opinions, it may seriously weaken the case of the party sponsoring the witness under circumstances where the opposing party had actual knowledge before the discovery cutoff that the expert would be offered at trial, yet received incomplete disclosures about the full nature of the opinions. It is tempting, under such circumstances, to wonder why the opposing party didn't file a motion to compel adequate disclosure under Rule 37(a)(2)(a), or simply take the deposition of the expert, even though that party was well within its rights not to do so, and to elect to take the position that Rule 37(c)(1) bars the testimony at trial.

[4] In attempting to decide whether or not the court can, in the exercise of its discretion, allow the challenged expert to testify at trial despite incomplete disclosures under Rule 26(a)(2), the court may look for guidance to the many reported decisions on this issue. However, when it does so, it will quickly discover that, as at "Alice's Restaurant," one can find what one wants. [FN15] *See, e.g., Metal Processing Co., Inc. v. Amoco Oil Co.,* 173 F.R.D. 244, 248 (E.D.Wis.1997) (refusing to exclude experts disclosed 20 days before trial, where court extends discovery deadline to permit party to depose experts who did not file timely reports); *Hester v. CSX Transportation, Inc.,* 61 F.3d 382, 388 n. 11 (5th Cir.1995) (trial court's decision refusing to exclude expert's rebuttal testimony was not an abuse of discretion even though opinion was not disclosed until day of trial where court finds no intent to withhold opinion in effort to obtain unfair advantage); *Starforth v. Western Resources, Inc.,* 96-2049-EEO, 1996 WL 677084 (D.Kan. Oct. 29, 1996) (refusing to strike expert for missing Rule 26(a)(2)(B) disclosure deadline where several months remained before trial); *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.,* 79 F.3d 182 (1st Cir.1996) (exclusion of expert testimony was not an abuse of discretion where experts' identities were disclosed three days before trial); *Fund Commission Service, II, Inc. v. Westpac Banking Co.,* No. 93 Civ. 8298, 1996 WL 469660, at *4

(S.D.N.Y. Aug. 16, 1996) (excluding party from using "any expert evidence at any stage in [the case]" where the party's "dilatory tactics have flouted the [Rule 26(a) ] Advisory Committee's policy of promoting full pretrial disclosure of expert information."). The net result of the analysis of these cases is that the trial court has enormous discretion in deciding whether a party's violation of the expert report rules is justified or harmless, and the result will be determined by the facts peculiar to each **\*506** case. *Metal Processing Co., Inc.,* 173 F.R.D. at 248. It is possible, however, to identify rules of reason which should be applied in analyzing this issue.

> FN15. See Arlo Guthrie, "Alice's Restaurant" (Reprise Records, 1967) ("You can get anything you want at Alice's Restaurant."). To date, however, neither the Fourth Circuit nor this Court appears to have interpreted in a published opinion the appropriateness of excluding expert testimony for the failure to comply with Rule 26(a)(2).

The first rule of reason is that the entire structure of the rules of procedure governing pretrial preparation, expert disclosures under Rule 26(a)(2) and discovery in general, underscore the need for a fixed period of discovery which ends at a date certain well before trial. Thus, last minute discovery should be strongly discouraged, absent truly exigent circumstances.

[5] Second, there is an important interrelationship between the expert disclosures required by Rule 26(a)(2) and the other forms of discovery which must be recognized by counsel, who are obligated to comply with all of the requirements for each component, or risk the adverse consequences of failing to do so. Therefore, it is incumbent upon counsel to make full and timely disclosures of information regarding their retained experts, supplement them promptly when required, [FN16] responsively answer interrogatories directed towards experts, and supplement these answers if warranted. Failure to do so may well result in the exclusion of the testimony of the expert at trial, in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

175 F.R.D. 497                                                                                    Page 11

175 F.R.D. 497, 39 Fed.R.Serv.3d 1351

**(Cite as: 175 F.R.D. 497)**

whole or in part. The days when counsel may "hide the ball" regarding expert disclosure, and intentionally provide a little, but by no means complete, information about the expected expert testimony are over, and those who continue to do this should not be rewarded for doing so. Moreover, it is no longer acceptable to wait until the last minute to retain and prepare experts. Counsel must be prepared to provide full and meaningful disclosure and discovery at the times required by the rules of procedure and the pretrial scheduling order.

> FN16. To avoid disputes about whether Rule 26(a)(2) disclosures were supplemented as required, this should be done in a writing which clearly reflects that the disclosures are being supplemented.

[6] Third, counsel must be familiar with the distinction between hybrid witnesses and expert witnesses, and the significance of this difference with respect to the required disclosures of Rule 26(a)(2). The writtenreport required by Rule 26(a)(2)(B) is inapplicable to hybrid witnesses, and counsel must be prepared to obtain information about the opinions and bases of their testimony by interrogatories and/or depositions. The failure to pursue these alternative means of discovering the expected opinion testimony of hybrid witnesses is not a basis for excluding that testimony at trial.

Fourth, when faced with a situation where no required expert disclosures have been made, or materially incomplete disclosures have been made, counsel must make a tactical decision. If the most important goal is to avoid surprise at trial or last minute discovery about expert testimony on the eve of trial, then counsel should consider filing a motion to compel adequate disclosures or in the alternative to exclude expert testimony as soon as possible following the discovery cutoff, so that if the court declines to exclude the expert's testimony, the opinions of that expert may be discovered, and a rebuttal expert engaged as far as possible ahead of trial. Alternatively, if the most important goal of the attorney is to preclude the expert from testifying at trial by evoking the automatic exclusion

provisions of Rule 37(c)(1), he or she should remember that this course is not risk free, and that the exclusion of evidence is a severe sanction which the court may be reluctant to impose despite Rule 37(c)(1). At least one court, for example, has recently refused to strike an expert's testimony for failing to comply with Rule 26(a)(2)(B) disclosures where the party moving for exclusion waited until the day before the discovery cut-off to challenge the adequacy of the report. *See Harvey v. District of Columbia,* 949 F.Supp. 874, 877 (D.D.C.1996) (noting that had the moving party "promptly communicated with the plaintiff, they could have met and conferred about the report and still would have had time to file a motion to compel production of a supplemental report.").

[7] Fifth, in determining whether or not the automatic exclusion provisions of Rule 37(c)(1) should be applied to exclude expert testimony, the court should consider four factors in assessing whether there was substantial justification for the failure to disclose or harmlessness to the opposing party: (1) **\*507** the importance of the excluded testimony; (2) the explanation of the party for its failure to comply with the required disclosure; (3) the potential prejudice that would arise from allowing the testimony; and (4) the availability of a continuance to cure such prejudice. *Trilogy Communications, Inc. v. Times Fiber Communications, Inc.,* 109 F.3d 739, 744 (Fed.Cir.1997). With respect to the first factor, the court should evaluate whether the expert whose testimony would be excluded is central to the sponsoring party's case, or merely one of several experts who will testify to the same point. If exclusion of the testimony would be fatal to the sponsoring party's case, there is authority which suggests that it would be abuse of discretion to exclude the evidence. *Orjias v. Stevenson,* 31 F.3d 995, 1005 (10th Cir.1994) ("Notwithstanding Rule 37(c), the district court may be found to have abused its discretion if the exclusion of testimony results in fundamental unfairness in the trial of the case"); *Newman v. GHS Osteopathic Inc.,* 60 F.3d 153, 157 (3rd Cir.1995) (same).

With respect to the second factor, the court should

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

175 F.R.D. 497, 39 Fed.R.Serv.3d 1351

**(Cite as: 175 F.R.D. 497)**

take into consideration the reason for the failure to make the disclosure. The court may consider, for example, the experience of counsel, and whether the failure to provide appropriate disclosures was willful or in bad faith as opposed to inadvertent or the result of inexperience. The court might consider whether any of the confusing circumstances discussed above were involved; whether opposing counsel wrote to request the required disclosure or protest the adequacy of the disclosure given; whether the failure was total as opposed to an incomplete disclosure or failure to timely supplement; and whether the information required by the disclosure was provided to opposing counsel by some other discovery method. In this regard, at least one court has recently also taken into consideration the fact that Rule 26(a)(2) disclosures are relatively new. *See Reed v. Binder,* 165 F.R.D. 424, 431 (D.N.J.1996) (declining to bar expert's testimony as sanction for inadequate Rule 26(b)(2)(B) disclosure in part because voluntary disclosure has not been the rule, and "the court perceives that attorneys practicing before this court have not become completely accustomed to the substantial changes in practice caused by the 1993 amendments to the rules"). In any event, when making its determination, the court should not overlook the fact that Rule 37(c)(1) requires that the reason for nondisclosure constitute *substantial* justification. *See Nguyen v. IBP, Inc.,* 162 F.R.D. 675, 678-82 (D.Kan.1995) ("Substantial justification requires justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request. The proponent's position must have a reasonable basis in law and fact."). *See, e.g., Salgado v. General Motors Co.,* No. 93 C 1427, 1996 WL 535333, at *2 (N.D.Ill. Sept. 19, 1996) (finding that experts' busy trial and travel schedules did not provide substantial justification for party's failure to comply with Rule 26(a)(2)(B)).

The third factor requires the court to consider the potential prejudice to the opposing party if the expert is allowed to testify. Perhaps the most important consideration in this regard is the amount of time remaining before trial. If the issue surfaces

months before trial, the court has great latitude to require the disclosure, permit the opposing party to take additional discovery and designate rebuttal experts, and to balance the scales by imposing a lesser sanction, such as awarding costs. *See McNerney v. Archer Daniels Midland Co.,* 164 F.R.D. 584, 586 (W.D.N.Y.1995) ("Now that plaintiff has submitted most of the components of the required report, any prejudice to defendant can be remedied by granting leave to defendant to depose the expert outside the discovery period [and costs] associated with obtaining compliance with that rule."). Where, however, the issue surfaces on the eve of trial, or worse yet, during the trial, the court's options are far more restricted. In this regard, it must be acknowledged that injecting expert discovery into the final stages of pretrial preparation, or during trial itself, is extremely disruptive as well as expensive. Whether the court is willing to allow this to happen may well be influenced by whether the dispute centers around a complete failure to provide disclosure of the identity or opinions of an expert, as opposed to a claim that the **\*508** disclosures were incomplete, or that disclosures which were once complete were not supplemented to cover an additional opinion the expert is now being asked to give. Another factor which should be considered is whether the proposed expert testimony will be the subject of a *Daubert* challenge. [FN17] *See Reed,* 165 F.R.D. at 429 n. 9 (noting that "[t]he disclosure requirements of the Rules are also particularly helpful to the court in making rulings limiting or restricting expert testimony pursuant to Evidence Rules 104(a) and 702 and *Daubert* "). If so, then the court will have to consider the disruptive impact which this may have on the trial, because it may have to conduct evidentiary hearings outside the presence of the jury pursuant to Fed.R.Evid. 104(a) to determine whether the proposed expert testimony may be presented to the jury.

> FN17. *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

The final factor the court should consider is whether a continuance may be granted to cure the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

175 F.R.D. 497                                                                                     Page 13

175 F.R.D. 497, 39 Fed.R.Serv.3d 1351

**(Cite as: 175 F.R.D. 497)**

effects of prejudice caused by a failure to disclose, or a late disclosure. Needless to say, if the issue arises months before a scheduled trial date, this remedy is far more palatable than if it arises on the eve of trial. Courts should be mindful that granting a continuance just before a scheduled trial inconveniences not only the attorneys and parties, but also non-party witnesses. Additionally, a court must be careful not to reward the party who failed to make proper disclosures by granting a continuance, a practice which invites abuse.

### CONCLUSION

In light of the above discussion, it is apparent that, to the extent that the health care experts identified by the plaintiff in her Rule 26(a)(2)(A) disclosures are intended to testify at trial regarding their treatment of the plaintiff, any opinions regarding the existence of her medical condition, its causation, her treatment and prognosis, then they are hybrid witnesses and the plaintiff was not obliged to provide the defendant with the comprehensive disclosures required under Rule 26(a)(2)(B). Accordingly, the disclosure of their identities complies with the federal rules. For this reason, the defendant's motion is DENIED. However, to the extent that the plaintiff intends for these witnesses to offer opinion testimony based on facts not obtained from their actual treatment of the plaintiff, they may not do so unless complete Rule 26(a)(2)(B) disclosures have been made. Because trial is some months away, there remains time to permit the reopening of discovery for the limited purpose of permitting the defendant to depose the plaintiff's health care experts. To insure that this is accomplished effectively, the following schedule will apply: Within 30 days of this Order, the defendant shall take the deposition of the plaintiff's health care experts. Within 21 days thereafter, the defendant shall designate any rebuttal experts. Within 30 days thereafter, the plaintiff may take the deposition of such rebuttal experts.

SO ORDERED.

175 F.R.D. 497, 39 Fed.R.Serv.3d 1351

**Motions, Pleadings and Filings (Back to top)**

• 1:95cv02652 (Docket) (Sep. 08, 1995)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                    Page 1

Not Reported in F.Supp.2d, 1999 WL 988799 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
Edwin R. BAKER, individually, and as father and
next of friend of Howard Ross Baker, a minor,
Plaintiffs,
v.
INDIAN PRAIRIE COMMUNITY UNIT,
SCHOOL DISTRICT NO. 204, et al., Defendants.
**No. 96 C 3927.**

Oct. 27, 1999.

*MEMORANDUM OPINION AND ORDER*

NOLAN, Magistrate J.

### I. INTRODUCTION

**\*1** This case arises from injuries Howard Ross
Baker sustained to his right hip and femur when he
was twelve years old and involved in a sledding
accident at May Watts School, which is located in
Naperville, Illinois and is part of Indian Prairie
Community Unit School District No. 204. Howard
Ross Baker, and his father, Edwin Baker, now
allege negligence and wilful and wanton conduct
against Indian Prairie Community Unit School
District No. 204 and numerous other defendants and
seek to recover damages and medical expenses
attributable to minor Baker's injuries. Defendants
maintain that they owed no duty to minor Baker
because the dangers associated with his sled run
were "open and obvious." All Defendants have
moved summary judgment on the issue of whether
the conditions encountered by minor Baker were "
open and obvious."

After the Bakers responded to Defendants' motions
for summary judgment, Defendants ServiceMaster
Management Services Limited Partnership and the

ServiceMaster Company ("ServiceMaster") and
Peter Vlamis moved to strike the affidavits of the
Bakers' experts and of minor Baker. Defendants
Indian Prairie Community Unit School District No.
204, Naperville Park District, W.E. Mundy
Landscaping & Garden Center, Inc., Intech
Consultants, Inc., Naperville Excavating, Inc., L.J.
Dodd Construction, Inc., and Phillips Swager
Associates, Inc. join ServiceMaster and Vlamis'
Motion to Strike. The Court stayed the filing of
Defendants' reply briefs in support of summary
judgment pending a ruling on the current Motion to
Strike. The Motion to Strike is now ripe for
determination. For the reasons set forth below,
ServiceMaster and Vlamis' Motion to Strike (# 222)
is GRANTED IN PART and DENIED IN PART.

### II. DISCUSSION

ServiceMaster and Vlamis request that the Court
strike the affidavits of the Bakers' experts, Harold
Wakeley and Eugene Holland, because, among
other reasons, certain of Wakeley's and Holland's
opinions are new and rendered after the expert
disclosure deadline. The Court agrees and will
address the timeliness of the expert opinions first
and then the remaining arguments related to each
affidavit in turn.

#### A. *Timeliness of Expert Witness Disclosures*

ServiceMaster and Vlamis contend that numerous
opinions and data contained in Wakeley's and
Holland's affidavits are untimely and should be
stricken. Rule 26(a)(2)(B) requires expert witnesses
to prepare a written report containing a complete
statement of all opinions to be expressed, the basis
and reasons therefore, and the data or other
information considered by the expert in forming the
opinions as well as a list of exhibits to be used, the
expert's qualifications, the expert's compensation,
and a list of other cases in which the expert testified

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 2

Not Reported in F.Supp.2d, 1999 WL 988799 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

in the last four years. A party's failure to comply with Rule 26(a) results in an "automatic and mandatory" exclusion of expert testimony "unless the party can show that its violation of Rule 26(a) was either justified or harmless." *Finley v. Marathon Oil Co.,* 75 F.3d 1225, 1230 (7th Cir.1996); Fed.R.Civ.P. 37(c)(1). A district court's decision to exclude evidence under Rule 37 is reviewed for abuse of discretion. *Doe, By and Through G.S. v. Johnson,* 52 F.2d 1448, 1446 (7th Cir.1995). The Bakers have not shown that their failure to timely disclose all of Wakeley's and Holland's opinions was either justified or harmless, and the arguments raised by the Bakers in response to the timeliness issue are without merit.

**\*2** The Bakers first claim, without any citation to authority, that it is "patently unfair and prejudicial to the plaintiff to prevent him from consulting with his experts and obtaining from them updated, modified or even new opinions and data in response to Motions for Summary Judgment filed after the expert disclosure date." The Bakers' Response, pp. 4-5. The expert disclosure deadlines do not prohibit the Bakers from thereafter consulting with their experts but do establish firm dates for disclosure of experts and expert opinions. The Bakers' assertion that expert disclosure deadlines do not prevent them from later offering new expert opinions is frivolous. Deadlines play an important role in the Court's ability to manage and control its docket, and the Court has the ability to establish and enforce its deadlines. *Parker v. Freightliner Corp.,* 940 F.2d 1019, 1024-1025 (7th Cir.1991) (holding courts have the power to establish and enforce deadlines concerning expert testimony and are not required to fire a warning shot prior to imposing sanctions).

The Bakers also maintain that the affidavits of Wakeley and Holland merely supplement their prior reports. Although Rule 26(e) provides that a party has a duty to "supplement or correct" its prior disclosures if it learns that the prior information "is incomplete or incorrect," the statements at issue are new conclusions which do not merely correct or complete prior opinions of Wakeley or Holland. For example, Wakeley's report contained one opinion: minor Baker demonstrated a level of hazard perception and risk awareness entirely consistent

with his age and level of development. In his affidavit, Wakeley concludes not only that Baker acted reasonably and rationally for his age but also that the dangers associated with sledding down the hill and over the snow pile were not obvious to a twelve year old boy and that the risk involved is not similar to the risk involved in a fall. Wakeley's opinions concerning the obviousness of the risk and whether the risk encountered by minor Baker were similar to a fall are new and offered for the first time after Defendants' summary judgment arguments on the exact same issues.

Finally, the Bakers contend that Defendants cannot show any prejudice as a result of the new expert opinions because: (1) "[t]his is a summary judgment proceeding;" (2) if summary judgment is denied, Defendants "will have ample opportunity to obtain appropriate expert opinions;" and (3) Defendants chose not to take depositions of the Bakers' experts. The Bakers appear to misunderstand the Federal Rules of Civil Procedure and the role of expert reports.

The sanction of exclusion applies at summary judgment as well as at trial. Rule 37(c)(1) explicitly provides that untimely disclosures may not be used " at a trial, at a hearing, *or on a motion."* Moreover, Defendants need not wait until after a ruling on summary judgment to discover all of Wakeley's and Holland's opinions and data where the Court set an expert opinion disclosure deadline prior to the dispositive motion deadline. Rule 26(a) requires expert reports to be "detailed and complete" and " not sketchy, vague or preliminary in nature." *Salgado By Salgado v. General Motors Corp.,* 150 F.3d 735, 741 n. 6 (7th Cir.1998) (citing Fed.R.Civ.P. 26 Advisory Committee's note). A complete expert report includes "the substance of the testimony which an expert is expected to give on direct examination together with the reasons therefor." *Id.* The requirement of a complete expert report minimizes the need for expert depositions. " The report must be complete such that opposing counsel is not forced to depose an expert in order to avoid ambush at trial; and moreover the report must be sufficiently complete so as to shorten or decrease the need for expert depositions and thus to conserve resources." *Id.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 1999 WL 988799 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

**\*3** Although correct, the Bakers' argument that Defendants chose to stay expert depositions until after the Court rules on summary judgment misses the point. Defendants did not move to stay expert depositions until after the Bakers' expert opinion disclosure deadline. After reviewing Wakeley's and Holland's reports, Defendants concluded it was unnecessary to engage in expensive expert depositions prior to moving for summary judgment on certain issues, including the issue of whether the risks encountered by minor Baker were "open and obvious." Defendants were entitled to assume that Wakeley's and Holland's reports were complete. Defendants are now unfairly prejudiced by the Bakers' reliance on new and untimely expert opinions in response to summary judgment. The Bakers' failure to inform Defendants of their experts' latest opinions denied Defendants the opportunity to depose Wakeley and Holland prior to moving for summary judgment. One of the primary goals of the federal civil discovery rules and Rule 26(a) is to "eliminate surprise." The Court will not allow the Bakers to ambush Defendants with new expert opinions after the expert opinion disclosure deadline and after they filed for summary judgment. *Salgado,* 150 F.3d at 742 n. 6. [FN1]

> FN1. The Court additionally notes that it granted the Bakers numerous extensions in this matter, including extensions of the discovery deadlines. If the Bakers needed more time to work with their experts and obtain expert opinions, they should have filed an appropriate motion before the expert opinion disclosure deadline rather than wait until after Defendants filed for summary judgment to come forward with new opinions in their experts' affidavits.

The following untimely expert opinions and data are stricken from the Bakers' experts' affidavits: (1) Harold Wakeley's Affidavit-paragraphs 6(b), 6(c), and subparts (b) and (c) in the sentence below 6(c) and (2) Eugene Holland's Affidavit-paragraphs 4-27, first paragraph and last sentence in 29, and paragraph 35. While ServiceMaster and Vlamis have moved to strike the entire affidavits of Wakeley and Holland, the Court believes it more

appropriate to strike only the untimely portions of the affidavits. *Prudential Ins. Co. of America v. Curt Bullock Builders, Inc.,* 626 F.Supp. 159, 164 (N.D.Ill.1985) (stating "[w]hen admissible facts and inadmissible statements occur in the same affidavit, the court need not strike the entire affidavit but rather may rely on the facts and disregard the rest.").

### B. *Harold Wakeley's Affidavit*

ServiceMaster and Vlamis also request that the Court strike Wakeley's remaining opinion that Baker acted reasonably and rationally for his age because it is a legal conclusion contrary to Illinois law, does not assist the trier of fact, and is not " scientifically valid" under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). The Court finds that the Bakers have not made a sufficient showing that Wakeley's testimony meets the criteria of *Daubert.*

To be considered on a motion for summary judgment, expert testimony must be admissible. *See* Fed.R.Civ.P. 56(e) (stating "Supporting and opposing affidavits shall ... set forth such facts as would be admissible in evidence and show affirmatively that the affiant is competent to testify to the matters stated therein."). *Daubert* held that under Federal Rule of Evidence 702, trial courts must ensure that expert testimony "rests on a reliable foundation and is relevant to the task at hand." *Daubert,* 509 U .S. at 597. When considering the admissibility of expert testimony, trial courts may consider the following factors: (1) whether theories or techniques can and have been tested; (2) whether it is generally accepted by the scientific community; (3) whether it has been the subject of publication or peer review; and (4) whether it has an acceptable known or potential error rate. *Id.* at 592-594. The inquiry is "flexible" and should be based "solely on principles and methodology, not on the conclusions that they generate." *Id.* at 594-595. *Daubert* applies to all expert testimony. *Kumho v. Tire Co., Ltd. v. Carmichael,* 119 S.Ct. 1167, 1174 (1999).

**\*4** Trial courts must employ a two-step analysis when determining the admissibility of expert

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 4

Not Reported in F.Supp.2d, 1999 WL 988799 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

testimony. *Cummins v. Lyle Industries,* 93 F.3d 362, 367 (7th Cir.1996). First, the court must determine whether the expert's testimony is reliable. *Id.* Conclusions in expert reports must be based on scientific methods and procedures, rather than subjective belief and unsupported speculation. *Daubert,* 509 U.S. at 590. Second, the court must decide "whether evidence or testimony assists the trier of fact in understanding the evidence or in determining a fact in issue." *Cummins,* 93 F.3d at 368. "An expert's affidavit must be sufficiently complete to satisfy the criteria of the *Daubert* decision...." *Navarro v. Fuji Heavy Industries, Ltd.,* 117 F.3d 1027, 1032 (7th Cir.1997), *cert. denied,* 118 S.Ct. 600 (1997). "[T]here is no duty to cross-examine or depose your opponent's witnesses so that they can supplement the testimony they failed to give on direct examination or in their affidavit." *Id.* The proponent of expert testimony bears the burden of establishing its admissibility. *Bradley v. Brown,* 852 F.Supp. 690, 697 (N.D.Ind.), *aff'd,* 42 F.3d 434 (7th Cir.1994).

The Court has reviewed Wakeley's report and affidavit. Wakeley is an engineering psychologist with M.S. and Ph.D. degrees in experimental psychology. Since 1990, he has been employed by the Human Factors Research Group as a Human Factors Scientist/Engineer. Between 1955 and 1990, he worked as a scientist/engineer at Illinois Institute of Technology (IIT) Research Institute. Wakeley also served as adjunct associate professor of engineering psychology at IIT between 1970 and 1985. Wakeley describes his professional experience as involving the determination of:
[T]he range and limits of human performance. The objective of these studies is to produce machines and systems that are cost-effective, productive, and safe in operation without endangering life and the environment. The approach used is the application of engineering and scientific knowledge about materials and human behavior to the design of things people use, methods for their use, and the environment in which people function.

Wakeley Aff. ¶ 4. With respect to the present case, Wakeley opines that "Howard Ross Baker demonstrated a level of hazard perception and risk awareness entirely consistent with his age and level

of development" because Baker was taken to an area specially prepared to be used by children for sledding purposes, the area showed evidence that others had recently used it, he observed a peer using the area, there was no information to indicate that the contemplated slide was hazardous, and there was no barrier to use of the slide area. *Id.* ¶ 6(a). Wakeley states that the bases for his opinion is as follows:People can perceive physical "hazards" but recognizing and accepting or rejecting a "risk" depends on the subjects use of relevant skills, rules, and knowledge to predict whether an action will have a safe outcome. Children, including 12 year olds, because they lack skills, familiarity with rules, and specialized knowledge, are far less able to reliably discern dangerous situations.

**\*5** Wakeley Aff. ¶ 7.

Wakeley's affidavit fails to specifically explain how he arrived at his conclusion that minor Baker " demonstrated a level of hazard perception and risk awareness entirely consistent with his age and level of development." What level of hazard perception and risk awareness does a twelve year old boy possess? How does Wakeley know what level of hazard perception and risk awareness a twelve year old boy possesses? What particular skills, experience, and capabilities possessed by minor Baker made his behavior reasonable for a twelve year old boy and made him not able to successfully predict whether the sled run would have a safe outcome? What is the reasoning behind Wakeley's conclusion? Did he recreate the accident or do any testing to support his opinion? [FN2] These questions remain unanswered by Wakeley's affidavit.

> FN2. The Court is not holding that a finding of reliability necessarily requires that Wakeley recreate the accident or do any other testing. Wakeley need only show that his testimony is consistent with the " same standards of intellectual rigor that are demanded in [his] professional work." *Cummins,* 93 F.3d at 369. Wakeley's affidavit does not specifically explain how experts in the field of human factors

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 5

Not Reported in F.Supp.2d, 1999 WL 988799 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

investigate and analyze accidents. Thus, the Court is unable to determine whether the methodology used by Wakeley to reach his conclusion in this case meets the standards of his profession.

Wakeley claims that in his research he applies " engineering and scientific knowledge" to human behavior, materials, and the environment. How did Wakeley apply "engineering and scientific knowledge" to Baker's accident? Wakeley also states in his affidavit that he "reviewed the human factors aspects of children's recreational behavior, in particular risk perception and cognition/decision-making of children, both as to minor Baker and as to 12-year-olds generally." Wakeley Aff.¶ 5. What are the "human factors aspects of children's recreational behavior" and how is Wakeley an expert in the area of child perception and cognition/decision-making? The generalized and unsupported nature of Wakeley's conclusion makes its difficult tell what analyses and methodology he used to reach his conclusion. Moreover, although Wakeley has impressive credentials, it is not evident from his curriculum vitae that he has any particular expertise in children's recreational behavior.

Rather than provide the Court with any indicia of reliability for Wakeley's conclusion, the Bakers' Response states only the following regarding Wakeley's qualifications as an expert and the admissibility of his opinion: "Dr. Wakeley is an expert on human factors. His qualifications are as disclosed in his curriculum vitae attached to his Affidavit. By virtue of his education, training and experience, he possesses knowledge that would be helpful to the trier of fact in understanding the various factors that go into perception and recognition of the conditions involved in this case from the point of view of a 12 year old, as the law requires." Bakers' Resp., pp. 5-6. Impressive credentials do not guarantee the admissibility of expert testimony.

Wakeley's opinion provides nothing more than a " bottom line" conclusion and fails to demonstrate that it is supported by scientific rigor. *McMahon v. Bunn-O-Matic Corp.,* 150 F.3d 651, 658 (7th

Cir.1998) (stating "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.") (quoting *Mid-State Fertilizer Co. v. Exchange National Bank,* 877 F.2d 1333, 1339 (7th Cir.1989)); *Navarro,* 117 F.3d at 1031 (holding expert's affidavit contained no support for conclusion and "a conclusion without any support is not one based on expert knowledge and entitled to the dignity of evidence."). As the Seventh Circuit explained in *Navarro,* an expert must explain how his conclusion is based on expert analysis:

**\*6** An expert's affidavit must be sufficiently complete to satisfy the criteria of the Daubert decision, and one of those criteria, as we have been at pains to emphasize, is that the expert show how his conclusion ... is grounded in-follows from-an expert study of the problem.

*Navarro,* 117 F.3d at 1032.

The Bakers have also failed to provide the Court with any information concerning the four indices of reliability identified by the Supreme Court in *Daubert. Daubert,* 590 U.S. at 592-594. The Court recognizes that those factors are "flexible" and " neither necessarily nor exclusively appl[y] to all experts or in every case." *Kumho Tire Co.,* 119 S.Ct. at 1171. Because the Bakers failed to address *Daubert,* the Court is unable to evaluate whether the four *Daubert* factors are relevant to determining the admissibility of a human factors expert's testimony. The absence of evidence supporting the four *Daubert* factors does not automatically foreclose a finding of reliability, but the Bakers must provide some basis for a finding of reliability. This record fails to disclose Wakeley's methodology and reasoning, and the Court cannot evaluate the reliability of an undisclosed methodology. Thus, given the current record, Wakeley's affidavit is inadmissible under *Daubert.*

The Court grants ServiceMaster and Vlamis' Motion to Strike the remaining conclusion of Harold Wakeley for purposes of ruling on summary judgment. The Court expresses no opinion on whether Wakeley can demonstrate the necessary reliability for trial, if the Bakers' claims survive summary judgment. Having found that Wakeley's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 6

Not Reported in F.Supp.2d, 1999 WL 988799 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

opinion fails to meet the *Daubert* criteria, the Court need not address the remainder of ServiceMaster and Vlamis' arguments regarding Wakeley's affidavit.

### C. *Eugene P. Holland's Affidavit*

Defendants additionally argue that the remaining portions of Eugene Holland's affidavit should be stricken because many of Holland's opinions are legal conclusions contrary to Illinois law on the issue of an "open and obvious" condition and do not assist the trier of fact.

ServiceMaster and Vlamis contend that the following opinions by Holland are inadmissible legal conclusions contrary to Illinois law: (1) a dangerous condition existed; (2) certain of Defendants' actions constituted negligence; and (3) Defendants knew or should have known that the sledders would use the snow pile. According to ServiceMaster and Vlamis, Illinois law dictates that Baker was expected to appreciate and avoid the obvious risk inherent in his sled down the hill and over the snow pile. Whether the risks associated with the sledding jump were "open and obvious" is the ultimate issue to be decided on summary judgment. The Court declines to rule on the merits of the open and obvious issue until the motion for summary judgment is fully briefed and thus, refuses to strike Holland's opinions on this ground.

Defendants correctly contend that Holland's opinion in paragraph 32(a) of his affidavit that the contract between District No. 204 and ServiceMaster required ServiceMaster to supervise the snow removal work of Mundy usurps the Court's role as the interpreter of the contract between ServiceMaster and the School District. An expert may not ordinarily interpret the meaning of a contract. *Delta Mining Corp. v. Big Rivers Electric Corp.,* 18 F.3d 1398, 1402 (7th Cir.1994) (stating " [a]bsent any need to clarify or define terms of art, science or trade, expert opinion testimony to interpret contract language is inadmissible."). The Court strikes that portion of paragraph 32(a) of Holland's affidavit. [FN3]

FN3. In their reply brief, ServiceMaster/Vlamis, W.E. Mundy Landscaping, and Indian Prairie Community School District # 204 request that the Court strike paragraphs 24, 25, 26, 31, 32, and 34 of Holland's affidavit. Intech Consultants and Phillips Swager Associates contend that Holland is not qualified to opine as to the standard of care applicable to civil engineers or architects and that Holland's opinions fail to establish with appropriate foundation what the standard of care is or the manner in which it may have been breached. The Court has previously stricken paragraphs 24-26 as untimely. The Court is unwilling to strike paragraphs 31, 32, and 34 of Holland's affidavit or his opinions regarding Intech Consultants and Phillips Swager Associates where Defendants' arguments regarding these matters were first raised in their reply brief and the Bakers have not had an opportunity to respond. The Court denies Defendants request to strike these matters from Holland's affidavit without prejudice. If Defendants wish to pursue these arguments for purposes of summary judgment, they may file an additional motion to strike containing these arguments at the same time they file their reply briefs in support of summary judgment. The Bakers' response to an additional motion to strike is due within seven days thereafter. Defendants may file a reply within seven days after the Bakers' response.

### D. *Harold Ross Baker's Affidavit*

**\*7** ServiceMaster and Vlamis lastly contend that minor Baker's affidavit should be stricken because it conflicts with his prior deposition testimony. Specifically, ServiceMaster and Vlamis argue that through his affidavit, minor Baker improperly implies that he was not aware that he would land on pavement after his sled run. "[A] plaintiff cannot create an issue of material fact merely by manufacturing a conflict in his own testimony by submitting an affidavit that contradicts an earlier

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 7

Not Reported in F.Supp.2d, 1999 WL 988799 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

deposition and, in turn, defeat a defendant's motion for summary judgment." *Ernst & Young, L.L.P.,* 171 F.3d 527, 532 (7th Cir.1999) (internal citations omitted). "[W]hen a conflict arises between a plaintiff's own sworn deposition and his sworn affidavit, the deposition testimony overrides statements made in the affidavit." *Id.*

At his deposition, Baker testified as follows:
Q: So the parking lot on the day of the accident is or was similar to that depicted in photograph 7-1; is that right?
A: Correct.
Q: So there's some icy patches but, most of it you could see the paved surface below it?
A: Yes.

Baker dep., p. 47.Q: And whereabouts where you when you saw him coming down the hill? Were you on the hill? In the parking lot?
A: I believe I was standing on the concrete just going up-beginning up the hill when I saw him go over the bottom.

Baker dep., p. 51.Q: And [Jasper] landed in the parking lot?
A: Yes.

Baker dep., p. 54.Q: I'm sorry, I though you told me-
A: I don't remember exactly in relation to where I had landed Tim had landed. I knew he had landed on the concrete in that general vicinity, but I don't know in relation to where I landed he did.

Q: Did you land approximately on the same area of pavement, approximately five feet from the-
A: I think I was a little farther, but I don't know for sure because I was rolling after I hit the ground.
Q: Okay. Same area on the concrete, but might have rolled a little bit so it's hard to determine exactly how you landed?
A: Yes.

Baker dep., p. 64.Q: You eventually slid over a mound at the base of the hill; is that right?
A: After I went down and got to the base?
Q: Yes.

A. Yes.

Baker dep., p. 49.Q: You were the next person to go down the hill after Tim Jasper; is that correct?
A: I believe so.
Q: And Tim landed in the parking lot also, correct, on his feet?
A: Yes.
Q: So you knew that you were going to end up in the parking lot on a harder surface; correct?
A: Yes.

Baker dep., 142.

In his affidavit filed in opposition to summary judgment, minor Baker states in part:
On that date, I could not tell where the pavement of the parking lot began and the sled hill ended because of the piled snow. There were patches of ice and/or snow covering the asphalt surface of the parking lot in the area to the north of the snow pile. The path that I saw Tim Jasper take down the sled hill to the snow pile was continuos snow or ice covered, with no bar spots. The snow pile at the base of the hill was pushed to the pile so the pile began before the hill ended. There was no flat area between the sled hill and the snow pile involved. The sled hill dropped until it met the snow pile which then began to rise. The snow pile appeared to be part of the sledding experience existing at May Watts Park/School at the time.

**\*8** Ross' Affidavit, ¶¶ 2-6, 9.

Taken individually, the statements in minor Baker's affidavit do not necessarily contradict the assertions made in his deposition concerning his knowledge of whether he would land on concrete. On the other hand, when considered together, it may reasonably be inferred from Baker's affidavit statements that he was not aware that he would land on concrete. Such an inference would contradict his above-quoted deposition testimony. Because the Court does not know at this stage of the proceedings whether minor Baker's affidavit may be used for other permissible purposes in response to summary judgment, the Court declines to strike his affidavit. However, when ruling on summary judgment, the Court will not consider minor Baker's affidavit statements for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 8

Not Reported in F.Supp.2d, 1999 WL 988799 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

the proposition that he did not understand he would
land on pavement after his sled run. [FN4]

> FN4. Defendants request for the first time
> in their reply that they be allowed to
> redepose minor Baker if his affidavit is
> allowed to stand. Defendants' request is
> denied.

### III. CONCLUSION

For the reasons explained above, Defendants
ServiceMaster and Vlamis' Motion to Strike
Affidavits of Plaintiff and Plaintiff's Experts is
GRANTED IN PART and DENIED IN PART.
Defendants' reply briefs in support of summary
judgment are due by November 9, 1999.

N.D.Ill.,1999.
Baker v. Indian Prairie Community Unit, School
Dist. 204
Not Reported in F.Supp.2d, 1999 WL 988799
(N.D.Ill.)

Briefs and Other Related Documents (Back to top)

• 1:96cv03927 (Docket) (Jun. 28, 1996)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FIREMAN'S FUND INSURANCE )
COMPANY a/s/o DAVID RYAN, )
                          )
              Plaintiff,  )
                          )     Civil Action No. 1:05-CV-10786(NMG)
v.                        )
                          )
WHIRLPOOL CORPORATION,    )
                          )
              Defendant.  )
_____)

## PLAINTIFF'S RESPONSES TO DEFENDANT WHIRLPOOL CORPORATION'S FIRST SET OF INTERROGATORIES

1.     Separately as to each of Plaintiff's insureds, please provide the following: full name, home address, home telephone number, all previous names by which they have been known, social security number, and date of birth.

**ANSWER:**

David and Dale Ryan
128 Westerly Terrace
Hartford, CT  06105
(H) 860-232-6233
(W) 860-275-8258

Objection to request for social security number as it is beyond the scope of permissible discovery.

2.     What are the names, business addresses, home addresses, business telephone numbers, and home telephone numbers of all persons claimed by either the Plaintiff or the homeowners to be eyewitnesses to the incident which forms the basis of your Complaint and explain the person's relationship to you or the Ryans, if any?

**ANSWER:**

David and Dale Ryan
128 Westerly Terrace
Hartford, CT  06105
(H) 860-232-6233
(W) 860-275-8258
Plaintiff's insureds.

Stephen Murphy, Captain
Nantucket Fire Department
131 Pleasant Street
Nantucket, MA  02554
508-228-2324
Supervisor for fire suppression and investigation activities.

Benjamin Turnbull
Isle Caretaking
5 Miacomet Road
Nantucket, MA 02554
508-228-8763
Insured's caretaker.

Thomas Hayne
Crawford Investigations
Greene, RI
401-397-7820
Plaintiff's cause and origin investigator.

Steve Pietropaolo
Levine Group, Inc.
650 Halstead Avenue
Mamaroneck, NY  10543
914-670-0208
Retained by Plaintiff to investigate cause of fire.

3.     What are the names, business addresses, home addresses, business telephone numbers, and home telephone numbers of all persons claimed by you to have arrived at the scene either immediately or soon after the incident which forms the basis of your Complaint; and explain the person's relationship to you or the Ryans, if any?

-2-

**ANSWER:**

David and Dale Ryan
128 Westerly Terrace
Hartford, CT  06105
(H) 860-232-6233
(W) 860-275-8258

4.    If you have in your possession, custody or control any recorded or written statements by persons you contend have knowledge of the incident which forms the basis of your Complaint, please list for each such statement the name of the witness, the date the statement of the witness was taken, the subject matter and substance of the statement, the name and address of the person who provided the statement, and the name and address of the person who obtained the statement.

**ANSWER:**

None.

5.    As to the Subject Product, please provide: the model number, serial number, date and location of purchase, and the person who made the purchase.

**ANSWER:**

KitchenAid (Whirlpool)
Model # KTRS22KHW
Serial # EK0819041
Purchased by David Ryan on 7/24/00 at Marine Home Center, Nantucket, MA.

6.    Identify the owner of the Subject Product at the time of the alleged occurrence and all previous and subsequent owners of the refrigerator, and give the location and identity of the person or facility having possession of the refrigerator at the time of answering these Interrogatories.

**ANSWER:**

Owner: David and Dale Ryan
Presently located at Levine Group, Inc., 650 Halstead Avenue, Mamaroneck, NY  10543.


7.    Please identify all persons who have repaired or used the Subject Product or

who otherwise have knowledge of the physical and mechanical condition of the Subject

Product, from the time of its purchase up to and including the present.

**ANSWER:**

Prior to the incident which forms the basis for this action, no work, repair, maintenance or
modifications of the refrigerator were made.  After the incident, there was destructive testing
of the refrigerator at Levine Group, Inc., 650 Halstead Avenue, Mamaroneck, NY  10543.  In
attendance were:

Steve Pietropaolo, Levine Group, Inc.
Ron Parson, Wright Group, Inc. (Berko)
Richard Splaine, Splaine Investigations (Whirlpool)
Daniel Cronin, Phoenix Investigations (Whirlpool)

8.    Please identify any person with knowledge, information, or records concerning

the purchase, use, sale, servicing, repair, conditions of operation, or storage of the Subject

Product, or any portion of the Subject Product at any time from date of original purchase of

the Subject Product to the present.

**ANSWER:**

David and Dale Ryan
128 Westerly Terrace
Hartford, CT  06105
(H) 860-232-6233
(W) 860-275-8258

Benjamin Turnbull
Isle Caretaking
5 Miacomet Road
Nantucket, MA 02554
508-228-8763

Thomas Hayne
Crawford Investigations
Greene, RI
401-397-7820

Steve Pietropaolo
Levine Group, Inc.
650 Halstead Avenue
Mamaroneck, NY  10543
914-670-0208

9.     If the Subject Product had been involved in any accident or had been damaged in any way -- other than in the occurrence that forms a basis of this lawsuit -- describe each accident and each item of damage, and identify all persons having knowledge of any such accident and damage.

**ANSWER:**

There was no damage to the Subject Product prior to the incident.

10.     If you contend that any component(s) of the Subject Product was defectively or negligently designed, please provide for each such component the name of the component, the specific alleged defect or defects in said component, and identify each expert upon whose opinion the Plaintiff bases its contention of defect.

**ANSWER:**

See opinions and conclusions in report dated 11/02/04 by Steve Pietropaolo of Levine Group, Inc.

11.     If you contend that any component(s) of the Subject Product was defectively or negligently manufactured, please provide for each such component the name of the component, the specific alleged defect or defects in said component, and identify each expert upon whose opinion the Plaintiff bases its contention of defect.

**ANSWER:**

See opinions and conclusions in report dated 11/02/04 by Steve Pietropaolo of Levine Group, Inc.

12.     If you contend that the Subject Product was defective due to a lack of any safety and/or design features, please identify any and all such safety and/or design features you contend should have used in the design and/or manufacture of the Subject Product.

**ANSWER:**

See opinions and conclusions in report dated 11/02/04 by Steve Pietropaolo of Levine Group, Inc.

13.     State whether you contend that the Subject Product failed to comply with any federal, state, local or industry standards, practices, rules or regulations, and if so identify such practices, rules, or regulations and state all facts and documents supporting that contention.

**ANSWER:**

See opinions and conclusions in report dated 11/02/04 by Steve Pietropaolo of Levine Group, Inc.

14.     Identify and describe the repair history of the Subject Product.

**ANSWER:**

No repairs were made to the Subject Product before the incident.

15.     As for the Berko toe kick heater that was located in the kitchen of the Ryan home, provide the following:

        a.   Model and serial number for the heater;

b.  Date and location of purchase;

c.  Who made the purchase; and

d.  The repair history of the heater, including dates, descriptions of service

performed, and the entity providing the repair service.

**ANSWER:**

Berko heater model # TS-1-A-T
This heater was located within the premises at the time the Ryans purchased the premises in January, 1990. They have no information on when it was installed or purchased. The heater never required repairs or maintenance and none was done.

16.    State whether the Berko toe kick heater was controlled and activated by the

central heating system or whether it was separately controlled by a mechanism located directly

on the heater.

**ANSWER:**

To the best recollection of the Ryans, the Berko heater was an individual heater controlled by a thermostat located within the kitchen.  It did not appear to be connected to any other heating system.

17.    Identify and describe any electrical wiring or outlets that were behind, next to,

or in close proximity to the refrigerator or within 30 feet of the refrigerator.

**ANSWER:**

To the best recollection of the Ryans, there was a standard outlet behind the Subject Product, a grounded outlet behind the stove, a standard outlet on the same wall as the thermostat for the Berko heater, and most likely another outlet behind the dishwasher and microwave.

18.    State the name, business address, and business telephone number of all persons

whom you expect to call as an expert witness at trial, stating the subject matter on which the

expert is expected to testify, the substance of his/her facts and opinions, and the grounds for each such opinion.

**ANSWER:**

The Plaintiff will designate its experts in accordance with the Court's scheduling order.

19.    Itemize all damages which you contend you are entitled to recover in this claim, identifying each expense, the amount claimed and how you calculated that amount.

**ANSWER:**

Building damage: $236,329.00
Contents damage: $94,923.63
Alternative Living Expense: $2,320.68

The calculations for these amounts will be found in the adjustment documents.

20.    Identify and describe in detail the nature and scope of any and all activity that took place in the home in which the Subject Product was located during the twenty-four (24) hours prior to the incident which forms the basis of your Complaint.

**ANSWER:**

The fire was discovered on 11/25/03 at ~6p.m. by David Ryan. Prior to that, Benjamin Turnbull had entered the home and turned the heat and water on at ~2p.m. The twenty hours prior to that, the house was vacant.

21.    Identify whether the Ryan home was used solely by the Ryans, or whether the home was used as rental property; and if the home was used by someone other than the Ryans, rented or otherwise, please provide for each person: their name, address, telephone number, relationship to the Ryan and the dates of use.

**ANSWER:**

To the best recollection of the Ryans, they rarely rented the home. Prior to the incident, Mr. Ryan was only able to recall renting the home to Atty. John Schuster (address not listed, Simsbury, CT, 860-651-1557) twice for a 1 week period each time. Mr. Schuster is a long time family friend of the Ryans. He was last in the home in the summer of 2004. The Ryans had been to the home in the period between when Mr. Schuster rented it and the time of the incident and had no problems they could recall.

22.     As to occupancy in the home, state how many days of the year the home was occupied and provide the date the home was last occupied before the incident, including the name of the occupant, their telephone number and address, and relationship to the Ryans.

**ANSWER:**

The Ryans would open the home around Easter and close it just after Thanksgiving. In the period in between, there use would vary from year to year. In addition to David and Dale Ryan, they had two adult daughters who use the home occasionally. Prior to the incident, the last people occupying the home were David and Dale Ryan sometime in the late summer/early fall of 2004.

23.     Provide a description of how often the heater in the home was used, including but not limited to whether the heater was used when the house was unoccupied and when the last time the heater was used before the incident which forms the basis of your Complaint.

**ANSWER:**

The Berko heater was seldom used. For the most part, the home was not used during cold periods. When the home did require heat, the Ryans would not use the Berko heater because it had a fan within the unit they described as "noisy". They claim the heat from the living room, dining room and 2 bedrooms heated the house sufficiently.

24.     Prior to the incident, had there been any electrical work completed in the Ryan home? If so, please describe the name, address and telephone number for who performed the work, when it was performed, and the kind of work that was performed.

**ANSWER:**

All electrical work done by the Ryans prior to the incident was done by Paul Blair, Hummock Pond Road, Nantucket, MA 508-228-5172. He had exchanged the electrical outlet behind the stove to put in a grounded outlet for a new stove. Mr. Blair also installed new light fixtures throughout the house and installed an outdoor spotlight. The Ryans could not specifically recall when this work was done as it was done over a substantial period of time on an informal basis.

25.    Did the Ryans ever have any electrical problems in the home from the time they

purchased the home until the time of the incident? If so, please describe the problems and state

when they occurred.

**ANSWER:**

No. The Ryans did not have electrical problems per se. They had electrical work done to accommodate an upgraded stove and to replace light fixtures they described as "cheap". But these items were in working order prior to their replacement.

26.    State the name, address, and position or occupation of the person(s) who

performed an investigation, on Plaintiff's behalf, of the incident complained of the Complaint,

including all testing, examination or analysis.

**ANSWER:**

Thomas Hayne
Crawford Investigations
Greene, RI
401-397-7820

Steve Pietropaolo
Levine Group, Inc.
650 Halstead Avenue
Mamaroneck, NY  10543
914-670-0208

Dated:  November 10, 2005        PLAINTIFF,

                                 BY:_____
                                     Erik Loftus, Esq.
                                     Law Offices of Stuart G. Blackburn
                                     Two Concorde Way
                                     P.O. Box 608
                                     Windsor Locks, CT 06096
                                     (860) 292-1116
                                     BBO #656315

# CERTIFICATION

THIS IS TO CERTIFY THAT, I, _Kevin Vanderkolk_ have read the foregoing answers to

Interrogatories and state that they are true and accurate to the best of my knowledge and belief

under pains and penalties of perjury on this _25th_ day of _October_, 2005.

_Kvj. Vkun_

STATE OF _Florida_        )
                          ) ss:              ,        , 2005
COUNTY OF _Duval_         )

On this _25th_ day of _Oct_, 2005, personally appeared _Kevin Vanderkolk_, who
affirmed under oath and truth, to the best of his/her knowledge and belief, of the foregoing
answers to interrogatories and also acknowledged his/her execution of the above.

In witness thereof, I hereunto set my hand and official seal.

_Aghavni I. Boatright_
Notary Public

Aghavni I. Boatright
My Commission DD296072
Expires April 03, 2008



212 F.R.D. 306                                                                                              Page 1

212 F.R.D. 306

**(Cite as: 212 F.R.D. 306)**


**Motions, Pleadings and Filings**


United States District Court,
M.D. North Carolina.
AKEVA L.L.C., a North Carolina Corporation,
Plaintiff,
v.
MIZUNO CORPORATION, a Japanese
Corporation; and Mizuno USA, Inc., a Georgia
Corporation, Defendants.
**No. 1:00CV00978.**


Dec. 20, 2002.


On defendants' motions to exclude allegedly untimely expert reports submitted by plaintiff in patent infringement suit, the District Court, Eliason, United States Magistrate Judge, held that: (1) plaintiff did not establish good cause for untimely expert disclosures in violation of discovery control order; (2) exclusion of second test and opinion by plaintiff's original expert was justified by plaintiff's untimely disclosure of second test and opinion in violation of expert disclosure order; and (3) plaintiff's untimely disclosure of second expert's report in violation of expert disclosure order did not warrant its exclusion.


Motions granted in part and denied in part.


West Headnotes

**[1] Federal Civil Procedure** ⟨⟩**1278**
170Ak1278 Most Cited Cases

**[1] Federal Civil Procedure** ⟨⟩**1935.1**
170Ak1935.1 Most Cited Cases
When a dispute arises concerning violation of expert disclosure obligations pursuant to a court approved discovery plan, a court should first look to rule governing scheduling or pretrial orders for determining both compliance and sanctions, as opposed to general sanctions rule concerning failure to disclose. Fed.Rules Civ.Proc.Rules 16(f), 37(c), 28 U.S.C.A.

**[2] Federal Civil Procedure** ⟨⟩**1278**
170Ak1278 Most Cited Cases

**[2] Federal Civil Procedure** ⟨⟩**1938.1**
170Ak1938.1 Most Cited Cases
When there is a discovery plan covering expert disclosures, the plan controls whether an expert disclosure is timely and not the explicit provisions of discovery rule. Fed.Rules Civ.Proc.Rule 26(a)(2)(C), 28 U.S.C.A.

**[3] Federal Civil Procedure** ⟨⟩**1261**
170Ak1261 Most Cited Cases
Discovery rule concerning supplementation of discovery disclosures and responses envisions supplementation when a party's discovery disclosures happen to be defective in some way so that the disclosure was incorrect or incomplete and, therefore, misleading; it does not cover failures of omission because the expert did an inadequate or incomplete preparation. Fed.Rules Civ.Proc.Rule 26(e), 28 U.S.C.A.

**[4] Federal Civil Procedure** ⟨⟩**1278**
170Ak1278 Most Cited Cases

**[4] Federal Civil Procedure** ⟨⟩**1935.1**
170Ak1935.1 Most Cited Cases
Plaintiff did not establish good cause for untimely expert disclosures in violation of discovery control order, where facts simply showed that plaintiff was surprised by testimony of defendant's expert, and decided to bolster its case by getting a new expert and having its first expert conduct another type of test. Fed.Rules Civ.Proc.Rule 16(f), 28 U.S.C.A.

**[5] Federal Civil Procedure** ⟨⟩**1278**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

212 F.R.D. 306                                                                    **Page 2**

212 F.R.D. 306

**(Cite as: 212 F.R.D. 306)**

170Ak1278 Most Cited Cases

**[5] Federal Civil Procedure ☜1935.1**
170Ak1935.1 Most Cited Cases
In determining sanction to impose for untimely expert disclosure in violation of discovery control order, factors to consider include: (1) the explanation for the failure to obey the order; (2) the importance of the expert opinion; (3) the prejudice to the opposing party by allowing the disclosures; and (4) the availability of alternative or lesser sanctions. Fed.Rules Civ.Proc.Rule 16(f), 28 U.S.C.A.

**[6] Federal Civil Procedure ☜1278**
170Ak1278 Most Cited Cases

**[6] Federal Civil Procedure ☜1935.1**
170Ak1935.1 Most Cited Cases
Relevant factors to consider in determining sanction for untimely expert disclosure in violation of discovery control order include: (1) the interest in expeditious resolution of litigation; (2) a court's need to manage its docket; and (3) public policy favoring disposition of cases on the merits. Fed.Rules Civ.Proc.Rule 16(f), 28 U.S.C.A.

**[7] Federal Civil Procedure ☜1278**
170Ak1278 Most Cited Cases
Docket control planning is sufficiently important factor to alone justify the exclusion of an untimely disclosed expert report or opinion even in absence of prejudice to the opposing party. Fed.Rules Civ.Proc.Rule 16(f), 28 U.S.C.A.

**[8] Federal Civil Procedure ☜1278**
170Ak1278 Most Cited Cases

**[8] Federal Civil Procedure ☜1935.1**
170Ak1935.1 Most Cited Cases
Exclusion of second test and opinion by plaintiff's original expert was justified by plaintiff's untimely disclosure of second test and opinion in violation of expert disclosure order, by plaintiff's failure to immediately request court permission for the test and opinion, and by fact that said report was not disclosed to defendants until after discovery ended, which was a second violation of court's discovery

order. Fed.Rules Civ.Proc.Rule 16(f), 28 U.S.C.A.

**[9] Federal Civil Procedure ☜1278**
170Ak1278 Most Cited Cases

**[9] Federal Civil Procedure ☜1935.1**
170Ak1935.1 Most Cited Cases
Plaintiff's untimely disclosure of expert report in violation of expert disclosure order did not warrant its exclusion, where plaintiff submitted the report prior to the end of discovery and within the thirty-day time period for rebuttal discovery that would have applied had case been operating without a discovery plan. Fed.Rules Civ.Proc.Rule 16(f), 28 U.S.C.A.

**[10] Federal Civil Procedure ☜1935.1**
170Ak1935.1 Most Cited Cases
When there is a substantial violation of rule governing scheduling orders, even without bad faith, deliberation or other aggravating factors, some sanctions in the form of attorney's fees and cost-shifting are appropriate in order to: (1) act as a general deterrent to violation of the court's order; (2) encourage adequate pretrial preparation; (3) ensure the party will not profit by its own failures; and (4) eliminate prejudice to the opposing party. Fed.Rules Civ.Proc.Rule 16(f), 28 U.S.C.A.

**[11] Federal Civil Procedure ☜1278**
170Ak1278 Most Cited Cases
In order to protect defendants against prejudice from plaintiff's untimely expert disclosure, court would require plaintiff to pay the costs and expense of the expert's deposition, including the expert fees, if any, of and the attorney's fees incurred by defendants in connection with motions to exclude expert reports, up to the amount of $3,000.00. Fed.Rules Civ.Proc.Rule 16(f), 28 U.S.C.A.
**\*307** William C. Connor, Scott Andrew Schaaf, Tuggle, Duggins & Meschan, P.A., Greensboro, NC, Patrick J. Flinn, Alston & Bird, Atlanta, GA, for plaintiff.

James Jason Link, John Steven Gardner, Kilpatrick Stockton, L.L.P., Winston-Salem, NC, Douglas D. Salyers, Troutman Sanders, Atlanta, GA, for defendants.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

212 F.R.D. 306                                                                                       Page 3

212 F.R.D. 306

**(Cite as: 212 F.R.D. 306)**

*ORDER*

ELIASON, United States Magistrate Judge.

This matter comes before the Court on two motions filed by the defendants, hereinafter denominated collectively as "Mizuno." Both motions seek to exclude allegedly untimely expert reports submitted by plaintiff. One concerns the expert report of a Dr. Karl B. Fields, and the other seeks to exclude the additional expert report of a Mr. Fredericksen with respect to experiments conducted by him at Michigan State University subsequent to his initial expert report. Defendants contend that both these expert reports are unauthorized and untimely and that plaintiff **\*308** Akeva L.L.C. ("Akeva") should be prohibited from using the expert reports at trial.

After this case was filed and the Court denied defendants' motion to dismiss, the Court, on May 29, 2002, entered a Rule 26(f) Report and Order based on the parties' stipulations. After some modifications, discovery was set to end on November 15, 2002. The trial is set for March 31, 2003.

The Rule 26(f) Report and Order specifically provides times for expert disclosure pursuant to Fed.R.Civ.P. 26(a)(2). The parties chose a bifurcated schedule wherein the party bearing the burden of proof on an issue must first disclose the expert and the expert's report on or before September 3, 2002. In the second tier, any party offering expert testimony in rebuttal had to disclose the expert and the report on or before October 3, 2002.

The expert opinions in this case concern plaintiff's claim that Mizuno produced various models of athletic footwear which infringed its patents. Plaintiff argues that defendants inserted a "wave" plate in the shoes that does not operate as defendants contend with respect to weight bearing displacement and, therefore, infringes plaintiff's patents. It appears that plaintiff's first expert witness, Mr. Fredericksen, performed an alleged industry standard test on the plate in the shoes. He submitted his expert report and was deposed on or

about October 9, 2002. Prior to that time, and on October 7, defendants identified a Dr. Pourdeyhimi and disclosed his expert report on October 7, 2002. He performed a test different from Mr. Fredericksen and came to a conclusion that defendants' athletic shoes did not infringe plaintiff's patents.

Before discovery ended on November 15, 2002, and on November 1, 2002, plaintiff identified a new expert, Dr. Fields, who conducted a different test of the athletic shoes by inserting a lead tape into the shoes and then taking an x-ray to note the displacement when weight was applied. Plaintiff offered Dr. Fields for deposition. Later, and on November 18, 2002, plaintiff notified defendants of its intent to "supplement" Mr. Fredericksen's report with the result of an additional test supervised by Mr. Fredericksen to be conducted at Michigan State University on November 21, 2002.

Defendants argue that plaintiff's two new expert disclosures are untimely and violate Fed.R.Civ.P. 37(c)(1), along with Local Rule 16.1(e). [FN1] They assert that plaintiff was required to disclose the expert reports at the time of initial disclosure. The failure to do so allegedly violates Rule 37(c) because plaintiff did not have justification, and the failure to disclose was harmful to defendants and, therefore, the Court should exclude the experts' opinions from being used at trial.

> FN1. Fed.R.Civ.P. 37(c)(1)states:
> A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed. In addition to or in lieu of this sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions. In addition to requiring payment of reasonable expenses, including attorney's fees, caused by the failure, these sanctions may include any of the actions authorized

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

212 F.R.D. 306                                                              Page 4

212 F.R.D. 306

**(Cite as: 212 F.R.D. 306)**

under Rule 37(b)(2)(A), (B), and (C) and may include informing the jury of the failure to make the disclosure.

Local Rule 16.1(e) reads:

The initial pretrial order, whether based upon a joint Rule 26(f) Report or a conference following the filing of separate reports, shall provide that discovery with respect to experts be conducted within the discovery period established in the case. The order shall set the date on which disclosure of expert information under Fed.R.Civ.P. 26(a)(2) must be made.

Plaintiff responds that the disclosures were timely under Rule 26(a)(2)(C) which provides:

These disclosures shall be made at the times and in the sequence directed by the court. *In the absence of other directions from the court or stipulation by the parties,* the disclosures shall be made at least 90 days before the trial date or the date the case is to be ready for trial or, if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under paragraph (2)(B), within 30 days after the disclosure made by the other party. The **\*309** parties shall supplement these disclosures when required under subdivision (e)(1). (But note, emphasis added)

It argues that under this rule, Dr. Fields' report was a rebuttal report and that under Fed.R.Civ.P. 26(a)(2)(C), plaintiff had thirty days after disclosure of the Pourdeyhimi report on October 7, 2002 to disclose the Fields' report, whose disclosure on November 1, 2002 was, thus, timely. With respect to Mr. Fredericksen's new test, plaintiff contends that it is a supplemental report and that Rule 26(e)(1) requires supplementation of expert reports as provided for in Rule 26(a)(3), which only requires disclosures at least thirty days prior to trial and, thus, the new Fredericksen test was timely disclosed.

Defendants retort that these reports are neither supplemental nor rebuttal reports, and so should have been initially disclosed. They allege harm because they relied on the Rule 26(f) Report and Order for disclosure times in order to prepare their

case. Allowing the additional expert reports will cost them the advantage they procured as a result of plaintiff being dissatisfied with Fredericksen's initial report, and will impose the extra costs of having to depose both Fredericksen and Fields, along with perhaps procuring another expert of their own.

### *Discussion*

[1] The first question to be decided is what rule to apply in evaluating whether plaintiff's expert report filings were untimely and what sanctions to impose. Defendants request sanctions under Fed.R.Civ.P. 37(c). The 1993 Amendment Advisory Notes characterize this rule as a revision which "provides a self-executing sanction for failure to make a disclosure required by Rule 26(a), without need for a motion under subdivision (a)(2)(A)." However, in this case, there was an initial pretrial conference scheduling plan and order pursuant to Rules 16 and 26 which governed and controlled disclosures. [FN2]

> FN2. Plaintiff overlooks this fact when it argues that it had thirty days to rebut evidence under Fed.R.Civ.P. 26(a)(2)(C). Plaintiff ignores the second sentence of the rule which specifically provides that those times only apply in "the absence of other directions from the court or stipulation by the parties." As will be discussed later, the Court's order, not the latter provisions contained in Rule 26(a)(2)(C), governed the parties' expert witness disclosures.

When a dispute arises concerning violation of expert disclosure obligations pursuant to a court approved discovery plan, the Court should first look to Rule 16(f) for determining both compliance and sanctions, as opposed to Rule 37(c). Rule 16(f) specifically speaks to non-compliance with a scheduling or pretrial order. Rule 37(c), on the other hand, is self-executing and will likely come into play later in the court proceedings, often at or near trial. It serves the situation where there is no discovery plan and the timing of the parties' discovery is controlled only by the Federal Rules of Civil Procedure. One difference between Rule 37(c) and Rule 16(f) is that violations of Rule 16(f)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

212 F.R.D. 306                                                           Page 5

212 F.R.D. 306

**(Cite as: 212 F.R.D. 306)**

must be brought to the Court's attention by motion. Both rules permit the Court to impose sanctions contained in Rule 37(b)(2)(B) & (C), along with imposing attorney's fees and reasonable expenses because of any non-compliance. In addition, Rule 16(f) provides for the contempt sanction contained in subsection (b)(2)(D) of Rule 37.

Because there was a court approved discovery plan in this case, the Court looks to Rule 16(f) to determine violations for not disclosing expert reports at the time required under the scheduling order, and to determine sanctions. At this stage, the question is not whether the defendants have been prejudiced, but whether plaintiff has shown good cause for its failure to timely disclose. *Lory v. General Elec. Co.,* 179 F.R.D. 86 (N.D.N.Y.1998); *see also Reliance Ins. Co. v. Louisiana Land and Exploration Co.,* 110 F.3d 253, 257 (5th Cir.1997)(Rule 16(b) only permits modification of scheduling order for good cause). Under Rule 16(f), the Court may impose the full range of sanctions, including precluding the expert's testimony. *Boardman v. National Medical Enterprises,* 106 F.3d 840, 843 (8th Cir.1997); *Lory,* 179 F.R.D. 86.

As noted above, plaintiff approaches this case as if no pretrial order had been entered. It, therefore, relies on the disclosure times set by the latter portions of Rule 26(a)(2)(C) **\*310** which govern in the absence of a pretrial order. Consequently, plaintiff presents a number of confusing justifications for its actions. The facts show that plaintiff presented two new expert opinions after the time set in the discovery plan. Plaintiff first argues that even though the second-tier disclosure talked about rebuttal opinions, this was in error and that the second-tier disclosure was merely for responsive disclosure. However, plaintiff had as much a role in choosing the words, as did defendants. Moreover, even under plaintiff's argument, the discovery plan simply did not provide a third-tier time for rebuttal experts. To meet this problem, plaintiff relies on the remaining provisions of Rule 26(a)(2)(C) which state that rebuttal experts' disclosures may be made at any time within thirty days of learning the need for rebuttal testimony (according to plaintiff,

irrespective of a court approved discovery plan). Yet, even that justification will not work for Mr. Fredericksen, whose disclosure came outside of the thirty-day period. Therefore, for him, plaintiff turns to the supplementation provisions of Rules 26(e)(1) and 26(a)(3), claiming that it had the right to make these "supplemental" disclosures up to thirty days before trial. [FN3] The Court rejects all of plaintiff's constructions.

> FN3. Plaintiff, again, disregards the discovery plan which required supplementation within thirty days after the close of discovery. Nevertheless, if the new Frederickson opinion constitutes supplementation, it would have been timely made.

[2] Starting with the alleged rebuttal testimony of Dr. Fields, the discovery plan did not permit a third tier of expert disclosure as plaintiff contends. This was due simply to inadvertence or neglect in the formulation of the discovery plan itself. Nothing prevented plaintiff from putting in a three-tier or even four-tier expert discovery provision. Second, when there is a discovery plan covering expert disclosures, the plan controls and not the explicit provisions of Rule 26(a)(2)(C). Consequently, the Court finds that Dr. Fields' untimely opinion was not permissible under the discovery plan and violated the Court's order.

[3] The Court also finds that Mr. Fredericksen's additional opinion does not constitute supplementation. Rule 26(e)(1) requires supplementation when a "party learns from some material respect the information disclosed is incomplete or incorrect." If the additional or corrective information has not otherwise been made known, a party must disclose at the times set out in Rule 26(a). *But see* n. 2, *supra.* Plaintiff does not argue that Mr. Fredericksen's initial opinion was incorrect, but appears to argue that it was incomplete. The Court cannot accept a definition of supplementation which would essentially allow for unlimited bolstering of expert opinions. Rule 26(e) envisions supplementation when a party's discovery disclosures happen to be defective in some way so

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

212 F.R.D. 306                                                                                          Page 6

212 F.R.D. 306

**(Cite as: 212 F.R.D. 306)**

that the disclosure was incorrect or incomplete and, therefore, misleading. *See Keener v. United States,* 181 F.R.D. 639 (D.Mont.1998). It does not cover failures of omission because the expert did an inadequate or incomplete preparation. *Id.* at 641; *see Schweizer v. DEKALB Swine Breeders, Inc.,* 954 F.Supp. 1495, 1510 (D.Kan.1997)(no reason opinions could not have been stated earlier). To construe supplementation to apply whenever a party wants to bolster or submit additional expert opinions would reek havoc in docket control and amount to unlimited expert opinion preparation. Therefore, Mr. Fredericksen's second test and opinion was not supplementation, but merely an out-of-time disclosure.

[4] Having rejected plaintiff's legal excuses, the Court turns to the factual basis for plaintiff's good cause argument. After the smoke of plaintiff's argument clears, the facts simply show that plaintiff was surprised by Dr. Pourdeyhimi's testimony. What is more difficult to tell is whether that surprise is justified. In essence, because Dr. Pourdeyhimi conducted a test that might cast doubt on Mr. Fredericksen's test of the shoes, plaintiff decided to bolster its case by getting a new expert and having Mr. Fredericksen conduct another type of test. These expert reports certainly have some aspects of rebuttal testimony about them, but may also be characterized as makeup for initially inadequate or incomplete preparation. In all events, the Court cannot find that plaintiff **\*311** has advanced just cause for failing to obtain this testimony earlier, and the Court finds plaintiff has violated the scheduling order by attempting to introduce additional expert testimony at times not authorized by the discovery control order.

[5][6][7] Having found a violation of Rule 16(f), the next issue is what kind of sanctions to impose, if any. The Court has broad discretion in employing sanctions. Courts have considered a number of factors. One set of factors looks to: (1) the explanation for the failure to obey the order; (2) the importance of the expert opinion; (3) the prejudice to the opposing party by allowing the disclosures; and (4) the availability of alternative or lesser sanctions. *See Reliance Ins. Co.,* 110 F.3d at 257;

*Tucker v. Ohtsu Tire & Rubber Co., Ltd.,* 49 F.Supp.2d 456, 461 (D.Md.1999); and *Fritter v. Dafina, Inc.,* 181 F.R.D. 215, 217 (N.D.N.Y.1998). Additional relevant factors, include: (1) the interest in expeditious resolution of litigation; (2) a court's need to manage its docket; and (3) public policy favoring disposition of cases on the merits. *Keener,* 181 F.R.D. at 641. The factors involving docket control planning are sufficiently important to alone justify the exclusion of an untimely disclosed expert report or opinion even in absence of prejudice to the opposing party. *Trilogy Communications, Inc. v. Times Fiber Communications, Inc.,* 109 F.3d 739, 745 (Fed.Cir.1997).

Where a plaintiff operates in bad faith or with deliberation, exclusion of evidence is often appropriate. *Quevedo v. Trans-Pacific Shipping, Inc.,* 143 F.3d 1255 (9th Cir.1998)(one and one-half month delay with no explanation); *Trilogy Communications, Inc.,* 109 F.3d 739 (not only untimely but attempt to squeeze in second expert opinion, rebuttal opinion, and affidavit); *Reliance Ins. Co.,* 110 F.3d 253 (only ten days late, prior to the end of discovery period, but intentional delay); *Boardman,* 106 F.3d 840; *McRae v. Publications Intern. Ltd.,* 985 F.Supp. 1036 (D.Kan.1997)(parties warned that expert discovery deadlines would be strictly enforced, exclusion to avoid trial by ambush); *Fritter,* 181 F.R.D. 215 (deliberate delay in testing of over one or two months in order to save costs); *Keener,* 181 F.R.D. 639 (one month and a dramatically different opinion).

[8] In the instant case, the Court does not find deliberate delay or aggravated circumstances, as occurred in the above cases. Moreover, plaintiff argues that defendants will suffer no prejudice because Dr. Pourdeyhimi actually conducted his test prior to the expert discovery exchange. Thus, defendants did not completely rely on Mr. Fredericksen in preparing their case. Also, the new tests are fairly important. It appears that there may be a number of different tests which can be performed in order to reveal the true nature of defendants' shoes, none of which may be definitive, but all of which may help provide an answer.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

212 F.R.D. 306                                                                          Page 7

212 F.R.D. 306

**(Cite as: 212 F.R.D. 306)**

Therefore, permitting the tests might provide a greater chance that the case would be decided on the merits and that the jury would be adequately informed in order to make a decision. On the other side of the equation, strict adherence to discovery rules are necessary to prohibit not only trial by ambush, but discovery gaming wherein a party holds back evidence or does not pay sufficient attention in the first instance to develop expert testimony. All of this imposes costs on the court and the opposing parties, both in the short and long run.

Even though defendants will not suffer prejudice in the sense of not being able to fairly present their case if the new opinions are allowed, [FN4] they nevertheless will suffer some prejudice in the form of additional costs and a loss of the surprise advantage that they had in selecting Dr. Pourdeyhimi and his unexpected test. Plaintiff may be additionally faulted because, although it immediately took steps to procure additional testimony and attempted to do so within the discovery time limits, [FN5] significantly, "plaintiff **\*312** never sought an extension of time from the district court." *Quevedo,* 143 F.3d at 1258. The Court is disturbed by these considerations and by plaintiff's actions, including its misconstruction of the Federal Rules relating to the disclosure of expert witness testimony as discussed above. The disruption caused by the proliferation of untimely expert testimony is real and attorneys must know such will not be permitted. To that end, the Court finds that the exclusion of Mr. Fredericksen's second test and opinion is well justified for all the reasons noted above, including plaintiff's failure to immediately request court permission for the test and opinion, and the fact that said report was not disclosed to defendants until after discovery ended and was a second violation of the Court's discovery order. *See Lory,* 179 F.R.D. at 87 (may consider using lesser sanctions when non-compliance limited to single instance).

FN4. Defendants will lose the advantage they had because Dr. Pourdeyhimi's new test surprised plaintiff and its expert. This type of prejudice is of a lesser quality than

that which hinders a party from presenting its case on an equal footing.

FN5. At oral argument, plaintiff informed the Court that Mr. Fredericksen's second test and opinion was delayed because of his inability to gain access to a university's laboratories in order to conduct his test.

[9] Dr. Fields' report stands in a slightly different position. Here, although plaintiff failed to immediately request that the Court permit it to prepare additional initial or else rebuttal expert testimony, plaintiff did submit the report prior to the end of discovery and within the thirty-day time period for rebuttal discovery that would have applied had this case been operating without a discovery plan. In other words, the Court finds that plaintiff did act marginally expeditiously with respect to Dr. Fields. The report is important to the merits of the case and the Court believes it will aid in reducing jury confusion or misunderstanding. Plaintiff's inadequate discovery plan submission and expert witness preparation show no sign of being other than simple mistakes with no ulterior motives. The costs to defendants of additional expert witness preparation do not necessarily require the exclusion of new expert opinions. *Tucker,* 49 F.Supp.2d 456 (discovery cutoff rescinded and trial indefinitely delayed). Therefore, the Court will deny defendants' motion for exclusion and consider alternative sanctions.

[10] As noted earlier, Fed.R.Civ.P. 16(f) provides for a range of sanctions for the untimely disclosure of expert witnesses and their reports. When there is a substantial violation of Rule 16(f), even without bad faith, deliberation or other aggravating factors, some sanctions in the form of attorney's fees and cost-shifting is not inappropriate in order to (1) act as a general deterrent to violation of the court's order, (2) encourage adequate pretrial preparation, (3) ensure the party will not profit by its own failures, and (4) eliminate prejudice to the opposing party. *Old Country Toyota Corp. v. Toyota Motor Distributors, Inc.,* 168 F.R.D. 134 (E.D.N.Y.1996).

[11] In the instant case, defendants were forced by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

212 F.R.D. 306                                                           Page 8

212 F.R.D. 306

**(Cite as: 212 F.R.D. 306)**

plaintiff's non-compliance to file two motions to
exclude the expert reports. As noted above,
plaintiff's need for additional expert opinion arises
as much from inadequate preparation as from
surprise. Plaintiff makes much of the fact that Dr.
Pourdeyhimi did not use an "industry standard" test.
On the other hand, plaintiff fails to explain why it
did not initially select the best test or tests if the
industry standard test is viewed by plaintiff to now
be inadequate. In order to protect defendants
against prejudice, the Court will require plaintiff to
pay the costs and expense of the Fields' deposition,
including the expert fees, if any, of Dr. Fields, and
the attorney's fees incurred by defendants in
connection with these motions, up to the amount of
$3,000.00. *Lory,* 179 F.R.D. 86; and *Old Country
Toyota Corp.,* 168 F.R.D. 134. In addition, within
thirty days from the date of this Order, defendants
may name a rebuttal expert to Dr. Fields and
produce an expert witness report. Said witness shall
be subject to deposition by plaintiff at its own cost.

**IT IS THEREFORE ORDERED** that defendants'
motion to exclude the second expert report of Mr.
Fredericksen (docket no. 76) is granted.

**IT IS FURTHER ORDERED** that defendants'
motion to exclude the expert report of Dr. Fields
(docket no. 61) is denied on the condition that
plaintiff pay defendants' attorney's fees for bringing
both the instant motion and the motion relating to
Mr. Fredericksen in the amount not to exceed
$3,000.00 and further, that plaintiff submit Dr.
Fields for deposition by defendants, with plaintiff
paying the cost of the deposition and Dr. **\*313**
Fields' expert witness fees. Within thirty days of
the date of this order, defendants may name a
rebuttal expert to Dr. Fields and produce an expert
report. Plaintiff shall pay the costs for the
deposition and any expert fees incurred at the
deposition. The above costs are not reimbursable
should plaintiff prevail in this action.

212 F.R.D. 306

**Motions, Pleadings and Filings (Back to top)**

• 1:00CV00978 (Docket) (Sep. 27, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.