# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

-----------------------------------------------------

FIREMAN'S FUND INSURANCE   :
COMPANY          :
As Subrogee of       :
David Ryan        :   CIVIL ACTION NO.
777 Marin Drive       :   1:05-CV-10786(NMG)
Novado, California 94998   :
             :
    Plaintiff     :
             :
 v.           :
             :
WHIRLPOOL CORPORATION  :
200 North M-63      :
Benton Harbor, MI  49022   :
             :   JULY 5, 2005
    Defendant   :

-----------------------------------------------------

## 26(a) INITIAL DISCLOSURES

## A. INDIVIDUALS WHO MAY POSSESS DISCOVERABLE INFORMATION

The Defendant

David Ryan
126 Westerly Terrace
Hartford, CT

Keving VanderKolk
James Cameron
Alan DeLee
John Paquet
Fatima Conrad
Craig/is
PO Box 40569
Jacksonville, FL

Robert J. Margetta
RJ Margetta Adjustment
82 Granite Street
Fall River, MA

Nantucket Fire Department
Nantucket, MA

Steven Pietropaolo, M.S.
Levine Group, Inc.
650 Halstead Avenue, Suite 103B
Mamaroneck, NY

Thomas Haynes
Crawford Investigation Services, Inc.
National Operations Center
285 W. Esplanade Ave., Suite 200
Kenner, LA

## B. DOCUMENTS SUPPORTING PLAINTIFF'S CLAIM

A. Crawford Investigations report (attached.)

B. Levine Group, Inc. report (attached.)

C. Nantucket Fire Department report (attached.)

D. Adjustment documents and valuation materials (attached.)

## C. COMPUTATION OF DAMAGES

$333,573.31

## D. INSURANCE AGREEMENT

Available upon request.

**FIREMAN'S FUND INSURANCE COMPANY**
By its attorneys,

Erik Loftus, Esquire
Law Offices of Stuart G. Blackburn
Two Concorde Way
P.O. Box 608
Windsor Locks, CT 06096
(860) 292-1116
BBO# 656315

2

## CERTIFICATION

I hereby certify that a copy of 26(a) Initial Disclosures has been mailed, first class mail, postage prepaid on the 5th day of July, 2005 to the following:

Steven M. Key, Esq.
Campbell Campbell Edwards & Conroy
One Constitution Plaza, Third Floor
Boston, MA  02129

_____
Erik Loftus, Esq.

3

# Exhibit 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FIREMAN'S FUND INSURANCE )
COMPANY a/s/o DAVID RYAN, )
                        )
           Plaintiff,   )
                        )     Civil Action No. 1:05-CV-10786(NMG)
v.                      )
                        )
WHIRLPOOL CORPORATION,   )
                        )
         Defendant.   )

## NOTICE OF COMPLIANCE

The Plaintiff, FIREMAN'S FUND INSURANCE COMPANY a/s/o DAVID RYAN,

hereby gives notice that it has answered all Defendant's First Set of Interrogatories and

Request for Production this 10th day of November, 2005.

PLAINTIFF,

BY: _____

Erik Loftus, Esq.
Law Offices of Stuart G. Blackburn
Two Concorde Way
P.O. Box 608
Windsor Locks, CT 06096
(860) 292-1116
BBO #656315

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FIREMAN'S FUND INSURANCE )
COMPANY a/s/o DAVID RYAN, )
                                                )
                        Plaintiff,          )
                                                )          Civil Action No. 1:05-CV-10786(NMG)
v.                                          )
                                                )
WHIRLPOOL CORPORATION,       )
                                                )
                        Defendant.        )
                                                )

## PLAINTIFF'S RESPONSES TO DEFENDANT WHIRLPOOL CORPORATION'S FIRST SET OF INTERROGATORIES

1.      Separately as to each of Plaintiff's insureds, please provide the following: full name, home address, home telephone number, all previous names by which they have been known, social security number, and date of birth.

**ANSWER:**

David and Dale Ryan
128 Westerly Terrace
Hartford, CT  06105
(H) 860-232-6233
(W) 860-275-8258

Objection to request for social security number as it is beyond the scope of permissible discovery.

2.      What are the names, business addresses, home addresses, business telephone numbers, and home telephone numbers of all persons claimed by either the Plaintiff or the homeowners to be eyewitnesses to the incident which forms the basis of your Complaint and explain the person's relationship to you or the Ryans, if any?

**ANSWER:**

David and Dale Ryan
128 Westerly Terrace
Hartford, CT 06105
(H) 860-232-6233
(W) 860-275-8258
Plaintiff's insureds.

Stephen Murphy, Captain
Nantucket Fire Department
131 Pleasant Street
Nantucket, MA 02554
508-228-2324
Supervisor for fire suppression and investigation activities.

Benjamin Turnbull
Isle Caretaking
5 Miacomet Road
Nantucket, MA 02554
508-228-8763
Insured's caretaker.

Thomas Hayne
Crawford Investigations
Greene, RI
401-397-7820
Plaintiff's cause and origin investigator.

Steve Pietropaolo
Levine Group, Inc.
650 Halstead Avenue
Mamaroneck, NY 10543
914-670-0208
Retained by Plaintiff to investigate cause of fire.

3.    What are the names, business addresses, home addresses, business telephone
numbers, and home telephone numbers of all persons claimed by you to have arrived at the
scene either immediately or soon after the incident which forms the basis of your Complaint;
and explain the person's relationship to you or the Ryans, if any?

-2-

**ANSWER:**

David and Dale Ryan
128 Westerly Terrace
Hartford, CT  06105
(H) 860-232-6233
(W) 860-275-8258


4.    If you have in your possession, custody or control any recorded or written

statements by persons you contend have knowledge of the incident which forms the basis of

your Complaint, please list for each such statement the name of the witness, the date the

statement of the witness was taken, the subject matter and substance of the statement, the name

and address of the person who provided the statement, and the name and address of the person

who obtained the statement.

**ANSWER:**

None.


5.    As to the Subject Product, please provide: the model number, serial number,

date and location of purchase, and the person who made the purchase.

**ANSWER:**

KitchenAid (Whirlpool)
Model # KTRS22KHW
Serial # EK0819041
Purchased by David Ryan on 7/24/00 at Marine Home Center, Nantucket, MA.


6.    Identify the owner of the Subject Product at the time of the alleged occurrence

and all previous and subsequent owners of the refrigerator, and give the location and identity

of the person or facility having possession of the refrigerator at the time of answering these

Interrogatories.

**ANSWER:**

Owner: David and Dale Ryan
Presently located at Levine Group, Inc., 650 Halstead Avenue, Mamaroneck, NY 10543.

      7.    Please identify all persons who have repaired or used the Subject Product or who otherwise have knowledge of the physical and mechanical condition of the Subject Product, from the time of its purchase up to and including the present.

**ANSWER:**

Prior to the incident which forms the basis for this action, no work, repair, maintenance or modifications of the refrigerator were made. After the incident, there was destructive testing of the refrigerator at Levine Group, Inc., 650 Halstead Avenue, Mamaroneck, NY 10543. In attendance were:

Steve Pietropaolo, Levine Group, Inc.
Ron Parson, Wright Group, Inc. (Berko)
Richard Splaine, Splaine Investigations (Whirlpool)
Daniel Cronin, Phoenix Investigations (Whirlpool)

      8.    Please identify any person with knowledge, information, or records concerning the purchase, use, sale, servicing, repair, conditions of operation, or storage of the Subject Product, or any portion of the Subject Product at any time from date of original purchase of the Subject Product to the present.

**ANSWER:**

David and Dale Ryan
128 Westerly Terrace
Hartford, CT 06105
(H) 860-232-6233
(W) 860-275-8258

Benjamin Turnbull
Isle Caretaking
5 Miacomet Road
Nantucket, MA 02554
508-228-8763

Thomas Hayne
Crawford Investigations
Greene, RI
401-397-7820

Steve Pietropaolo
Levine Group, Inc.
650 Halstead Avenue
Mamaroneck, NY 10543
914-670-0208

9.      If the Subject Product had been involved in any accident or had been damaged
in any way -- other than in the occurrence that forms a basis of this lawsuit -- describe each
accident and each item of damage, and identify all persons having knowledge of any such
accident and damage.

**ANSWER:**

There was no damage to the Subject Product prior to the incident.

10.     If you contend that any component(s) of the Subject Product was defectively or
negligently designed, please provide for each such component the name of the component, the
specific alleged defect or defects in said component, and identify each expert upon whose
opinion the Plaintiff bases its contention of defect.

**ANSWER:**

See opinions and conclusions in report dated 11/02/04 by Steve Pietropaolo of Levine Group,
Inc.

11.     If you contend that any component(s) of the Subject Product was defectively or
negligently manufactured, please provide for each such component the name of the component,
the specific alleged defect or defects in said component, and identify each expert upon whose
opinion the Plaintiff bases its contention of defect.

**ANSWER:**

See opinions and conclusions in report dated 11/02/04 by Steve Pietropaolo of Levine Group, Inc.

12.    If you contend that the Subject Product was defective due to a lack of any safety and/or design features, please identify any and all such safety and/or design features you contend should have used in the design and/or manufacture of the Subject Product.

**ANSWER:**

See opinions and conclusions in report dated 11/02/04 by Steve Pietropaolo of Levine Group, Inc.

13.    State whether you contend that the Subject Product failed to comply with any federal, state, local or industry standards, practices, rules or regulations, and if so identify such practices, rules, or regulations and state all facts and documents supporting that contention.

**ANSWER:**

See opinions and conclusions in report dated 11/02/04 by Steve Pietropaolo of Levine Group, Inc.

14.    Identify and describe the repair history of the Subject Product.

**ANSWER:**

No repairs were made to the Subject Product before the incident.

15.    As for the Berko toe kick heater that was located in the kitchen of the Ryan home, provide the following:

    a. Model and serial number for the heater;

-6-

b.  Date and location of purchase;

c.  Who made the purchase; and

d.  The repair history of the heater, including dates, descriptions of service

performed, and the entity providing the repair service.

**ANSWER:**

Berko heater model # TS-1-A-T
This heater was located within the premises at the time the Ryans purchased the premises in January, 1990.  They have no information on when it was installed or purchased.  The heater never required repairs or maintenance and none was done.

16.    State whether the Berko toe kick heater was controlled and activated by the

central heating system or whether it was separately controlled by a mechanism located directly

on the heater.

**ANSWER:**

To the best recollection of the Ryans, the Berko heater was an individual heater controlled by a thermostat located within the kitchen.  It did not appear to be connected to any other heating system.

17.    Identify and describe any electrical wiring or outlets that were behind, next to,

or in close proximity to the refrigerator or within 30 feet of the refrigerator.

**ANSWER:**

To the best recollection of the Ryans, there was a standard outlet behind the Subject Product, a grounded outlet behind the stove, a standard outlet on the same wall as the thermostat for the Berko heater, and most likely another outlet behind the dishwasher and microwave.

18.    State the name, business address, and business telephone number of all persons

whom you expect to call as an expert witness at trial, stating the subject matter on which the

-7-

expert is expected to testify, the substance of his/her facts and opinions, and the grounds for each such opinion.

**ANSWER:**

The Plaintiff will designate its experts in accordance with the Court's scheduling order.

19.    Itemize all damages which you contend you are entitled to recover in this claim, identifying each expense, the amount claimed and how you calculated that amount.

**ANSWER:**

Building damage: $236,329.00
Contents damage: $94,923.63
Alternative Living Expense: $2,320.68

The calculations for these amounts will be found in the adjustment documents.

20.    Identify and describe in detail the nature and scope of any and all activity that took place in the home in which the Subject Product was located during the twenty-four (24) hours prior to the incident which forms the basis of your Complaint.

**ANSWER:**

The fire was discovered on 11/25/03 at ~6p.m. by David Ryan. Prior to that, Benjamin Turnbull had entered the home and turned the heat and water on at ~2p.m. The twenty hours prior to that, the house was vacant.

21.    Identify whether the Ryan home was used solely by the Ryans, or whether the home was used as rental property; and if the home was used by someone other than the Ryans, rented or otherwise, please provide for each person: their name, address, telephone number, relationship to the Ryan and the dates of use.

**ANSWER:**

To the best recollection of the Ryans, they rarely rented the home. Prior to the incident, Mr. Ryan was only able to recall renting the home to Atty. John Schuster (address not listed, Simsbury, CT, 860-651-1557) twice for a 1 week period each time. Mr. Schuster is a long time family friend of the Ryans. He was last in the home in the summer of 2004. The Ryans had been to the home in the period between when Mr. Schuster rented it and the time of the incident and had no problems they could recall.

22.    As to occupancy in the home, state how many days of the year the home was occupied and provide the date the home was last occupied before the incident, including the name of the occupant, their telephone number and address, and relationship to the Ryans.

**ANSWER:**

The Ryans would open the home around Easter and close it just after Thanksgiving. In the period in between, there use would vary from year to year. In addition to David and Dale Ryan, they had two adult daughters who use the home occasionally. Prior to the incident, the last people occupying the home were David and Dale Ryan sometime in the late summer/early fall of 2004.

23.    Provide a description of how often the heater in the home was used, including but not limited to whether the heater was used when the house was unoccupied and when the last time the heater was used before the incident which forms the basis of your Complaint.

**ANSWER:**

The Berko heater was seldom used. For the most part, the home was not used during cold periods. When the home did require heat, the Ryans would not use the Berko heater because it had a fan within the unit they described as "noisy". They claim the heat from the living room, dining room and 2 bedrooms heated the house sufficiently.

24.    Prior to the incident, had there been any electrical work completed in the Ryan home? If so, please describe the name, address and telephone number for who performed the work, when it was performed, and the kind of work that was performed.

**ANSWER:**

All electrical work done by the Ryans prior to the incident was done by Paul Blair, Hummock Pond Road, Nantucket, MA 508-228-5172. He had exchanged the electrical outlet behind the stove to put in a grounded outlet for a new stove. Mr. Blair also installed new light fixtures throughout the house and installed an outdoor spotlight. The Ryans could not specifically recall when this work was done as it was done over a substantial period of time on an informal basis.

     25.    Did the Ryans ever have any electrical problems in the home from the time they purchased the home until the time of the incident? If so, please describe the problems and state when they occurred.

**ANSWER:**

No. The Ryans did not have electrical problems per se. They had electrical work done to accommodate an upgraded stove and to replace light fixtures they described as "cheap". But these items were in working order prior to their replacement.

     26.    State the name, address, and position or occupation of the person(s) who performed an investigation, on Plaintiff's behalf, of the incident complained of the Complaint, including all testing, examination or analysis.

**ANSWER:**

Thomas Hayne
Crawford Investigations
Greene, RI
401-397-7820

Steve Pietropaolo
Levine Group, Inc.
650 Halstead Avenue
Mamaroneck, NY  10543
914-670-0208

Dated:  November 10, 2005

PLAINTIFF,

BY: _____

Erik Loftus, Esq.
Law Offices of Stuart G. Blackburn
Two Concorde Way
P.O. Box 608
Windsor Locks, CT 06096
(860) 292-1116
BBO #656315

-11-

## CERTIFICATION

THIS IS TO CERTIFY THAT, I, _Kevin Vandenberk_ have read the foregoing answers to

Interrogatories and state that they are true and accurate to the best of my knowledge and belief

under pains and penalties of perjury on this _25th_ day of _October_, 2005.

_K/j. Vun_

STATE OF _Florida_ )
                    ) ss:              ,        , 2005
COUNTY OF _Duval_ )

On this _25th_ day of _Oct_ , 2005, personally appeared _Kevin Vandenkalk_ who
affirmed under oath and truth, to the best of his/her knowledge and belief, of the foregoing
answers to interrogatories and also acknowledged his/her execution of the above.

In witness thereof, I hereunto set my hand and official seal.

_Aghavni I. Boatright_
Notary Public

Aghavni I. Boatright
My Commission DD296072
Expires April 03, 2008

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FIREMAN'S FUND INSURANCE ) | |
| COMPANY a/s/o DAVID RYAN,  ) | |
| ) | |
| Plaintiff,     ) | Civil Action No. 1:05-CV-10786(NMG) |
| ) | |
| v.                                        ) | |
| ) | |
| WHIRLPOOL CORPORATION,   ) | |
| ) | |
| Defendant.    ) | |
| _____ ) | |

## PLAINTIFF'S RESPONSES TO DEFENDANT WHIRLPOOL CORPORATION'S FIRST SET OF REQUEST FOR PRODUCTION

1.    The refrigerator referred to in the Plaintiff's Complaint, its power cord, the electrical outlet into which it was plugged, and any house wiring retrieved from the premises.

**RESPONSE:**

Available for inspection at:
Levine Group, Inc.
650 Halstead Avenue
Mamaroneck, NY  10543
914-670-0208

2.    The Berko toe kick heater that was located in the kitchen of the Ryan home.

**RESPONSE:**

Available for inspection at:
Levine Group, Inc.
650 Halstead Avenue
Mamaroneck, NY  10543
914-670-0208

3.    All statements of possible witnesses, whether written, oral, summarized, or otherwise produced in any manner, relating to the alleged incident.

**RESPONSE:**

None.

      4.     All documentation supporting the Ryan's claim for any type of property damage (real and personal).

**RESPONSE:**

Attached (on cd).

      5.     All canceled checks, charge receipts, invoices, bills, statements, and other documents of any nature evidencing all expenses incurred by (and where applicable paid by or on behalf of) the Ryans, as a result of property damage (real and personal) allegedly sustained as a result of the alleged fire.

**RESPONSE:**

Attached (on cd).

      6.     A copy of all lists, schedules, or similar documents provided to any insurance company, agency, or others setting forth property (real and personal) and values for property which the Plaintiff alleges was either destroyed or damaged by the alleged fire.

**RESPONSE:**

Attached (on cd).

      7.     All documentation, not already provided in response to the above requests, which support the Ryan's claim for damages.

**RESPONSE:**

Attached (on cd).

8.    Any and all owner's manuals, instruction manuals, warranties, warranty manuals, delivery documents, service agreements, or other materials of any nature, received by the Ryans at the time they purchased the subject refrigerator.

**RESPONSE:**

Attached (on cd).

9.    A complete legible copy of all maintenance records, service records, service invoices, service receipts, work orders, bills, statements, canceled checks, or other documents regarding all service or maintenance performed on the subject refrigerator and the Berko heater since the date the products were purchased.

**RESPONSE:**

No work was done on either the subject refrigerator or Berko heater.

10.    Any and all sales documents, invoices, bills, statements, receipts, canceled checks, purchase orders, charge receipts, and other documents of any nature pertaining to the sale of the subject refrigerator and Berko heater to the Ryans.

**RESPONSE:**

None available.  Marine Home Center most likely has records for the refrigerator.  The Ryans did not purchase the Berko heater.

11.    Any and all sales documents, invoices, bills, statements, receipts, canceled checks, delivery orders, charge receipts, work orders, and other documents of any nature pertaining to the delivery of the subject refrigerator and Berko heater to the Ryans.

**RESPONSE:**

None available.  Marine Home Center most likely has records for the refrigerator.  The Ryans did not purchase the Berko heater.

12.    Any and all sales documents, invoices, bills, statements, receipts, canceled checks, charge receipts, work orders, and other documents of any nature pertaining to the installation of the subject refrigerator and the Berko heater in the Ryan home.

**RESPONSE:**

None available.  Marine Home Center most likely has records for the refrigerator.  The Ryans did not purchase the Berko heater.

13.    A copy of any and all reports prepared by any police agency, fire department, or other person or agency (not including your attorneys) which investigated the source and/or cause of the alleged fire.

**RESPONSE:**

Attached (on cd).

14.    All reports drafted or maintained by any insurance carrier or insurance adjustment company dealing with or in any way related to the events alleged in the Complaint.

**RESPONSE:**

Attached (on cd).

15.    All photographs, motion pictures, slides, videotapes, and other depictions of the subject refrigerator, or any of its components, and of the scene of the fire alleged in the Complaint.

-4-

**RESPONSE:**

Attached (on cd).


16.    All documents concerning or pertaining to any examination, test, analysis, evaluation, or study of the subject refrigerator or the Berko heater, or any of any components of either product at any time before or after the fire alleged in the Complaint.

**RESPONSE:**

Attached (on cd).


17.    All documents reflecting, referring to, or relating to any repairs, alterations, changes or renovations to the premises within 12 months preceding the fire in question.

**RESPONSE:**

None available.   Beyond the electrical work referred to in our response to interrogatory number 24, the only other work to the premises was done by Benjamin Turnbull, who replaced both the roof and all the windows using supplies he obtained at Island Lumber.  Because the work relationship was informal, the Ryans did not retain documents related to the work.  Also, they are unsure of when the work actually occurred.  It may have been prior to 12 months before the fire.


18.    All documents reflecting or referring to any repair, alteration, or other change to the subject refrigerator, the Berko heater or any of their components.

**RESPONSE:**

None available.  No repairs, alterations, or other changes were made to either the refrigerator or Berko heater by the Ryans.


19.    All documents that you contend support your allegation in the Complaint that the refrigerator was defective.

**RESPONSE:**

Attached (on cd).


20.    A current résumé and curriculum vitae for each expert you have retained.

**RESPONSE:**

Experts will be designated in accordance with the Court's scheduling order.


21.    All documents, photographs or other materials on which any expert relied, consulted or used to form or prepare an opinion or report relating to the subject refrigerator or relating to the fire alleged in the Complaint.

**RESPONSE:**

Attached (on cd).


22.    All reports relating to this case prepared by any expert.

**RESPONSE:**

Experts will be designated in accordance with the Court's scheduling order.


23.    All photographs in your possession relating to this case, prepared by your experts or other persons.

**RESPONSE:**

Experts will be designated in accordance with the Court's scheduling order. Photographs are attached (on cd).

24.   All documents or materials constituting, evidencing or relating to any prior events or claims which you contend constitute notice to Whirlpool of any defect in the design or manufacture of the subject refrigerator.

**RESPONSE:**

None available.


25.   All documents reflecting any interest of any person other than the Plaintiff in any recovery, judgment, or settlement in this case.

**RESPONSE:**

None available.


26.   All documents identified, mentioned, or referred to in the Plaintiff's Answers to Whirlpool's First Set of Interrogatories to the Plaintiff or relied upon by the Plaintiff, or the attorneys for the Plaintiff, in responding to those Interrogatories.

**RESPONSE:**

Attached (on cd).


Dated November 10, 2005          PLAINTIFF,

                                 BY:
                                      Erik Loftus, Esq.
                                      Law Offices of Stuart G. Blackburn
                                      Two Concorde Way
                                      P.O. Box 608
                                      Windsor Locks, CT 06096
                                      (860) 292-1116
                                      BBO #656315

-7-

## CERTIFICATION

I hereby certify that the foregoing NOTICE OF COMPLIANCE, PLAINTIFF'S RESPONSES TO DEFENDANT WHIRLPOOL CORPORATION FIRST SET OF INTERROGATORIES and DEFENDANT'S FIRST SET OF REQUEST FOR PRODUCTION have been mailed this 10th day of November, 2005, first class mail, postage prepaid to the following:

Steven M. Key, Esq.
Campbell Campbell Edwards & Conroy
One Constitution Plaza, Third Floor
Boston, MA 02129

Robert W. Foster, Jr., Esq. (pro hac vice counsel)
Nelson Mullins Riley & Scarborough LLP
1320 Main Street, 17th Floor
Columbia, SC 29201

Erik Loftus, Esq.

# Exhibit 3

# CRAIG/is Ltd.

**Insurance Services**

PO Box 40569   Jacksonville   Florida   32203-0569
Voice 904.807.2500   Fax 904.807.2510

12/2/2003

Whirlpool Corporation
2000 CAP M 63 North
MD 2000
Benton Harbour, MI 49022

### IMPORTANT NOTICE

Re:    FFIC Claim Number    : 00503119324
       FFIC Insured    : David Ryan
       Date of Loss    : 11/25/2003
       Type of Loss    : fire damage to home
       Anticipated Loss Amount    : $500,000.00 or more

Attention: Mr. Mike Metzger

Via Fax (269) 923 3919 ~~5186~~

Dear Mr. Metzger:

Thank you for discussing the above loss with me on the phone. As I explained, we represent Fireman's Fund Insurance Company ('FFIC') in pursuing subrogation recovery of any insurance funds which might be paid to FFIC's above noted insured for the above noted loss. The information we have been provided identifies you and/or your company as a party that may be responsible for causing, or contributing to the loss, and you and/or your company may be subject to subrogation.

As I explained to you, this loss is based upon a fire which occurred at the vacation home of the insured at 7 Sandpiper Way, Nantucket, Massachusetts on the above loss date. It appears that a refrigerator manufactured by your company may have caused the fire. As I further explained to you, we are preserving the scene for your expert to have an opportunity to examine the loss site. However, we can only do this for a reasonable amount of time. You had indicated to me that you would have your expert contact me to arrange a site visit. Please do this immediately.

Immediately notify your insurance carrier of this loss and potential claim against you and or your company, and have your carrier contact our office. If you do not have an insurance carrier, you and your company are put on notice of this claim. Please immediately let me know if that is the case.

Any dispute must be forwarded to our office in writing within ten (10) days of your receiving this letter.

Sincerely,

John Cameron
(904) 807-2525
(904) 807-2625 (fax)

# Exhibit 4

# LGI LevineGroup Inc.

**FORENSIC ENGINEERS & CONSULTANTS**

0050311932 4

**Engineers/Consultants**
Steven Pietropaolo, M.S.
Jerome G. Levine, M.E.
John P. Flynn, P.E.

Field Technicians/
**Field Investigators**
Raymond D. Infante
Russell A. Levine

December 15, 2003

Alan DeLee
Craig Insurance Services
225 Water Street
Jacksonville, Florida 32220

RE:    **INSURED:**          David Ryan
        **L/L:**               7 Sandpiper Way
                        Nantucket, MA 02554
        **TEL NO.:**        Tom Haynes, Crawford Invest. (401) 397-7820  (860) 428-4130
        **YOUR CLAIM NO.:**    00503119324
        **OUR FILE NO.:**       8031
        **TYPE OF LOSS:**      Fire
        **DATE OF LOSS:**      November 25, 2003

Dear Mr. DeLee:

We wish to thank you for the assignment with reference to the above captioned matter.

We made a site inspection on December 11, 2003, and at this time, submit the following:

1.   Copy of Fire Department photographs transferred to CD's. The Fuji-Film CD contains electronic copies of their 35mm site photos. The other CD is their digital photographs of an exemplar refrigerator.
2.   Copy of the business cards of those present, and the sign in sheet.
3.   Our invoice for payment

If you have any questions regarding the above, please contact the undersigned.

Very truly yours,
LGI LEVINEGROUP, INC.

Steven Pietropaolo, M.S.
President & CEO
SP: pc
Encl.

P.S. When referring to this report either by query or paid invoice, please include our file/invoice number.

00503119324

# WRIGHT GROUP INC.

HEATER

Ron Parsons

P.O. Box 738                  Office: 508-485-2900
Marlboro, MA 01752            FAX: 508-485-3141

---

## Splaine Investigations Inc.

14 NORTH HILL DRIVE
N. FALMOUTH, MA 02556                Whirlpool
                                     Manufacturer

RICHARD J. SPLAINE, ME, CFI          OFFICE: 508-563-5845
                                     FAX: 508-563-3875
                                     E-MAIL: RDSIA@AOL.COM

---

# LGI LevineGroup Inc.
### FORENSIC ENGINEERS & CONSULTANTS

Insured

Steven Pietropaolo, M.S.
President & CEO

650 Halstead Avenue, Suite 103B ▪ Mamaroneck, NY 10543
Tel: 914-670-0208 ▪ Fax: 914-670-0210 ▪ steve@levinegrp.com

---

## PHOENIX INVESTIGATIONS, INC.

Whirlpool —
Local Supplier

Daniel A. Cronin
President
                                     508-252-4007
                                     Fax 508-252-3933
                                     Post Office Box 4
                                     Rehoboth, Massachusetts 02769

# Exhibit 5

United States District Court, D. New
Hampshire.
Richard LUND and John L. Claps,
Plaintiffs,
v.
CITIZENS FINANCIAL GROUP, INC.
and Citizens Bank New Hampshire,
Defendants.
No. CV 97-183-M.
Sept. 30, 1999.

*ORDER*

MCAULIFFE.
*1 Plaintiffs Richard Lund and John L.
Claps challenge defendants'
repudiation of rights they claim under
a Supplemental Executive Retirement
Plan ("SERP") allegedly established by
their former employer (and
defendants' predecessor), First NH
Bank.[FN1] Plaintiffs' amended complaint
[FN2] asserted state law claims based on
contract, breach of the implied duty
of good faith and fair dealing,
promissory estoppel, common law
breach of fiduciary duty, common law
fraud, common law negligent
misrepresentation and, in the
alternative, federal counts under the
Employee Retirement Income
Security Act of 1974, 29 U.S.C. §
1001 et seq. ("ERISA"), for recovery
of benefits due under the SERP, see
29 U.S.C.A. § 1132(a)(1)(B)(West
1999), and breach of fiduciary duty.
Plaintiffs also brought a claim seeking
declaratory judgment.
FN1. First NH Bank and its successors
are sometimes hereinafter referred to
as "the bank."

FN2. Suit was originally filed in State
court and removed to this court
pursuant to 28 U.S.C. §§ 1441 and
1446.

By order dated June 25, 1998, the
court dismissed plaintiffs' state law
claims as preempted by ERISA, and
dismissed the federal law breach of
fiduciary duty claim because the
alleged SERP is a "top hat" plan
exempt from ERISA's fiduciary duty
requirements.[FN3] Plaintiffs' remaining
claims-Count VII, seeking recovery of
benefits due under the SERP, and
Count IX, seeking declaratory
judgment-were tried to the court. On
November 16, 1998, a hearing was
held on pending motions in limine.
The court resolves all outstanding
motions and rules on plaintiffs'
remaining claims on the merits as
follows.
FN3. A "top hat" plan is "a plan which
is unfunded and is maintained by an
employer primarily for the purpose of
providing deferred compensation for a
select group of management or highly
compensated employees."29 U.S.C.A.
§ 1101(a)(1) (West 1999).

*Background*

The court finds that the following
facts were proved at trial. From
September, 1982, through 1990,
Plaintiff Lund was employed as the
president and Chief Executive Officer
("CEO") of Exeter Banking Company,
a wholly owned subsidiary of First NH
Bank. He thereafter held a number of
commercial lending management
positions with First NH Bank until he
left the bank's employ in 1995.
Plaintiff Claps was employed as a vice
president, and soon thereafter senior
vice president, of Merchants National
Bank of Manchester, New Hampshire,
from May, 1981, to November, 1986.
He then served as president, CEO and
director of First NH Investment
Services until he left the bank in
August, 1995.
In the latter part of 1986 or early
1987, Joseph DeAngelis, the bank's
senior vice president of human
resources,[FN4] and Frank O. Buhl, the

bank's CEO, began developing a SERP in response to the Tax Reform Act of 1986. The Tax Reform Act of 1986 limited benefits that could be provided to certain highly compensated employees under the bank's qualified defined benefit pension plan. The bank sought to restore those benefits through a SERP.

FN4. DeAngelis was vice president of human resources prior to January, 1987, and senior vice president of human resources thereafter.

Between May and July of 1987, the bank retained actuary Charles Commander and attorney Alan Cleveland to assist in developing the SERP. DeAngelis instructed Attorney Cleveland to draft a SERP in accordance with a list of principal plan provisions prepared by Mr. Commander. (Pls.' Ex. 1.) At some point prior to August 25, 1987, DeAngelis presented the personnel committee of the bank's board of directors with a concept, or design, for the SERP that the personnel committee approved. On August 25, 1987, the chairman of the personnel committee brought the concept or design, the terms of which are now either disputed or unclear, before the bank's board of directors. The board then voted to adopt a SERP.[FN5] At the time, however, no actual written plan existed. A written plan draft was not circulated until about a year later, on June 10, 1988, and was not finalized until February of 1989.

FN5. Testimony regarding the board's action on the proposed SERP conflicted. Lund, who was at the board meeting, testified that the board voted to adopt the intention to adopt a SERP. DeAngelis, who was not at the meeting, testified to his understanding that the board voted to adopt a SERP in accordance with the design or concept presented.

*2 First NH Bank was acquired by the Bank of Ireland in 1988. On April 26, 1988, a meeting was held at the Sheraton Wayfarer Hotel in Bedford, New Hampshire, to discuss the impending acquisition with the bank's employees. The first part of the meeting addressed participants in the bank's stock option plan, who were told that the Bank of Ireland would redeem their outstanding stock options at net value when the acquisition was completed. The employees were asked to sign a document memorializing their agreement not to exercise stock options prior to the acquisition by Bank of Ireland.

The second part of the meeting involved a smaller group, consisting of senior officers of First NH Bank and the presidents of each of the bank's subsidiaries. DeAngelis told this smaller group that the bank had approved a SERP in which they were participants. Under the terms of the plan as described at the meeting, participants would be eligible for full retirement benefits at age 62, or, could take a reduced early retirement benefit at age 55. The maximum benefit, available at age 62, would be calculated as the average of the participant's five highest years' salary, multiplied by 60 percent, minus amounts payable to the participant under the bank's qualified benefit plan, Social Security, and other pension plans. Early retirement benefits would be reduced according to the same formula used in the bank's qualified benefits plan. In fact, DeAngelis believed, and expressly told the attendees of the meeting, that the SERP was designed to track the bank's qualified benefits plan. Thus, the plan described at the meeting, like the qualified benefits plan, offered a deferred vested benefit, meaning that once the benefit vested, it was payable upon the participant's reaching retirement age even if he or she had previously

left the bank's employ. As described to the participants in April, 1988, the SERP benefit vested with ten years of service. The participants were not told that they would lose their SERP benefits if they later competed with the bank in someone else's employ. They were told that a written plan was not yet available but would be forthcoming.

On June 10, 1988, after the meeting, Attorney Cleveland forwarded to DeAngelis a first written draft of the SERP which DeAngelis forwarded in turn to Mr. Commander, possibly without reading it. Under the terms of the written draft, a participant had to remain employed by the bank through retirement to be eligible for the SERP benefits. The draft also contained a "bad boy clause" providing for forfeiture of benefits if the participant went to work for a competitor of the bank. Mr. Commander returned the draft with comments which, after discussing them with DeAngelis, Attorney Cleveland largely incorporated into the written plan. The final draft was completed in February of 1989. There is no evidence that the bank's board of directors ever formally considered or approved or adopted the written embodiment of the SERP. However, a document purporting to be "[t]he First NH Banks, Inc. Supplemental Executive Retirement Plan, established as of August 25, 1987," (Defs.' Ex. 1)(the "1987 written SERP") was kept as a business record of the bank and treated and administered by the bank's personnel department as an operative plan. That plan provided that a participant would forfeit his rights under the plan if, *inter alia,* either of the following events occurred:

*3 Executive engages in any activity or conduct which, in the opinion of the Bank, is directly or indirectly competing against any business engaged in by the Bank or any of its Affiliates or subsidiaries; or
...

Executive terminates employment with the Bank or its Affiliates or subsidiaries for any reason, including his or her death but excluding termination by reason of disability as defined under Section IV hereunder, prior to the date Executive both attains age 55 years and completes 10 years of service with the Bank or its Affiliates.

(Defs.' Ex. 1 at 6-7.)

Another document titled Bank of Ireland First Holdings, Inc. Supplemental Executive Retirement Plan (SERP), purporting to be an amendment of the previous document and stamped "Approved Jan 28 1993," was also kept in the bank's records and implemented by the personnel department as the bank's SERP. (Defs.' Ex. 2.) Finally, a Bank of Ireland Group U.S. Supplemental Executive Retirement Plan, purporting to be effective as of January 1, 1995, was similarly kept and administered by the bank. Each of these plans also provided for forfeiture of benefits if the participant competed with the bank or terminated employment under other than specified circumstances.

Following the April 26 Sheraton Wayfarer meeting, plaintiffs and others repeatedly requested copies of the written SERP from the bank and were repeatedly told that it was not yet available. In late 1990, Lund again requested a copy, as he was undergoing a divorce and needed to provide information about his retirement benefits. Kim Lee, DeAngelis' successor, sent him a two page summary of the principal plan provisions. The terms therein were consistent with Lund's recollection of the SERP described in 1988, except for the addition of a new term providing that the "[b]enefit is pro-rated if the participant has less than 20 years of service." (Pls.' Ex. 1.) Lund forwarded the document to

Claps in early 1991.

Claps completed ten years of service with the bank in May of 1991. Lund completed his tenth year of service on September 20, 1992.

In early 1993, plaintiffs asked either Jane Shea-Seitz, Ms. Lee's successor, or Ann McArdle, the bank's Senior Vice-President for Compensation and Benefits, to meet with them to discuss the SERP. A meeting was held at the bank's offices in Concord, New Hampshire. Plaintiffs, Ms. McArdle, plan participant Mike Kirk, and Attorney Cleveland attended.[FN6] Plaintiffs and Mr. Kirk described the SERP as they understood it and were given copies of the 1987 "plan" and its 1992 "revision." Each was then or later [FN7] asked to write a memorandum to Ms. Shea-Seitz setting forth his understanding and position regarding the SERP. Ms. McArdle told plaintiffs and Mr. Kirk that she would research the matter and forward her findings to Terry Forsythe, group corporate secretary for the Bank of Ireland in Dublin.

FN6. Plaintiffs testified that Ms. Shea-Seitz also attended the meeting, but Ms. McArdle testified that she did not. Ms. McArdle's memorandum to Ms. Shea-Seitz describing a meeting on April 13, 1993, appears to confirm her testimony. It is possible that more than one meeting occurred, as plaintiffs' memoranda to Ms. Shea-Seitz, which they testified she requested at the meeting, are dated somewhat later than April (Claps' memorandum is dated June 7, 1993; Lund's is dated June 9, 1993). (Pls.' Ex. 13.) Mr. Kirk, who also thought Ms. Shea-Seitz attended the meeting, submitted a memorandum dated July 22, 1993) Id.

FN7. See supra note 6.

In early 1994, plaintiffs were informed that the Bank of Ireland did not agree with their interpretation of the SERP. Ms. McArdle probably told

the plaintiffs at the time that if they disagreed with that determination, they could pursue the matter further with Mr. Forsythe either directly or through Ms. Shea-Seitz. Lund testified that he asked for something in writing, but only received a memorandum from Ms. Shea-Seitz confirming that his participation in the SERP was grandfathered and that a benefit calculation would be prepared for him. [FN8] Lund testified that he never received the promised benefit calculation.

FN8. In late 1990, when First NH Bank merged most of its affiliate banks, Lund's position as CEO of an affiliate bank terminated. Arguably, therefore, he would no longer have been a participant in the SERP. Ms. She-Seitz's memorandum confirmed that the bank nevertheless considered Lund an eligible participant.

*4 Both plaintiffs left the bank's employ in 1995, after having worked more than ten years for the bank, but prior to reaching age 55. Lund became president and CEO of Farmington National Bank in Farmington, New Hampshire. Claps went to work for Northern Trust Corporation as a senior vice president of one of its subsidiaries, Northern Trust Bank of Arizona. In connection with terminating his employment, Claps negotiated and executed a severance agreement with the bank under which he continued to receive his salary through August, 1996, as well as other benefits. In exchange, Claps agreed to fully release the bank, its successors and related persons from all claims, demands and causes of action then existing.

On March 5, 1996, Lund's counsel wrote to Ms. McArdle requesting a "clear statement" of the bank's position on Lund's rights under the SERP. (Pls.' Ex. 18.) At some point thereafter, the bank denied plaintiffs' entitlement to any benefits under the

SERP. Plaintiffs then brought suit by writ dated March 7, 1997.

### Standard of Review

"A district court reviews ERISA claims arising under 29 U.S.C. § 1132(a)(1)(B) *de novo* unless the benefits plan in question confers upon the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Rodriguez-Abreu v. Chase Manhattan Bank, N.A.,* 986 F.2d 580, 583 (1st Cir.1993)(internal quotations and footnote omitted). The 1987 written SERP document grants the bank the power to interpret and construe the terms of the SERP. ( *See* Defs.' Ex. 1.) It was not proven at trial, however, that the SERP as embodied in that document was ever officially adopted by the bank's board of directors. Indeed, it seems likely that it never was. Moreover, the document was not disclosed to plaintiffs until 1993, well after plaintiffs had vested under the terms of the SERP as orally described to them.

Plaintiffs are not bound by the discretionary authority reserved to the bank in a document that the bank's board apparently never approved, and which was never timely disclosed to them. See *Bartlett v. Martin Marietta Operations Support, Inc. Life Ins. Plan,* 38 F.3d 514, 517 (10th Cir.1994)(holding that the district court properly employed *de novo* standard of review, and ignored language in a summary plan description ("SPD"), when the SPD had not been printed until after plaintiff's death and the only document made available to employees prior to that date did not reserve discretionary authority). The court therefore applies a *de novo* standard of review.

### Discussion

### I. *Pending Motions*

On the evening before the first day of trial, defendants filed a number of motions in limine on which the court deferred ruling. Each motion will be addressed in turn.

#### A. *Defendants' "Motion in Limine" Concerning Statute of Limitations.*

Defendants' first "motion in limine" actually seeks dismissal of plaintiffs' claims as barred by the statute of limitations. Defendants argue that Plaintiffs' Exhibits 5, 10 and 11 show that plaintiffs were aware of the claims asserted in this action by April, 1993, and that those claims are therefore barred by the applicable three-year statute of limitations. N.H.Rev.Stat.Ann. § 508:4, I (1997). **\*5** Plaintiffs object on both procedural and substantive grounds. First, plaintiffs argue that notwithstanding the appellation "motion in limine," defendants' motion is actually one to dismiss or for summary judgment, and as such, is untimely. Under the pretrial scheduling order adopted by the court on May 16, 1997, the deadline for filing a motion to dismiss was September 1, 1997, and for filing motions for summary judgment was June 1, 1998. Moreover, plaintiffs argue that defendants waived any statute of limitations defense by failing to plead it in their answer. Federal Rule of Civil Procedure 8(c) requires that "[i]n pleading to a preceding pleading, a party shall set forth affirmatively ⋯ statute of limitations ⋯ and any other matter constituting an avoidance or affirmative defense." Thus, all affirmative defenses must be pleaded in the defendants' answer. *McKinnon v. Kwong Wah Restaurant,* 83 F.3d 498, 505 (1st Cir.1996). "Affirmative defenses not so pleaded are waived." *Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.,* 15 F.3d 1222, 1226 (1st

Cir.1994). The court accepted defendants' late-filed answer on August 25, 1998. Defendants were then permitted to amend their answer on September 21, 1998. Neither pleading raised the statute of limitations as an affirmative defense. Nor did defendants assert the statute of limitations in their pretrial statement or trial memorandum filed on September 9, 1998. Accordingly, the defense has been waived by counsel's failure to assert it in a timely fashion.

Even if the defense had not been waived, however, defendants failed to prove it either before or at trial. ERISA does not provide a statute of limitations for actions brought under 29 U.S.C. § 1132(a)(1)(B) to recover benefits or clarify rights to future benefits. Courts therefore apply the most analogous state statute of limitations. See Union Pacific R.R. Co. v. Beckham, 138 F.3d 325, 330 (8th Cir.1998). Federal common law, however, determines when a claim accrues. See id.; Northern Cal. Retail Clerks Unions and Food Employers Joint Pension Trust Fund v. Jumbo Markets, 906 F.2d 1371, 1372 (9th Cir.1990).

The most analogous New Hampshire statute of limitations is that governing personal actions, including breach of contract: N.H.Rev.Stat.Ann. § 508:4, I. See Black Bear Lodge v. Trillium Corp., 136 N.H. 635, 637, 620 A.2d 428 (1993) (contract actions governed by N.H.Rev.Stat.Ann. § 508:4, I); Harrison v. Digital Health Plan, 183 F.3d 1235, 1999 WL 595392, at *3 (11th Cir. Aug. 9, 1999)(noting that "almost without exception, federal courts have held that a suit for ERISA benefits pursuant to section [1132(a)(1)(B) ] should be characterized as a contract action for statute of limitations purposes"). That statute provides a three year limitations period:

*6 Except as otherwise provided by law, all personal actions, except

actions for slander or libel, may be brought only within 3 years of the act or omission complained of, except that when the injury and its causal relationship to the act or omission were not discovered and could not reasonably have been discovered at the time of the act or omission, the action shall be commenced within 3 years of the time the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the injury and its causal relationship to the act or omission complained of.

N.H.Rev.Stat.Ann. § 508:4, I (1997). Generally, a cause of action for benefits under ERISA accrues when a claim for benefits has been formally denied, see Beckham, 138 F.3d at 330, and the employer's appeals process has been exhausted, see Thomas v. Eastman Kodak Co., 183 F.3d 38, 1999 WL 487158, at *10 (1st Cir. July 15, 1999) (contrasting Title VII with ERISA). Nevertheless, some courts have held that "an ERISA beneficiary's cause of action accrues before a formal denial, and even before a claim for benefits is filed, when there has been a repudiation by the fiduciary which is clear and made known to the beneficiary." Beckham, 138 F.3d at 330 (internal quotation marks and brackets omitted). Defendants argue that Plaintiffs' Exhibits 5, 10 and 11 show that plaintiffs were aware of their ERISA claims no later than April, 1993. Restated in terms of Beckham, defendants' argument is that by April, 1993, plaintiffs knew that the bank had repudiated their interpretation of the SERP. Plaintiffs counter that their Exhibits 5, 10 and 11 actually show that the bank was still investigating their claims in 1993, and therefore, no clear repudiation had been communicated to them. The court agrees. Plaintiffs' Exhibit 5 is a memorandum dated April 26, 1993, from Ms. McArdle to Ms. Shea-Seitz reporting on an April 13, 1993,

meeting with the plaintiffs and Mr. Kirk. The memorandum confirms that at the meeting, Ms. McArdle provided the plaintiffs with copies of the 1987 and 1992 SERP-related documents, which would have notified plaintiffs that written documents describing terms contrary to their understanding of the SERP existed. However, the memorandum also states that Ms. McArdle "asked Rick, John and Mike to give [her] some time to research the matter." (Pls.' Ex. 5.) Thus, no clear repudiation of benefits was conveyed to plaintiffs at the April 13, 1993, meeting.

Plaintiffs' Exhibits 10(ID) and 11 are memoranda to Ms. Shea-Seitz from Claps and Lund, respectively, detailing their position regarding their SERP claims, particularly relating what they had been told on April 7, 1988. Both memoranda, written in June of 1993, confirm that plaintiffs had recently been informed that the written SERP documents provided, contrary to their understandings, that to be eligible for benefits, a participant had to be employed by the bank at retirement and could not compete with the bank. However, Ms. Shea-Seitz's very request that plaintiffs prepare the memoranda demonstrates that the bank was still looking into the matter and considering the merits of their claims. The memoranda do not document a clear repudiation of benefits by the bank.

*7 The evidence presented at trial established that plaintiffs were told that the bank would look into the matter and forward the results of its investigation up the chain of command to the Bank of Ireland, where the actual decision regarding SERP benefits would be made. Lund testified that he called Ms. McArdle in early 1994, and was told that the Bank of Ireland did not agree with plaintiffs' position regarding SERP benefits. Although Lund could not recall exactly when that conversation

took place, he testified that it was prior to his receipt of a memorandum from Ms. Shea-Seitz dated March 8, 1994. Thus, the conversation with Ms. McArdle most likely took place before March 7, 1994, which is three years prior to the date of plaintiffs' writ. If that conversation started the limitations period running, plaintiffs' suit would be time-barred.

The court finds, however, that the conversation did not start the limitations period. Accrual of a cause of action under 29 U.S.C. § 1132(a)(1)(B) requires a "clear and unequivocal repudiation of rights under the pension plan which has been made known to the beneficiary." *Daill v. Sheet Metal Workers' Local 73 Pension Fund,* 100 F.3d 62, 66 (7th Cir.1996). Ms. McArdle testified that she believes she told plaintiffs and Mr. Kirk that "the initial response from Bank of Ireland was that they didn't see any merit to what they were talking about." She also stated that although she did not "recall specifically what happened[,][she] would have said to them as to anybody else if you still disagree, then feel free to pursue it either with Terry Forsythe directly or through Jane Shea-Seitz."

Ms. McArdle's informal transmittal of an "initial response" from the Bank of Ireland, accompanied by an explicit invitation to pursue the matter further if dissatisfied, did not constitute a "clear and unequivocal repudiation." *Daill,* 100 F.3d at 66. A plan or insurer that informs a claimant that his benefits have been denied, but that he has a right to appeal, has not clearly and unequivocally repudiated its obligation, and a claimant would not automatically conclude that it had. The initial denial signals to the claimant merely that [he] should appeal, not that [he] should file suit immediately. So long as internal remedies are available to the plaintiff, the possibility remains that the

insurance company or plan will grant the claim-i.e., there has been no final decision and resort to court is premature. *Mitchell v. Shearson Lehman Bros., Inc.,* 1997 WL 277381, at *3 (S.D.N.Y. May 27, 1997); *see also Salcedo v. John Hancock Mut. Life Ins. Co.,* 38 F.Supp.2d 37, 43 (D.Mass.1998)("Time spent in pursuing internal appeals should not be charged to the plaintiff, for there has been no unequivocal repudiation of a plaintiff's right to benefits until the review is concluded."). *But see Patterson-Priori v. Unum Life Ins. Co. of America,* 846 F.Supp. 1102 (E.D.N.Y.1994) (holding that cause of action accrued at time of initial termination of benefits despite notification of right to appeal).

**\*8** The evidence at trial did not conclusively show when the bank "clearly repudiated" plaintiffs' eligibility for SERP benefits. Lund's testimony indicates that unequivocal denial was probably communicated by letter from Attorney Cleveland to plaintiffs' counsel some time after March, 1996.[FN9] In any event, the court finds that clear repudiation was not communicated prior to March 7, 1994. Thus, plaintiffs' suit was timely filed. Defendants' "Motion in Limine" Concerning Statute of Limitations is denied.

FN9. Plaintiffs' counsel indicated at the post-trial motions hearing that he believed the letter was received in November, 1996.

### B. *Defendants' Motion in Limine Concerning Equitable Estoppel Claims Not Pled*

Defendants' second motion in limine argues that plaintiffs should not be permitted at trial to introduce or argue a theory of equitable estoppel because they failed to plead such a claim in their complaint. Plaintiffs counter that under the Federal Rules of Civil Procedure, a complaint need not expressly describe the legal theories on which a claim is based. The court agrees.

The "theory of the pleadings" doctrine, under which a complaint must proceed upon some definite theory and plaintiff must succeed on that theory or not succeed at all, has been all but abolished under the federal rules. Thus, under Fed.R.Civ.P. 8 it is not necessary that a legal theory be pleaded in the complaint if plaintiff sets forth sufficient factual allegations to state a claim showing that he is entitled to relief under *some* viable legal theory. *Fitzgerald v.Codex Corp.,* 882 F.2d 586, 589 (1st Cir.1989) (citations and internal quotation marks omitted). The First Circuit has been especially hesitant to use technical pleading requirements to defeat claims in the ERISA context. *See Degnan v. Publicker Indus. Inc.,* 83 F.3d 27, 30 (1st Cir.1996) ("ERISA is a remedial statute designed to fashion anodynes that protect the interests of plan participants and beneficiaries. Courts should not hasten to employ technical rules of pleading and practice to defeat that goal." (citations omitted)).

Although our court of appeals has not yet decided whether to recognize an ERISA estoppel claim, *see City of Hope Nat'l Med. Ctr. v. Healthplus, Inc.,* 156 F.3d 223, 230 n. 9 (1st Cir.1998), it has noted that the claim "allows recovery upon a showing of (1) a representation of fact made to the plaintiff; (2) a rightful reliance thereon; and (3) injury or damage to plaintiff resulting from a denial of benefits by the party making the representation," *Cleary v. Graphic Communications Int'l Union Supplemental Retirement and Disability Fund,* 841 F.2d 444, 447 (1st Cir.1988). *See also Law v. Ernst & Young,* 956 F.2d 364, 368 (1st Cir.1992) (describing elements of an estoppel claim). Plaintiffs' amended

complaint alleges that the bank represented to plaintiffs that under the terms of the SERP being offered to them they would become vested after ten years of service without having to be employed by the bank until retirement and without having to agree not to compete with the bank. (Compl. at ¶ 10.) The complaint alleges that in reliance on the bank's promises regarding the SERP, plaintiffs refrained from exercising stock options, as desired by the bank, and they remained with the bank through the Bank of Ireland acquisition and until they had completed more than ten years of service, foregoing other job opportunities. (Compl. at ¶ 16.) Finally, plaintiffs allege that they have suffered or will suffer damage as a result of defendants' denial of their eligibility for benefits under the SERP. (Compl. at ¶ 70.) Thus, plaintiffs pled sufficient facts to put defendants on reasonable notice of a potential estoppel claim against them. Defendants' Motion in Limine Concerning Equitable Estoppel Claims Not Pled is denied.

   C. *Defendants' "Motion in Limine" Seeking Order That Plaintiffs' Claims [are] Barred by the Statute of Frauds.*

***9** Defendants' third "motion in limine" FN10 argues that plaintiffs' claims are barred by the statute of frauds and must be dismissed. Specifically, defendants argue that the alleged SERP is a contract that could not by its terms be performed within a year and is therefore unenforceable under N.H.Rev.Stat.Ann. § 506:2 (1997) unless it is "in writing and signed by the party to be charged." Defendants' reliance on N.H.Rev.Stat.Ann. § 506:2 is misplaced. Under 29 U.S.C.A. § 1144(a) (West 1999), the provisions of subchapters I and III of ERISA "supersede any and all State laws insofar as they may now or

hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title." Thus, New Hampshire's statute of frauds is inapplicable to the SERP. *See Ludwig v. NYNEX Serv. Co., 838 F.Supp. 769, 799 n. 47 (S.D.N.Y.1993)* (noting that the court "regards the defendants' affirmative defense of the Statute of Frauds under New York law as being inconsistent with Congress's imprimatur for the courts to develop a federal common law of ERISA"); *cf. Nash v. Trustees of Boston Univ., 946 F.2d 960, 964 (1st Cir.1991)* (assuming, without deciding, "that state law contract principles are preempted under ERISA"). *But see Rockney v. Pako Corp., 734 F.Supp. 373, 382-83 (D.Minn.1988), aff'd, 877 F.2d 637 (8th Cir.1989)*(adopting Minnesota's statute of frauds as the federal rule of decision in an ERISA case to provide alternative basis for granting summary judgment). FN10. The court notes that although this motion is titled a motion in limine, it is actually a motion to dismiss that is untimely under the court's scheduling order.

It does not appear that federal common law would impose a statute of frauds principle in this case. The First Circuit has noted that "Congress specifically contemplated that federal courts, in the interests of justice, would engage in interstitial lawmaking in ERISA cases in much the same way as the courts fashioned a federal common law of labor relations under section 301 of the [Labor-Management Relations Act]." *Kwatcher v. Massachusetts Serv. Emp. Pension Fund, 879 F.2d 957, 966 (1st Cir.1989)*. Interstitial lawmaking is unwarranted, however, where the issue is addressed by the statute itself. *See Bigda v. Fischbach Corp., 898 F.Supp. 1004, 1016 (S.D.N.Y.1995)* (observing that "[t]he

failure of ERISA to provide nonforfeitability coverage to top hat plans is not an 'interstice' " in the statute but purposeful omission). ERISA generally requires an employee benefit plan to be embodied in a written instrument: "Every employee benefit plan shall be established and maintained pursuant to a written instrument."29 U.S.C.A. § 1102(a)(1) (West 1999).FN11 Top hat plans, however, are exempt from this requirement as they are excluded from the portion of ERISA (Subchapter I, Subtitle B, Part 4) that imposes it. *See* 29 U.S.C.A. § 1101(a)(1). Therefore, "top hat agreements can be partially or exclusively oral." *In·re New Valley Corp.,* 89 F.3d 143, 149 (3d Cir.1996). Because the statute itself answers whether a top hat plan must be in writing, the court cannot fashion a federal common law statute of frauds principle that would provide a different answer. *Cf. Bigda,* 898 F.Supp. at 1016 ("Since ERISA intentionally omits top hat plans from its nonforfeitability protection, federal common law may not be used to create nonforfeitability protection under ERISA."). Accordingly, Defendants' "Motion in Limine" Seeking Order that Plaintiffs' Claims [are] Barred by the Statute of Frauds is denied.

FN11. Some courts have concluded that because of the location of the writing requirement within the ERISA statute, a plan need not be written to be enforceable under ERISA. The court in *Donovan v. Dillingham,* 688 F.2d 1367, 1372 (11th Cir.1982)(en banc), for instance, stated:

There is no requirement of a formal, written plan in either ERISA's coverage section, ERISA [§ ] 4(a), 29 U.S.C. [§ ] 1003(a), or its definitions section, ERISA [§ ] 3(1), 29 U.S.C. [§ ] 1002(1). Once it is determined that ERISA covers a plan, the Act's fiduciary and reporting provisions do require the plan to be established pursuant to a written instrument, ERISA [§§ ] 102 and 402, 29 U.S.C. [§§ ] 1022 and 1102; but clearly these are only the responsibilities of administrators and fiduciaries of plans covered by ERISA and are not prerequisites to coverage under the Act. Furthermore, because the policy of ERISA is to safeguard the well-being and security of working men and women and to apprise them of their rights and obligations under any employee benefit plan, see ERISA [§ ] 2, 29 U.S.C. [§ ] 1001, it would be incongruous for persons establishing or maintaining informal or unwritten employee benefit plans, or assuming the responsibility of safeguarding plan assets, to circumvent the Act merely because an administrator or other fiduciary failed to satisfy reporting or fiduciary standards.

The court need not rely on such an interpretation, however, because, as discussed below, ERISA's writing requirement, whatever its scope, does not apply to top hat plans.

### D. *Defendants' "Motion in Limine" Concerning Release of Defendants by Plaintiff Claps.*

**\*10** Defendants' fourth "motion in limine" argues that Plaintiff Claps' claims are barred by the release clause in his severance agreement with the bank. Defendants ask that Claps' claims be dismissed and that they be awarded reasonable costs and attorneys' fees incurred in defending against claims Claps knew were barred. Plaintiffs argue that defendants' motion is procedurally defective because it is an untimely motion to dismiss or for summary judgment and it asserts an affirmative defense not pled in defendants' answer. Plaintiffs also contend that the release does not constitute a valid waiver of Claps'

ERISA benefits.

Release is an affirmative defense, see Fed.R.Civ.P. 8(c), which, if not pleaded, is generally deemed waived, see *Conjugal Partnership v. Conjugal Partnership,* 22 F.3d 391, 400 (1st Cir.1994). "Nevertheless, it is settled that when there is no prejudice and when fairness dictates, the strictures of the raise or waive rule may be relaxed." *Id.* (internal quotation marks and brackets omitted). Defendants argue that there is no prejudice here as Claps, having executed the release, knew of its existence. The position seems unworkable-it would obviate the need to plead release in most cases, as anyone who signs a release must usually be presumed to know, in the absence of fraudulent concealment of the nature of the document being executed, of its existence. Yet the argument also appeals to a sense of fairness, in that one who knowingly releases a claim for valid consideration should of course be held to his bargain.

Case precedent reflects the tension between protecting a litigant's ability to rely on the pleadings and the Federal Rules of Civil Procedure to determine what awaits him at trial on the one hand, and preventing a litigant who knows he has released his claim from exploiting a violation of procedural rules, on the other. Compare *George R. Hall, Inc. v. Superior Trucking Co., Inc.,* 532 F.Supp. 985, 991 (N.D.Ga.1982) (finding prejudice and stating that "[i]n the absence of any meaningful mention of release by [defendant], [cross-claimant] could rely on the absence of release from the case, and could forego any discovery or preparation to meet that defense with the security that any claims of release were precluded") with *Havoco of America, Ltd. v. Hilco, Inc.,* 750 F.Supp. 946, 959 (N.D.Ill.1990), *aff'd sub nom. Havoco of America, Ltd. v. Sumitomo Corp. of America,* 971 F.2d

1332 (7th Cir.1992) (finding no prejudice where, *inter alia,* Havoco had known of the release for fourteen years and "[i]f Havoco failed to anticipate that the defendants might raise the release as a defense at some point, Havoco has only itself to blame"). A number of factors in this case weigh in favor of barring the affirmative defense, including that it was not raised until the eve of trial and that defendants, as successors to the recipient of the release, can arguably be charged with knowledge of its existence as easily as can Claps.[FN12] Nevertheless, the court finds that Claps' obvious knowledge of the release belies any claim of prejudice. The court will not bar assertion of the defense due to failure to plead it in defendants' answer.

FN12. The release was eventually discovered in defendants' files. Defendants' counsel represented to the court that the release was difficult to find because of the changes in ownership of the bank, and that it was not discovered until the weekend prior to trial.

*\*11* Plaintiffs argue that the defense must fail nonetheless because of the best evidence rule. That rule, as embodied in Federal Rule of Evidence 1002, requires that "[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress." Plaintiffs argue that because the severance agreement containing the release was not introduced into evidence, but was merely read in part into the record by defense counsel, its contents may not be proven without violating the best evidence rule.

The court reserved ruling at trial on the admissibility of the severance agreement. Plaintiffs objected to its admission, and to testimony by Claps concerning it, on the basis that it had not been disclosed by defendants

during discovery. Rule 37(c)(1) of the Federal Rules of Civil Procedure provides, in part, that "[a] party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) shall not, unless such failure is harmless, be permitted to use as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed." Rules 26(a) and 26(e)(1), in turn, require the disclosure, and the supplementation of any disclosure, of witnesses and exhibits expected to be used at trial and items requested through permitted methods of discovery.[FN13]

FN13. Federal Rule of Civil Procedure 26(a)(1), requiring automatic initial disclosure of certain materials, is not in force in the District of New Hampshire. See Local Rules of the United States District Court for the District of New Hampshire 26.1(a).

Defendants argue that the severance agreement was not within the scope of any of plaintiffs' discovery requests. Plaintiffs counter that the agreement is a "document[ ] relating in any way to the SERP first described to Plaintiffs in April 1988" sought in their first request for production of documents. The court need not resolve this dispute, as the agreement is certainly an exhibit "the party expects to offer ⋯ [or] may offer [at trial]" if the need arises."Fed.R.Civ.P. 26(a)(3)(C). Thus, under Fed.R.Civ.P. 26(a)(3)(C), defendants were required to provide plaintiffs with at least an identification of the severance agreement no fewer than thirty days before trial. Having failed to do so, defendants are subject to Rule 37(c)(1) sanctions. Plaintiffs rely on Klonoski v. Mahlab, 156 F.3d 255 (1st Cir.1998), to support exclusion of the severance agreement. In Klonoski, the First Circuit noted that Rule 37(c)(1) is "mandatory ⋯ and the required sanction in the ordinary case is

mandatory preclusion." Id. at 269. Rule 37(c)(1) itself, however, contains two limitations on its application that were overlooked in Klonoski.

Under Rule 37(c)(1), the court must first consider whether the party has established "substantial justification" for the failure to disclose and then consider whether the failure to disclose was "harmless." Substantial justification requires justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request. The proponent's position must have a reasonable basis in law and fact. The test is satisfied if there exists a genuine dispute concerning compliance. Failure to comply with the mandate of the Rule is harmless when there is no prejudice to the party entitled to the disclosure. The burden of establishing substantial justification and harmlessness is upon the party who is claimed to have failed to make the required disclosure.

*12 Nguyen v. IBP, Inc., 162 F.R.D. 675, 679-80 (D.Kan.1995). The only justification offered by defendants is that due to changes in ownership of the bank, they were unable to locate the release until the weekend before trial. The court in Klonoski noted, however, that "Rule 26 provides no exception for documents found after discovery deadlines have passed." Klonoski, 156 F.3d at 268. Moreover, defendants have not contended that the release was ever outside of their possession or control, or beyond their ability to recover. Rather, disruptions in record-keeping at the bank apparently made locating its own files difficult. That is not substantial justification. Cf. Lintz v. American Gen. Finance, Inc., 1999 WL 619045 at *6 (D.Kan. Aug. 2, 1999) ("That outside counsel and an in-house paralegal did not know of the

existence of the documents [kept in an investigative file maintained by in-house counsel] until shortly before disclosing them provides insufficient justification to excuse the untimely disclosures.").

The second inquiry under Rule 37(c)(1) is whether the failure to disclose was harmless. The Advisory Committee Notes explain that limitations in the rule are designed "to avoid unduly harsh penalties" in situations such as "the inadvertent omission from a Rule 26(a)(1)(A) disclosure of the name of a potential witness known to all parties." Accordingly, as the Lintz court recognized, in cases of document production "harmlessness would also cover such situations as the inadvertent omission from disclosure of documents known to all parties."Id., 1999 WL 619045 at *6. Defendants have consistently argued that Claps cannot have been prejudiced by their failure to produce the severance agreement when he testified that he remembered signing the agreement and had a copy of it in his files. ( See Tr., 11/13/98, at 86.) The court agrees and finds that defendants' nondisclosure of the severance agreement was harmless. See Lintz, 1999 WL 619045 at *7 (finding nondisclosure harmless as to a plaintiff who "signed the document during her employment with defendants. She knew of its existence and could not have been surprised by its contents."); cf. Breitling U.S.A. Inc. v. Federal Express Corp., 45 F.Supp.2d 179, 183 n. 3 (D.Conn.1999)(declining to exclude unproduced document from consideration under Rule 37(c)(1) when "[t]he plaintiff does not dispute the authenticity of the [document], nor does it claim that it was never provided with the document."); U.S. Axminster, Inc. v. Chamberlain, 176 F.R.D. 532, 534 (N.D.Miss.1997)(finding no prejudice where, inter alia, defendant was

informed of the existence of the undisclosed agreement by the deposition testimony of plaintiff's president). Thus, the severance agreement is admissible and plaintiffs' best evidence argument is moot.

*13 Plaintiffs next argue that the severance agreement is not a valid waiver or release of Claps' rights under the SERP. Plaintiffs argue that the SERP is not mentioned in the severance agreement, that it was not discussed in the negotiations over the severance agreement, and that Claps could not have released his cause of action against the bank at the time he executed the severance agreement because it had not yet accrued.

The validity of a waiver or release of rights in a benefit plan covered by ERISA is governed by federal common law. See Rodriguez-Abreu, 986 F.2d at 587. "To be valid, a waiver of ERISA benefits must be an intentional relinquishment or abandonment of a known right or privilege." Id. In assessing validity, the First Circuit has found the following factors helpful, although not exclusive: "(1) plaintiff's education and business sophistication; (2) the respective roles of employer and employee in determining the provisions of the waiver; (3) the clarity of the agreement; (4) the time plaintiff had to study the agreement; (5) whether plaintiff had independent advice, such as that of counsel; and (6) the consideration for the waiver." Morais v. Central Beverage Corp. Union Employees' Supp. Retirement Plan, 167 F.3d 709, 713 n. 6 (1st Cir.1999).

Claps was, at the time he left the bank, president and chief executive officer of First NH Investment Services. His position involved "working with qualified plans, SERPs and whatnot." (Tr., 11/13/98, at 7.) Thus, Claps was a sophisticated executive, familiar with banking and business in general, and pension

plans in particular. Claps also played an active role in fashioning the terms of his severance agreement. His testimony at trial confirmed that he met with L. Douglas O'Brien, president and CEO of the bank, and "engage[d] in give-and-take bargaining over the terms of [his] separation." (Tr., 11/13/98, at 63 (quoted language is a question by defense counsel).)

Although the severance agreement does not expressly refer to the SERP, its terms are unequivocal. It provides, in part:

In exchange for the salary, benefits, and other consideration provided by this agreement, you agree to release Bank of Ireland First Holdings, Inc. and all of the employees, officers, directors, agents, successors, assigns, and corporate affiliates and subsidiaries of Bank of Ireland First Holdings, Inc. from any and all claims, demands and causes of action of any kind or nature, including but not limited to, claims of discrimination, wrongful discharge or breach of contract, whether known or unknown or suspected or unsuspected, which you now own or hold or have at any time before this owned or held against any of the above.

(Ex. A to Defs.' Mot. in Limine Concerning Release of Defs. by Pl. Claps., ¶ 15.) The agreement also states that it supersedes all prior agreements or understandings between the bank and Claps. It explicitly sets forth the terms under which Claps would continue to participate in identified bank benefit plans such as life, health and dental insurance, the Retirement Plan of Bank of Ireland First Holdings, Inc., and his 401(k) plan, but the SERP is not mentioned. Thus, the severance agreement unambiguously excludes Claps from further participation in the SERP. See *Smart v. Gillette Co. Long-Term Disability Plan,* 70 F.3d 173, 179 (1st Cir.1995)(severance

agreement that listed benefits plaintiff would receive but failed to mention long term disability benefits unambiguously excluded plaintiff from long term disability coverage). In addition, the scope of the release, which covers "any and all claims, demands and causes of action of any kind or nature," is broad enough to cover Claps' claim for benefits under the SERP.

*14 No evidence was presented at trial as to how long Claps had to review the agreement or whether he consulted an attorney or other advisor. With respect to the last factor, the agreement indicates that Claps did receive valuable consideration for the release, including the continuation of his salary and car allowance for a year after termination of his employment, and continued participation in certain bank benefit plans for a specified period of time. Thus, factors 1, 2, 3 and 6 weigh in favor of the validity of the release and factors 4 and 5 are roughly neutral.

Claps also argues that under the terms the severance agreement, he could not release a cause of action that had not yet accrued at the time of the agreement's execution. Although it has not been necessary, or possible, to determine precisely when plaintiffs' cause of action accrued, the court previously noted that it may have been as late as November, 1996, in other words, after Claps executed the severance agreement. Although plaintiffs do not cite authority directly on point, there is some support for their argument. See *Auslander v. Helfand,* 988 F.Supp. 576, 581 (D.Md.1997) (declining to grant summary judgment on the basis of a release that "unambiguously release[d] Defendants from claims arising before the date of the settlement agreement," where Defendants "failed to meet their burden of demonstrating that Plaintiff's [ERISA]

claim accrued before the date of the settlement agreement"). However, more persuasive authority is contrary to plaintiffs' position. Plaintiffs' argument erroneously employs a statute of limitations analysis to determine the scope of Claps' release. The problem with [plaintiffs'] argument is that it mixes up apples and oranges. The statute of limitations starts to run when the plaintiff's cause of action accrues, and accrual occurs either when the plaintiff discovers, or should have discovered, that [he] has been injured. In release cases, the question is not when was the date of accrual, but rather whether the plaintiff is knowingly giving up the right to sue on some claims, or all claims that are in general terms predictable. *Wagner v. Nutrasweet Co.,* 95 F.3d 527, 533 (7th Cir.1996) (citations omitted); *see also Mississippi Power & Light Co., v. United Gas Pipe Line Co.,* 729 F.Supp. 504, 507 (S.D.Miss.1989)(citing case for proposition that "whether a claim exists at the time of execution of a general release, for purposes of determining whether that claim has been released, is a very different question from whether a claim exists in the statute of limitations context"). Thus, whether or not a cause of action has accrued for statute of limitations purposes is not dispositive of whether a claim has been released. "A releasor may relieve the obligor of existing contractual duties and other obligations, even where those obligations have not yet come due and before a claim concerning a breach of those obligations has as yet arisen." *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1540-41 (10th Cir.1993) **\*15** This observation is bolstered by examining the language of the release itself. The agreement releases the bank and related parties "from any and all claims, demands and causes of action of any kind or nature

··· whether known or unknown or suspected or unsuspected, which you now own or hold or have at any time before this owned or held." (Ex. A to Defs.' Motion in Limine Concerning Release of Defendants by Plaintiff Claps.) The inclusion of the terms "claims" and "demands" in addition to "causes of action" indicates that the parties intended the release to cover more than accrued causes of action. *See Vitkus,* 11 F.3d at 1540 (release covered not only causes of action but "existing 'financial obligations'"); *Mississippi Power,* 729 F.Supp. at 507 ("The terms used in the release- 'obligations, demands, rights, claims, right of action, remedies'-clearly evidence an intent to cover something broader than a mere cause of action.").

Where the release covers "claims" in a broader sense than "causes of action," and the relevant question is whether the maker of the release has knowingly and voluntarily waived such a claim, "the critical inquiry is whether the claim or right can be said to exist such that a party is capable of waiving it or preserving it." *Mississippi Power,* 729 F.Supp. at 508. In other words, the question is whether the claim is one "whose facts were well enough known for the maker of the release to frame a general description of it and request an explicit reservation." *Johnson, Drake and Piper, Inc. v. United States,* 209 Ct.Cl. 313, 531 F.2d 1037, 1047 (Ct.Cl.1976).

That test is plainly met in this case. Claps obviously knew at the time he negotiated and signed the release that whether he would receive benefits under the SERP if he left the bank prior to retirement was a matter of ongoing dispute. At trial he conceded that he knew the matter was "an issue on the table" at the time he left the bank. (Tr., 11/13/98 at 62.) Claps could easily have negotiated an exclusion from the release of any claim or right he had in

the SERP, or could have refused to execute the release at all if no exclusion were granted and the matter was of sufficient importance to him. Defendants' "Motion in Limine" Concerning Release of Defendants by Plaintiff Claps is granted to the extent that it seeks dismissal of all Claps' SERP claims.

Defendants' motion also seeks an award of costs and attorneys fees incurred by defendants in defending against Claps' released claims. The court declines to order such an award. Claps' argument that the release did not apply to his unaccrued ERISA claim was not frivolous. Moreover, defendants could have saved themselves virtually all of the costs of litigation had they simply paid attention to this case at its inception, located the release in their own files, and filed a timely dispositive motion.

E. *Defendants' "Motion in Limine" Concerning Attorneys' Fees Not Pled.*

**\*16** Defendants' next "motion in limine" seeks to preclude plaintiffs from recovering attorneys' fees under 29 U.S.C. § 1132(g) because they failed to plead a request for attorneys' fees in their complaint. (Defendants fail to cite any authority supporting their motion.) Courts have split on whether a request for attorneys' fees must be contained in a party's pleadings. *See generally*, *Rural Telephone Serv. Co., Inc. v. Feist Publications, Inc.*, 1992 WL 160890 (D.Kan. June 18, 1992)(collecting cases). One line of cases holds that "[c]laims for attorney fees are items of special damage which must be specifically pleaded under Federal Rule of Civil Procedure 9(g). In the absence of allegations that the pleader is entitled to attorney's fees, therefore, such fees cannot be awarded." *Maidmore Realty Co., Inc. v. Maidmore Realty Co., Inc.*, 474 F.2d 840 (3d

Cir.1973); *see also United Indus., Inc. v. Simon-Hartley, Ltd.,* 91 F.3d 762, 765 (5th Cir.1996)(citing cases that require attorneys' fees to be specifically pled under Fed.R.Civ.P. 9(g) and stating that "[a]s a general rule, ··· we find nothing inappropriate with requiring a party to put its adversaries on notice that attorneys' fees are at issue in a timely fashion or waive that claim."); *In re American Cas. Co.,* 851 F.2d 794, 802 (6th Cir.1988)(noting that attorneys' fees are items of special damage that must be specifically pled); *Atlantic Purchasers, Inc. v. Aircraft Sales, Inc.,* 705 F.2d 712, 716 n. 4 (4th Cir.1983)(same); *Western Cas. and Sur. Co. v. Southwestern Bell Tel. Co.,* 396 F.2d 351, 356 (8th Cir.1968)(same).

A second line of cases holds that Fed.R.Civ.P. 54(c) allows recovery of attorneys' fees even if a claim for them has not been pled. *See Thorstenn v. Barnard,* 883 F.2d 217, 218 (3d Cir.1989); *Engel v. Teleprompter Corp.,* 732 F.2d 1238, 1240-41 (5th Cir.1984); *Klarman v. Santini,* 503 F.2d 29, 36 (2d Cir.1974); *Paliaga v. Luckenbach S.S. Co.,* 301 F.2d 403, 410 (2d Cir.1962). Rule 54(c) provides in part that "[e]very final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings." Although Rule 54(c) contains no express limitation, some courts have restricted its application to situations in which the opposing party will not be prejudiced. *See, e.g., Engel,* 732 F.2d at 1242.

Attempts to reconcile or distinguish these cases have been varied, and the First Circuit does not appear to have addressed the issue at all. The court in *Atchison Casting Corp. v. Dofasco,* 1995 WL 655183, at \*5 (D.Kan. Oct. 24, 1995), however, noted that "[t]he cases citing Rule 54(c) have a common thread: fees

may be awarded where the parties to the action knew or should have known an attorneys' fees award could issue." ERISA unmistakably provides for an award of attorneys' fees and defendants have known from the inception of this action that plaintiffs were asserting ERISA claims, at least in the alternative. Moreover, plaintiffs asserted a claim for attorneys' fees in their pretrial statement, filed on September 9, 1998, more than a month before trial. Thus, defendants knew or should have known that plaintiffs could be awarded attorneys' fees, or, expressing the same conclusion in terms used in *Marshall v. New Kids On The Block Partnership,* 1993 WL 350063, at *1 (S.D.N.Y. Sept. 8, 1993), and *Rural Telephone Serv. Co.,* 1992 WL 160890, at *1, allowing plaintiffs to advance a claim for attorneys fees will not prejudice the defendants. *Cf. Credit Managers Ass'n of So. Cal. v. Kennesaw Life and Accident Ins. Co.,* 25 F.3d 743, 747 (9th Cir.1994)(finding, without discussing either Fed.R.Civ.P. 9(g) or Fed.R.Civ.P. 54(c), that the district court properly considered an ERISA defendant's claim for attorneys' fees not pled in its answer where, *inter alia,* the "pretrial conference order ⋯ put CMA on notice that Kennesaw intended to seek fees if it prevailed at trial"). Accordingly, plaintiffs will not be barred from asserting a claim for attorneys' fees. Defendants' Motion in Limine Concerning Attorneys' Fees Not Pled is denied.

### F. *Defendants' Motion in Limine Concerning Hearsay.*

**\*17** Defendants' next motion in limine seeks to exclude, as inadmissable hearsay, statements about the terms of the SERP made by DeAngelis and Buhl at the April 1988 meeting. *See*Fed.R.Evid. 801. Such statements are not hearsay. DeAngelis and Buhl were particularly

high-level officers of the bank (DeAngelis had primary responsibility for developing and presenting the SERP plan) and were authorized to describe the terms of the SERP at the April 1988 meeting. Thus, their statements are offered against the bank and are "statement [s] by the [bank's] agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship."Fed.R.Evid. 801(d)(2)(D). Defendants' Motion in Limine Concerning Hearsay is denied.

### G. *Defendants' Motion to Amend Answer.*

Defendants have also moved to amend their answer to plead the affirmative defenses of statute of limitations and release. Defendants' ability to assert these affirmative defenses is discussed above in connection with the merits of the defenses. Consistently with the court's rulings above, defendants' motion is granted in part and denied in part: defendants' motion to amend their answer to plead the defense of release is granted, but the motion is denied as to the statute of limitations defense.

### H. *Defendants' Motion to Supplement Pretrial Statement.*

Defendants seek leave to supplement their pretrial statement to substitute JoAnn Swift for Wallace Demary as Keeper of the Records of the bank and to add six exhibits, numbered 12 through 17. Plaintiffs point out that Ms. Swift was not called to testify at trial and that defendants did not seek to introduce their exhibits numbered 13 through 17. Plaintiffs represent that Defendants' exhibit 12 was admitted for a limited purpose by the parties' agreement. Thus, plaintiffs argue, defendants' motion is moot and sanctions should be imposed for

defendants' refusal to withdraw the motion.

The court agrees that whether Ms. Swift's name should be added to the pretrial statement is moot. However, the supplemental pretrial statement also lists Claps' release as an exhibit, which the court has held admissible. Thus, to be scrupulous, defendants' pretrial statement is deemed amended to at least list the release. *See* L.R.16.2 (b)(7)(requiring that a final pretrial statement contain "a list of all exhibits to be offered at trial"). Defendants' Motion to Supplement Pretrial Statement is denied as to listing Ms. Swift and granted as to listing the release and any other exhibits actually admitted at trial.

### I. *Defendants' Motion to Allow Admission of Privileged Document.*

Defendants' final motion seeks admission of a document defendants withheld during discovery on the basis of attorney-client privilege, but later, upon realizing that the privilege did not apply, turned over to plaintiffs. Plaintiffs object, and ask that they be awarded reasonable attorneys' fees incurred in responding to the motion, as defendants refused to withdraw it even after the court sustained plaintiffs' objection to the use of the document at trial. ( *See* Tr., 11/12/98, morning, at 59.) As ruled from the bench at trial, defendants' motion is denied. The parties will bear their own fees related to the motion.

### II. *Decision on the Merits*

**\*18** Having ruled on all pending motions, focus now turns to the merits. Plaintiff Lund (Claps' claims are dismissed) argues that the bank's SERP presentation to participants at the April, 1988, meeting constituted an offer, and he accepted by continuing to work for the bank for the specified time period, thereby forming a binding unilateral contract. *See, e.g., Kemmerer v. ICI Americas Inc., 70 F.3d 281, 287 (3d Cir.1995)*(internal quotation marks omitted)("A pension plan is a unilateral contract which creates a vested right in those employees who accept the offer it contains by continuing in employment for the requisite number of years."). Defendants disagree, saying that the presentation was not a definite offer, but merely a statement of the bank's *intent* to create a SERP at some point in the future. Thus, there was nothing for plaintiff to accept and no unilateral contract could be or was formed. *Cf. Elmore v. Cone Mills Corp., 23 F.3d 855, 862 (4th Cir.1994)*(en banc)(letters sent to employees to keep them "apprised of the proposed developments in their pension plans" in connection with a leveraged buy-out of the employer were "merely preliminary statements of [the employer's] intentions regarding the plan and do not constitute an enforceable plan"); *Carver v. Westinghouse Hanford Co., 951 F.2d 1083, 1087 (9th Cir.1991)*(no ERISA plan created by documents designed to "apprise anxious employees of what they might expect once the transition from several employers to [the consolidated employer] was completed").

The Court of Appeals for this circuit has noted that "a 'plan, fund or program' under ERISA is established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Wickman v. Northwestern Nat'l Ins. Co., 908 F.2d 1077, 1082 (1st Cir.1990)*(quoting *Donovan, 688 F.2d at 1373*)(internal quotation marks omitted). The SERP here meets those requirements. At the April, 1988, meeting, DeAngelis described the SERP's terms in detail.

In fact, DeAngelis unequivocally confirmed at trial that from the description he gave at the meeting, a participant who knew his salary, defined benefit, social security benefit and any other pension benefit available to him could calculate the benefit he would receive under the SERP. (Tr., 11/12/98, afternoon, at 99.) DeAngelis also told the invited attendees who the class of persons eligible to participate in the SERP were. (Tr., 11/12/98, afternoon, at 79.) In addition, he told the attendees that the plan was to be unfunded, so the source of funding would be the bank's general revenues and/or assets. (Tr., 11/12/98, morning, at 18 (testimony of Mr. Lund).)

The final requirement is that procedures for obtaining benefits be ascertainable from the surrounding circumstances. Although there is no evidence that claims procedures were specifically discussed at the meeting, DeAngelis testified that the SERP was intended to be a "mirror plan" to the bank's qualified retirement plan and that he communicated that to the attendees. (Tr., 11/12/98, afternoon, at 54-55.) Thus, the procedure for obtaining benefits could be determined as well, by reference to the bank's qualified plan. ( See Pls.' Ex. 21, Summary Plan Description, dated May 1, 1988, describing plan adopted on January 1, 1985, and containing section entitled "How to Apply for Benefits.") This case, therefore, differs from _Elmore, 23 F.3d at 862,_ in which the purported plan failed the _Donovan_ test because "[t]he only way an employee could ascertain the procedures for obtaining benefits would be to refer to the 1983 [employee stock ownership plan] formal plan document, which was not adopted until" after the representations regarding the purported plan were made. The court finds that under the _Donovan_ test, adopted by the First Circuit in

_Wickman,_ the SERP described and offered to plaintiff in April, 1988, was definite enough to constitute an ERISA plan.

**\*19** Defendants also argue that they cannot be bound by an oral SERP offered to plaintiff in April, 1988, because all parties knew that the SERP was eventually going to be embodied in a formal written document. Defendants rely on _Gel Sys. v. Hyundai Eng'g & Constr. Co., 902 F.2d 1024, 1027 (1st Cir.1990),_ in which the First Circuit noted that under Massachusetts law, "the fact that a writing specifically contemplates the future execution of a formal contract gives rise to a 'strong inference' that the parties do not intend to be bound until the formal document is hammered out." The _Gel Systems_ court also recognized, however, that reference to later execution of a formal document does not automatically compel the conclusion that the initial agreement is not binding. _Id._ The court noted that "[i]f all material terms which are to be incorporated into a future writing have been agreed upon, it may be inferred that the writing to be drafted and delivered is a mere memorial of the contract already final by the earlier mutual assent of the parties to those terms." _Id._ at 1027-28 (internal quotation marks omitted).

As described above, the terms of the SERP were related to plaintiff in detail-there was nothing more for the parties to "hammer[ ] out." _Id._ at 1027. Thus, the court concludes that the contemplated formal document was intended to merely memorialize the already-binding agreement entered into at the meeting. This conclusion is supported by DeAngelis' testimony in response to the following question put by the court: "From your perspective, when you left that room [i.e. the April, 1988, meeting], did the people in that room have a reasonable expectation that there

was a plan, they were going to be participating in it, and the plan as described would be as you described it to them?" (Tr., 11/12/98, afternoon, at 59.) DeAngelis answered: "Sure. I had a reasonable expectation, your Honor. I was a participant in that plan." ( *Id.* at 59-60.)

Defendants next argue that even if a SERP was created by the acceptance of the bank's oral offer at the April, 1988, meeting, that SERP was revoked and superseded by the subsequent 1987 written document describing a SERP with different terms. Defendants cite the "general rule" that top hat plans may be freely amended. See *Amatuzio v. Gandalf Sys. Corp., 994 F.Supp. 253, 265 (D.N.J.1998)*("As a general rule, welfare plans such as severance plans may be freely amended or canceled at any time."); *Carr v. First Nationwide Bank, 816 F.Supp. 1476, 1489 (N.D.Cal.1993)*(noting that rules governing top hat and welfare benefit plans are essentially the same with respect to amendment or termination of a plan). That general rule, however, merely recognizes that ERISA's fiduciary duty standards do not apply to the amendment or termination of a top hat or welfare benefit plan. *Carr, 816 F.Supp. at 1489.* Amendment or termination may nevertheless be precluded by the plan itself, interpreted under general contract law principles. See *id.; Kemmerer, 70 F.3d at 288.*

*20 A top hat plan is a unilateral contract "formed when an employee accepts the employer's offer by performing the requisite number of years of performance." *Benham v. Lenox Sav. Bank, 26 F.Supp.2d 231, 238-39 (D.Mass.1998).* Once that performance has been completed, the employer cannot terminate or amend the plan unless it has explicitly reserved the right to terminate or amend after performance. See *Kemmerer, 70 F.3d at 287-88; In re*

*New Valley, 89 F.3d at 151.* Defendants argue that the bank amended the plan prior to the plaintiff's completion of performance. Specifically, they argue that the SERP was amended no later than February, 1989, when Attorney Cleveland delivered a draft plan document to DeAngelis. The court disagrees. First, defendants have failed to prove that the SERP described in the 1987 document was ever established by the bank's board of directors. Moreover, even if the 1987 written SERP had been established, it was never disclosed to plaintiff until 1993, after he had completed ten years of service with the bank. Plaintiff attempted, with reasonable diligence, to obtain a written description of the SERP, but he was repeatedly told that it had not yet been completed. The court, therefore, holds that the bank did not, by its unilateral action-action not communicated to plaintiff-effectively amend the SERP as to Plaintiff Lund prior to his having vested. See *Bartlett, 38 F.3d at 517* (approving district court's holding that employee "could not be bound to terms of the policy of which he had no notice").

Even if plaintiff could not enforce the SERP as a contract, he would prevail under an estoppel theory. As noted above, the First Circuit has not yet decided whether to recognize an estoppel theory under ERISA. See *City of Hope Nat'l Med. Ctr., 156 F.3d at 230 n. 9.* Other courts, however, have recognized ERISA estoppel claims under varying circumstances. See generally *Black v. TIC Inv. Corp., 900 F.2d 112, 114-15 (7th Cir.1990)*(collecting cases). The court finds estoppel principles particularly applicable in this case, which does not involve any of the concerns that might militate against recognizing estoppel in ERISA cases, namely, risk of impairment of the actuarial soundness of a plan (the plan here is unfunded), see *id.* at 115 (allowing

estoppel claim against an unfunded, single-employer, welfare benefit plan because "there is no need for concern about the Plan's actuarial soundness"), or using oral representations to modify the terms of a written plan (here the oral representations predated any written version of a plan), see *Elmore*, 23 F.3d at 869 (Murnaghan, J., concurring)(advocating recognition of estoppel principles where oral contract existed before the written plan).

*21 Defendants argue that plaintiff nevertheless fails to meet two of the elements of estoppel. First, defendants contend that the representations made here were of future intentions, not present fact, and therefore do not support an estoppel claim. The court disagrees. Defendants rely on DeAngelis' testimony that at the time of the April, 1988, meeting there was not yet a SERP plan in place. While that testimony was somewhat ambiguous- he seemed to be referring to a formal, final, written plan-his testimony nevertheless established that in announcing the SERP to the invited executives, he was communicating that a presently-existing benefit was being conferred. ( See Tr., 11/12/98, afternoon, at 60.) And, there was an obvious reason to do so in that fashion-the bank was particularly interested in making sure that its cadre of senior executives did not leave precipitously while the Bank of Ireland proceeded with its takeover.

Moreover, defendants' argument assumes the strict application of equitable estoppel. Courts have not been clear whether the doctrine applicable in circumstances such as those present here is equitable or promissory estoppel. See generally *Elmore,* 23 F.3d at 867 n. 5 (Murnaghan, J. concurring). The primary difference is the nature of the statement inducing reliance:

"equitable estoppel depends on a misrepresentation of an existing fact, while promissory estoppel requires a promise concerning future intent." *Cossack v. Burns,* 970 F.Supp. 108, 117 (N.D.N.Y.1997)(internal quotation marks and brackets omitted). Otherwise, the doctrines are similar. See *Phelps v. Federal Emergency Management Agency,* 785 F.2d 13, 16 (1st Cir.1986)(Equitable estoppel applies where "one person makes a definite misrepresentation of fact to another person having reason to believe that the other will rely upon it and the other in reasonable reliance upon it acts to his or her detriment."(internal quotation marks omitted)); *Santoni v. Federal Deposit Ins. Corp.,* 677 F.2d 174, 178 (1st Cir.1982)(Doctrine of promissory estoppel provides that "[a] promise which the promissor should reasonably expect to induce action or forebearance on the part of the promissee or a third person and which does induce such action or forebearance is binding if injustice can be avoided only by enforcement of the promise."(internal quotation marks omitted)).

The court finds that even if DeAngelis' description of the SERP should be viewed as a statement of planned future action rather than of existing fact, it was a sufficiently detailed promise, intended to and certainly likely to induce action in reliance by the invited executives, to be enforced under the doctrine of promissory estoppel. See *Santoni,* 677 F.2d at 179 (noting that the "promise must be definite and certain so that the promissor should reasonably foresee that it will induce reliance by the promissee or a third party").

*22 Defendants next argue that plaintiff's estoppel claim fails because any reliance on DeAngelis' statements was unreasonable where plaintiff knew the SERP was to be embodied in a written document. Defendants rely on *Amatuzio* for the proposition

that if employees "know a written plan exists, then it is incumbent upon them to ascertain their rights under that plan and per se unreasonable to rely on any oral representations at odds with its written terms." *Amatuzio,* 944 F.Supp. at 269. The problem with that argument is that while plaintiff undoubtedly knew and expected that a written plan would be prepared, he reasonably expected that the written plan would be true to the bank's oral representation, *and* he did not know of any written document purporting to describe the plan until after he had vested under the oral plan (despite reasonable efforts to get a copy). In fact, when plaintiff sought to obtain a copy of the written plan, he was told that one did *not* exist, in that it had not yet been finalized. Thus, plaintiff's situation is more accurately described in the passage in *Amatuzio* immediately following that cited by defendants: "But if employees do not know that a written plan document exists, and they negotiate for contractually vested benefits, then the employer will not be able to repudiate the contract later by bringing to light a previously undisclosed contractual disclaimer." *Amatuzio,* 994 F.Supp. at 269; *see also Lipscomb v. Transac, Inc.,* 749 F.Supp. 1128, 1135 (N.D.Ga.1990)("While an employer may rely upon a written plan to protect itself from oral modifications and amendments, its agents may not, before producing a written plan, make false representations to employees with regard to coverage, and only after a claim is filed or a relevant event occurs rely upon a later-composed, conveniently inconsistent version of the 'plan' to deny benefits to employees."). The court finds that the bank either represented that the SERP described at the April, 1988, meeting existed, or, promised that it would be created in the future. The bank expected plaintiff to rely on those

representations or promises and plaintiff did reasonably rely by continuing to work for the bank through the Bank of Ireland acquisition and for the requisite number of years, and by foregoing other opportunities. Plaintiff will be injured by loss of vested SERP benefits. Thus, plaintiff satisfies the elements of estoppel, whether articulated as equitable or promissory.[FN14]

FN14. Some courts also require the existence of "extraordinary circumstances" to create an estoppel under ERISA. *See, e.g., Amatuzio, 994 F.Supp. at 271.* To the extent such a requirement may exist here, the court finds that it is satisfied. The representations regarding the SERP were made at the time the bank's executives were informed of the impending acquisition by Bank of Ireland, and were expressly made for the purpose of inducing the executives to stay with the bank through the acquisition, in order to facilitate that acquisition on advantageous terms. Such circumstances are sufficiently extraordinary. *See id.* at 273 (finding extraordinary circumstances "in light of the number and scope of layoffs occurring in the relevant time period and the obvious need for plaintiffs to have accurate and complete information about their severance packages as they faced prospective unemployment").

### III. *Attorneys' Fees*

Under ERISA, the court, in its discretion, may award reasonable attorneys' fees and costs to the prevailing party. *See Cottrill v. Sparrow, Johnson & Ursillo, Inc.,* 100 F.3d 220, 225 (1st Cir.1996); 29 U.S.C.A. § 1132(g)(1)(West 1999). Merely prevailing on an ERISA claim does not, however, under First Circuit precedent, raise a presumption of

entitlement to an award of fees. *See Cottrill,* 100 F.3d at 226. Rather, the court should consider the following factors:

**\*23** (1) the degree of culpability or bad faith attributable to the losing party; (2) the depth of the losing party's pocket, i.e., his or her capacity to pay an award; (3) the extent (if at all) to which such an award would deter other persons acting under similar circumstances; (4) the benefit (if any) that the successful suit confers on plan participants or beneficiaries generally; and (5) the relative merit of the parties' positions.

*Id.* at 225. The list is not exclusive, however. *Id.*

Considering the referenced factors, an award of attorneys' fees and costs to Plaintiff Lund is appropriate. The evidence establishes that the bank, through Ms. McArdle, knew in 1993 that DeAngelis' own recollection of his description of the terms of the SERP to invited attendees of the April, 1988, meeting matched that of the plaintiffs. ( *See* Pls.' Ex. 13.) While not necessarily indicating bad faith on the successor bank's part, that circumstance enhances the bank's culpability in denying Lund's eligibility under the SERP, and highlights the greater merit of Lund's position in this suit. The bank of course has the financial capacity to pay the award, and the award will deter other employers from making and breaking oral promises regarding ERISA benefits as part of an effort to keep critical executives in place while advantageous takeovers are impending.

As the SERP had few participants, the benefit, if any, that Plaintiff Lund's success will confer on others is probably limited. Nevertheless, that factor is easily outweighed by the other four. The court finds that Plaintiff Lund is entitled to recover his reasonable attorneys' fees and costs of this action.

### Conclusion

The result in this case essentially turns on a finding of credibility. The only evidence as to what was said at the April 26, 1988, meeting was the testimony of Lund, Claps, DeAngelis and Kirk. Their accounts were consistent and, particularly when corroborated by each other, credible. The only other attendees of the meeting who testified-Buhl and plan participant Bradford Guile-had very little memory of the meeting. There was conflicting testimony as to what form of SERP the bank's board of directors actually did, or intended to, adopt, although the court notes the absence of testimony from persons who could have shed light on that issue, such as Attorney Kimon Zachos, who actually presented the original concept or design to the board, and other board members. Nevertheless, what plan the board intended to establish, and whether it actually did so, are questions not particularly relevant under these circumstances. An authorized agent of the bank who had actual and apparent authority, communicated the bank's offer of a SERP to plaintiff, describing its terms in a manner about which there is no credible dispute. Plaintiff accepted and reasonably relied on the offer, and completed his performance under the contract. He is, therefore, entitled to have the terms of that contract-the terms that were presented to him-enforced.

**\*24** The following motions are denied: Defendants' Motion in Limine Concerning Statute of Limitations (document no. 53); Defendants' Motion in Limine Concerning Equitable Estoppel Claims Not Pled (document no. 54); Defendants' Motion in Limine Seeking Order that Plaintiffs' Claims [are] Barred by the Statute of Frauds (document no. 55); Defendants' Motion in Limine Concerning Attorneys' Fees Not Pled (document

no. 57); Defendants' Motion in Limine Concerning Hearsay (document no. 58); Defendants' Motion to Allow Admission of Privileged Document (document no. 66).

Defendants' Motion in Limine Concerning Release of Defendants by Plaintiff Claps (document no. 56) is granted to the extent that it seeks dismissal of all Plaintiff Claps' claims and denied to the extent it seeks an award of attorneys' fees and costs. Defendants' Motion to Amend Answer (document no. 59) is granted as to pleading the defense of release and denied as to pleading the statute of limitations. Defendants' Motion to Supplement Pretrial Statement (document no. 61) is denied as to listing Ms. Swift and granted as to listing the release and any other exhibits actually admitted at trial.

The court holds that Plaintiff Lund is entitled to relief, in the form of a declaratory judgment, under contract and estoppel principles. At such time as Plaintiff Lund retires,[FN15] he will be entitled to receive SERP benefits under the terms the court has found were orally described to him by DeAngelis in April of 1988. Plaintiff Lund is also entitled to recover his reasonable attorneys fees and costs of this action. As explained above, Plaintiff Claps is not entitled to benefits under the oral SERP as he released his claims to such benefits in his severance agreement.

FN15. Plaintiff Lund has already reached the eligible age for early retirement.

The foregoing shall constitute the court's findings of fact and conclusions of law required by Fed.R.Civ.P. 52; any requests for findings or rulings not expressly or impliedly granted in this order are hereby denied. See Applewood Landscape & Nursery Co., Inc. v. Hollingsworth, 884 F.2d 1502, 1503 (1st Cir.1989); Morgan v. Kerrigan, 509 F.2d 580, 588 n. 14 (1st Cir.1974). The clerk is instructed to enter judgment on the merits in favor of Plaintiff Lund against Defendants Citizens Financial Group Inc. and Citizens Bank New Hampshire. Plaintiff Claps' claims against Defendants Citizens Financial Group Inc. and Citizens Bank New Hampshire are dismissed. If the parties are unable to agree on reasonable attorneys' fees and costs to which Lund is entitled, plaintiff shall submit a well-supported claim for attorneys' fees and costs within 30 days of the date of this order. Any objection to plaintiff's claim for fees and costs shall be filed within 30 days after the claim is filed.

SO ORDERED.

D.N.H.,1999.

Lund v. Citizens Financial Group, Inc. Not Reported in F.Supp.2d, 1999 WL 814341 (D.N.H.)

# Exhibit 6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

------------------------------------------------

FIREMAN'S FUND INSURANCE     :
COMPANY     :
As Subrogee of     :
David Ryan     :     CIVIL ACTION NO.
777 Marin Drive     :     1:05-CV-10786(NMG)
Novado, California 94998     :
    :
           Plaintiff     :
    :
      v.     :
    :
WHIRLPOOL CORPORATION     :
200 North M-63     :
Benton Harbor, MI  49022     :
    :
         Defendant     :     FEBRUARY 20, 2006

------------------------------------------------

### AFFIDAVIT

The undersigned, Erik Loftus, been duly sworn, and deposed and states:

1.      I am over the age of 18 and believe in the obligation of an oath;

2.      That I am an attorney with the Law Office of Stuart Blackburn located at Two Concorde Way, PO Box 608, Windsor Locks, Connecticut;

3.      That I have been a member, in good standing, of the Bar of the Commonwealth of Massachusetts since October 6, 2003 and have been assigned BBO # 656315;

4.      That I am the lead attorney for the Plaintiff in the matter of Fireman's Fund Insurance Company v. Whirlpool Corporation, ongoing in the United States District Court, District of Massachusetts, with Civil Action Number 1:05-CV-10786 (NMG);

5.      That, on January 11, 2006, I attended the depositions of Stephen Murphy and Benjamin Turnbull in Nantucket, Massachusetts, such depositions notice by and attended by Defendant's counsel Robbie Foster;

6.      That, during the recess between the depositions and after the depositions were complete, I conversed with Attorney Foster regarding the future course of

this case including the Defendant's amenability to mediation and the depositions of the expert witnesses Thomas Haynes and Steven Pietropaolo;

6.      That, at that time, Attorney Foster stated that he was looking forward to the deposition of Steven Pietropaolo as he had recently had the opportunity to depose him in another matter.

Erik Loftus

Subscribed and sworn to before me on this 20th day of Februrary, 2006.

Stuart G. Blackburn
Commissioner Superior Ct.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

------------------------------------------------

FIREMAN'S FUND INSURANCE : 
COMPANY :
As Subrogee of :
David Ryan :                                    CIVIL ACTION NO.
777 Marin Drive :                               1:05-CV-10786(NMG)
Novado, California 94998 :
 :
                        Plaintiff :
 :
        v. :
 :
WHIRLPOOL CORPORATION :
200 North M-63 :
Benton Harbor, MI  49022 :
 :
                        Defendant :          FEBRUARY 20, 2006

------------------------------------------------

## PLAINTIFF'S OBJECTION TO DEFENDANT'S MOTION TO STRIKE EXPERT WITNESSES AND MOTION TO PERMIT LATE RULE 26(a)(2)(B) DISCLOSURE

Plaintiff, Fireman's Fund Insurance Company, by and through its undersigned attorney, hereby objects to the Defendant Whirlpool Corporation's Motion to Strike Plaintiff's Expert Witnesses, Steven Pietropaolo and Thomas Haynes, and submits the following memorandum in support thereof.

The Plaintiff acknowledges that it submitted its expert disclosures 17 days after the scheduling order deadline, but this error was harmless under F.R.C.P. 37(c)(1) and exclusion of the Plaintiff's experts is not the appropriate remedy in light of the circumstances of this case.

## BACKGROUND

On April 12, 2005, the Plaintiff filed a three count complaint against Whirlpool Corporation sounding in product liability stemming from a fire to the Plaintiff's insured's home in Nantucket, Massachusetts.

On July 5, 2005, the Plaintiff filed its F.R.C.P. 26(a) Initial Disclosures in which it identifies Steven Pietropaolo and Thomas Haynes as individuals who possess discoverable information and attached their expert reports. See Plaintiff's Exhibit 1, attached hereto.

On November 10, 2005, the Plaintiff submitted to the Defendant its responses to interrogatories and requests for production.   See Plaintiff's Exhibit 2, attached hereto.  While the Plaintiff did not specifically disclose Steven Pietropaolo and Thomas Haynes as experts in those responses, it did identify both as individuals who were eyewitnesses (interrogatory #2), individuals with knowledge of the product (interrogatory #8), and individuals who performed investigations on the Plaintiff's behalf (interrogatory #26).  In addition, Steven Pietropaolo is mentioned as an individual who has knowledge of the condition of the product (interrogatory #7), and his report was referred to in response to interrogatories regarding defective design of the product (interrogatory #10), defective manufacture of the product (interrogatory #11), defectiveness due to lack of safety features for the product (interrogatory #12), and the product's failure to comply industry standards (interrogatory #13).

In response to requests for production, the Plaintiff indicated that the product and other evidence were located at Steven Pietropaolo's facility

(requests #1, 2). Both Mr. Pietropaolo and Mr. Hayne's expert reports accompanied the responses.

On February 2, 2006, the Plaintiff filed a formal F.R.C.P. 26(a)(2)(B) expert disclosure for both Steven Pietropaolo and Thomas Haynes, containing the basic information required by the rule. The Plaintiff supplemented that disclosure on February 17, 2006, with extensive information regarding the background of each witness. The Defendant's Motion to Strike was filed the same day.

## LEGAL ARGUMENT

It is uncontested that the Plaintiff failed to formally identify its experts by the deadlines set forth in the Court's scheduling order. As correctly noted by the Defendant, Federal Rule of Civil Procedure 37(c)(1) states that "[a] party that without substantial justification fails to disclose information required by Rule 26(a) or Rule 26(e)(1) . . . is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed. In addition to or in lieu of this sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions."

Exclusion of the Plaintiff's experts in this case is not mandatory under Rule 37. Rather, the rule allows for other, less stringent, sanctions when the circumstances warrant such action. For example, in Daugherty v. Fruehauf Trailer Corp., 146 F.R.D. 129, 131 (E.D.Pa. 1993), the court denied the defendant's motion to strike four experts disclosed by the plaintiff six weeks after

the deadline in the scheduling order, but ordered the plaintiff to be responsible for the costs to depose the experts. In this case, preclusion is not the appropriate remedy. When imposing discovery sanctions, the court should consider both the sufficiency of less stringent sanctions and the need for deterrence. See <u>Satcorp Intern. Group v. China Nat. Import & Export Corp.</u>, 917 F.Supp. 271, 277 (S.D.N.Y. 1996), vacated in part, 101 F.3d 3 (1996).

    A.    <u>The Plaintiff's Failure to Disclose its Experts in a Timely Fashion was Unintentional and Innocent and its Experts Should Not Be Excluded.</u>

The Plaintiff's complaint in this matter is, in essence, a product liability action against the Defendant, the manufacturer of a refrigerator alleged to have caused a fire in the Plaintiff's insured's home. In general, product liability actions, especially when alleging a defect within a complex mechanical device, require the testimony of experts in order for the injured party to prevail. In this case, if the Court strikes the Plaintiff's designated experts as requested by the Defendant, it will effectively end its case. Without expert testimony, the Plaintiff will be unable to prove a defect and the Plaintiff will be denied any opportunity for a remedy.

Shortly after the loss, the Plaintiff retained the services of Thomas Haynes to conduct a cause and origin investigation of the fire, and Steven Pietropaolo to inspect the refrigerator alleged to have caused that fire. The Defendant was put on notice of Mr. Pietropaolo's involvement on or before December 15, 2003 and retained experts to participate with Mr. Pietropaolo during the inspection and

4

destructive testing of the refrigerator. See Plaintiff's Exhibit 3 and 4, attached hereto. On July 5, 2005, shortly after the Plaintiff instituted this suit, initial disclosures were made to the Defendant identifying Mr. Haynes and Mr. Pietropaolo as individuals with information concerning the incident as well as copies of both their reports. Plaintiff's Exhibit 1.

On November 10, 2005, after the scheduling conference but prior to any factual depositions, the Plaintiff's responses to the Defendant's Interrogatories and Requests for Production once again identified Mr. Haynes and Mr. Pietropaolo as noted above, and again attached copies of their reports. Plaintiff's Exhibit 2. The Plaintiff did not specifically disclose Mr. Haynes or Mr. Pietropaolo in response to the Defendant interrogatory requesting as much, because factual discovery had barely commenced and it was certainly possible that their final opinions would be affected by deposition testimony. After the relevant depositions, there was no change in their opinions or alterations to the reports that had been delivered to the Defendant twice before.

Beginning towards the close of 2005 and continuing into 2006, undersigned counsel for the Plaintiff has been focused on putting this case into mediation by mid-February, as was recommended by Judge Nicewicz at the scheduling conference. The Defendant has consistently expressed hesitance and ambiguity to this alternative, but did not voice its outright refusal until late January, 2006. Shortly after being informed of this decision and relaying it to the Plaintiff, undersigned counsel began to review the file with an eye towards preparing it for trial. It was at that point that undersigned counsel realized that

the deadline for formal expert disclosure had passed on January 16, 2006. Formal expert disclosures were filed immediately after the expired deadline was noted, on February 2, 2006.

The Plaintiff's failure to file a timely expert disclosure was due to the oversight and neglect of undersigned counsel. As such, the Plaintiff prays the Court will sustain its objection to the Defendant's motion or, in the alternative, choose a less disastrous sanction as it is allowed to do under Rule 37(c)(1). Considerations of fair play may dictate that the court eschew the harshest sanctions provided by this rule where failure to comply with discovery requirements is due to mere oversight of counsel amounting to no more than simple negligence. Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp., 602 F.2d 1062, 1068 (C.A.N.Y. 1979).


B.    Plaintiff's Failure to Disclose its Experts in a Timely Fashion is Harmless Under Rule 37(c)(1).

With the exception of the Plaintiff's tardy disclosure of its expert witnesses, this case has not deviated from the original scheduling order. Neither party has filed a motion to extend or continue the scheduling order. Assuming the Plaintiff's experts are allowed to testify, there are no foreseeable grounds for a dispositive motion on either side. The parties' anticipated future holds only the disclosure and depositions of their respective experts. The trial is not scheduled to commence until October 2, 2006. As such, there is no discernable prejudice to the Defendant's case by the Plaintiff's untimely disclosure, and the violation is harmless under Rule 37(c)(1).

Rule 37(c)(1) allows an exception to the harsh sanction of exclusion when the failure to timely disclose is "harmless." There has been no definitive standard for application of that portion of the rule, and the appellate courts have consistently ruled that the determination of the imposition of sanctions under Rule 37 is within the discretion of the trial court. Boardman v. National Medical Enterprises, 106 F.3d 840, 843 (C.A.Mo. 1997).

Despite the lack of clear guidelines, the court in Lund v. Citizens Financial Group, Inc., 1999 WL 814341 (D.N.H. 1999), determined that a party's failure to disclose will rise to the level of harmless when the undisclosed information was known to all parties. Plaintiff's Exhibit 5, attached hereto. As previously noted, the Defendant was on notice of Mr. Pietropaolo's involvement long before the instant suit was initiated. The Defendant was again put on notice of Mr. Pietropaolo's involvement, as well as Mr. Haynes, by virtue of the Plaintiff's initial disclosures and responses to written discovery. Indeed, the final expert reports formally disclosed by the Plaintiff were identical to those previously delivered to the Defendant twice. Additionally, undersigned counsel for the Plaintiff and Defendant's counsel, Robbie Foster, tentatively discussed the forthcoming depositions of Mr. Pietropaolo and Mr. Haynes during the January 11, 2006, depositions of Stephen Murphy and Benjamin Turnbull. Attorney Foster specifically stated that he was looking forward to deposing Mr. Pietropaolo as he had recently done so in another case. See Affidavit of Erik Loftus, attached hereto as Exhibit 6.

In its Motion to Strike Plaintiff's Expert Witnesses, the Defendant states that it "justifiably believed that Plaintiff would designate experts, if any by the expert disclosure deadline. Based on the Plaintiff's pledge to designate experts in accordance with the scheduling order and Plaintiff's failure to designate experts by January 13, 2006, Whirlpool was surprised when it received Plaintiff's expert designations almost three weeks after the deadline." In light of the aforementioned discussion and document exchange, this statement is not convincing. The Defendant clearly knew the identity and opinions of the Plaintiff's experts, and it is unreasonable to believe that the untimely formal disclosure altered their defense in the least.

Disregarding the Defendant's actual knowledge of the Plaintiff's experts for the moment, several courts have formulated a multi-prong standard for determining whether a discovery rule violation is harmless. See Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co., 170 F.3d 985, 993 (10th Cir. 1999); see also David v. Caterpillar, Inc., 324 F.3d 851, 857 (C.A.Ill. 2003). The David court enunciated the following factors that "should guide the district court's discretion: (1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." Id. (interpreting Bronk v. Ineichen, 54 F.3d 425, 428 (7th Cir. 1995).)

With respect to these factors, the Plaintiff has demonstrated that the Defendant has not been prejudiced or surprised by the untimely expert

disclosure.  While the Defendant has made no overt claim of prejudice in its brief, any possible prejudice incurred by the Defendant was cured by the Plaintiff's subsequent filing of its formal expert disclosure.  The Plaintiff is ready to produce its experts for deposition and will do everything in its power to produce them on dates convenient for Defendant's counsel.  Further, the Plaintiff would not object to any extension of the Defendant's expert deadlines, the extension of which would not have any bearing on the trial readiness of the matter.  Finally, the Plaintiff did not act in bad faith in failing to disclose its experts by the scheduling order deadline.  The Plaintiff did identify its experts and twice provided the Defendant with copies of their reports.  The Defendants have made no allegations of bad faith with respect to the untimely disclosure, and the Plaintiff has not benefited in any way from its violation.

The circumstances before the Court do not involve any underhandedness by the Plaintiff to attempt to gain an advantage over the Defendant.  This is not a situation where disclosure was made just prior to trial, long after the deadline expired.  See Miksis v. Howard, 106 F.3d 754 (C.A.Ind. 1997); see also Semi-Tech Litigation LLC v. Bankers Trust Co., 219 F.R.D. 324 (S.D.N.Y. 2004).  In the cited cases, it is clear why exclusion of the expert testimony was necessary in the interests of fairness.  However, the present case is not analogous.  The present case is not scheduled for trial for close to eight months, and there was no disclosure of any information which the Defendant has not had possession of for the past seven months, beyond additional background information.

9

Undersigned counsel's oversight is not easily forgivable, especially by undersigned counsel. My failure to follow the court's order was tantamount to failing to give the order the respect it deserved. I will take this opportunity to offer my apologies to the Court and opposing counsel for this violation. Without downplaying the seriousness of the discovery violation, exclusion of the Plaintiff's experts is not the appropriate sanction in this situation.

In the event that the Court finds that the late disclosure was not harmless, which is certainly within its discretion, the result would be the effective termination of the Plaintiff's legal remedy. Rule 37(c)(1) does not mandate exclusion, but provides for exceptions for harmlessness and alternate sanctions which, according to the advisory notes to the 1993 Amendment, were inserted into the rule to avoid the "harsh penalties" the rule would otherwise provide in a variety of situations. The Plaintiff prays the Court finds that this is a situation where the harsh penalty of exclusion is not warranted.

## CONCLUSION

Based on the foregoing, the Plaintiff humbly requests this Court to deny the Defendant's Motion to Strike the Plaintiff's Experts, or, in the alternative, impose alternative sanctions as allowed by Rule 37(c)(1) which will permit the experts to testify.

10

THE PLAINTIFF,


By: /s/ Erik Loftus
Erik Loftus, Esq.
Law Offices of Stuart G. Blackburn
Two Concorde Way
P. O. Box 608
Windsor Locks, CT  06096
860-292-1116
Fed. Bar No.:  CT25168

## CERTIFICATION

This is to certify that the foregoing OBJECTION TO DEFENDANT'S MOTION TO STRIKE PLAINTIFF'S EXPERTS was mailed, postage prepaid, first class mail, this 20th day of February, 2006 to the following:

Steven M. Key, Esq.
Campbell Campbell Edwards & Conroy
One Constitution Plaza, Third Floor
Boston, MA  02129

Robert W. Foster, Jr., Esq. (pro hac vice counsel)
Nelson Mullins Riley & Scarborough LLP
1320 Main Street, 17th Floor
Columbia, SC  29201


　　　　　　　　　　　　　　 /s/ Erik Loftus
　　　　　　　　　　　　　　　　　Erik Loftus, Esq.